**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, for the Use and Benefit of GREENMOOR, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | Civil Action No. 06-cv-0234 |
| v. | ) ) | Magistrate Judge Cathy Bissoon |
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, and BURCHICK CONSTRUCTION COMPANY, INC., | ) ) ) ) ) | |
| Defendants. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### INTRODUCTION

This is a breach of contract action arising out of the renovation of the Moorhead Federal Building in Pittsburgh, Pennsylvania.  The action is brought by the asbestos abatement subcontractor, Greenmoor, Inc.,[1] against the general contractor on the project, Defendant Burchick Construction Company, and its surety, Travelers Casualty and Surety Company of America (collectively, "Defendants").

### FINDINGS OF FACT

Having conducted a bench trial in the above-captioned case, the Court now enters these findings of fact and conclusions of law.[2]

---

[1]    Greenmoor has brought this action in the name of the United States of America for its use and benefit because it seeks to recover on a federal contract under the Miller Act, 40 U.S.C. § 3131, et seq.,

[2]    The trial transcript in this case has been filed under separate docket numbers.

# I.   BACKGROUND

## A.   The Parties and Other Entities

1.   Plaintiff/Counter-Defendant Greenmoor, Inc. ("Greenmoor"), is a licensed asbestos abatement contractor.  (2/2/09 Tr. (Doc. 109) at 52, 58-60 (Dellovade); Joint Ex. 1, Joint Stipulation of Uncontested Facts ("Jt. Ex.") at ¶29).  Mr. Fred Dellovade is the owner and President of Greenmoor.

2.   Defendant/Counter-Plaintiff Burchick Construction Company ("Burchick") is a Pittsburgh-based general contractor engaged in the construction of various types of commercial, institutional and governmental projects. (3/30/09 Tr. (Doc. 124) at 6-9, 12 (Burchick).) Mr. Joseph Burchick is the owner and President of Burchick.

3.   Defendant Travelers Casualty and Surety Company of America ("Travelers"), served as the surety on the Moorhead Federal Building Renovation Project ("Moorhead Project"), and issued the performance and payment bonds for Burchick, as principal.  (Jt. Ex. 1 at ¶ 27; Pl. Ex. 19.)

4.   United States Surety Company ("US Surety") served as Greenmoor's surety on the Moorhead Project and issued the performance and payment bonds for Greenmoor.

5.   The United States General Services Administration (the "GSA") was the owner of the Moorhead Project.  Mr. Mark Lewandowski was the chief contracting officer for the GSA.

6.   URS Corporation ("URS") was the construction manager on the Moorhead Project.

7.   Gobbell Hays Partners, Inc. ("Gobbell Hays") was the asbestos abatement expert for the Moorhead Project.  Gobbell Hays prepared the specifications for the Moorhead Project as they related to asbestos.  (3/30/09 Tr. at 75 (Burchick).)

### B.    The Moorhead Federal Building Renovation Project

8.    The Moorhead Federal Building, located at the corner of Liberty and Grant Streets in Pittsburgh Pennsylvania, is a twenty-five story office complex with two basement levels, totaling approximately 780,000 gross square feet of floor space.  (Jt. Ex. 1 at ¶ 2.)

9.    In January of 2003, the United States General Services Administration (the "GSA") issued a bid solicitation for the renovation of the Moorhead Federal Building.  (Jt. Ex. 1 at ¶1.)

10.    Work on the Moorhead Project consisted of interior renovation, replacement and upgrades to the architectural, mechanical, plumbing, fire protection, telecommunications and electrical systems of the building.  The scope of the Moorhead Project virtually required a complete replacement of the plumbing, HVAC, electrical and similar systems within the building.  (Jt. Ex. 1 at ¶ 3; 3/30/09 Tr. at 21, 25-26 (Burchick).)

11.    The Moorhead Project included the reconfiguration of the interior space and the replacement and/or upgrade of interior finishes in the building.  (Jt. Ex. 1 at ¶ 4.)

12.    The Moorhead Project contained large quantities of asbestos and asbestos containing materials (collectively, "ACM") within the fireproofing materials, insulation, floor tile, and in other interior areas.  (Jt. Ex. 1 at ¶ 10.)

13.    Work in various areas was to be prosecuted while other areas of the building were occupied by the building tenants.  (Jt. Ex 1 at ¶ 5.)

14.    To accommodate this situation, the Moorhead Project was divided into five phases spanning nearly five years.  (Jt. Ex 1 at ¶ 6.)  In general, the phases represented different floors within the existing building, each of which required varying levels of work.  Id.

15.     Phase I included floors 21 through 25; Phase II included floors 19 and 20; Phase III included floors 12 through 18; Phase IV included both basement levels and floors 1 through 6; and Phase V included floors 7 through 11.  (Pl. Ex 17 at GR 2083-2084.)

16.     At the commencement of each phase, the adjacent floors to be completed during the phase would be vacated.  (Jt. Ex 1 at ¶7.)  Following completion of each phase, from demolition and abatement through renovation, there was a brief interim period during which the tenants would return to the new space.  (Jt. Ex 1 at ¶8.)

17.     In addition to the work done on the floors vacated during each phase, certain activities had to be completed out of sequence, i.e., on floors that were not vacated for a given phase, in order to accommodate the continuous operation of the building infrastructure, such as the plumbing and mechanical systems.  (Jt. Ex. 1 at ¶ 9.)

18.     GSA issued a set of specifications and comprehensive schematic drawings, or plans, to identify the general scope of work to be done on each floor.  (Jt. Ex. 1 at ¶ 12; Pl. Ex. 17 (hereinafter, the "Specifications").

19.     The Specifications were contained in three volumes, with the first volume primarily directed to architectural demolition and asbestos abatement.  (Jt. Ex. 1 at ¶ 14; Pl. Ex. 17.)

20.     The schematic drawings or plans addressed the work that had to be done to prepare each floor for renovation and were divided into two sets.  (Jt. Ex. 1 at ¶14; Pl. Ex. 6.)

21.     One set of drawings or plans were the architectural demolition drawings ("AD drawings"), which established the scope of the demolition work necessary to remove existing structures (walls, partitions, etc.) so that future renovation could take place.  (Jt. Ex. 1 at ¶ 14; Pl. Ex. 6.)

22.     The other set of drawings or plans were the hazardous material drawings ("H Drawings").  The H Drawings established the scope of asbestos abatement on each floor, including removal of spray-on fireproofing material, vinyl asbestos tile, and textured plaster ceilings.  (Jt. Ex. 1 at ¶14; Pl. Ex. 6.)

### C.     Asbestos Abatement

23.     Asbestos abatement was the most critical activity to the project schedule as other work could not proceed until the abatement work was completed.  (Def. Ex. 183.)

24.     The abatement and handling of asbestos and asbestos-containing material is heavily regulated by the United States Environmental Protection Agency ("EPA"), the Occupational Safety and Health Administration ("OSHA"), the Pennsylvania Department of Environmental Protection ("DEP") and the Allegheny County Health Department ("ACHD").

25.     OSHA has instituted a classification system to classify work in construction based on the potential or possibility of exposure to asbestos.  (Pl. Ex. 653 at 1-15, Bates No. P653-029-030.)  There are four classes of work, with Class I work providing the potential for the highest asbestos exposure and Class IV work providing the potential for the least exposure.  Id.

26.     The asbestos abatement work that was to be completed on the Moorhead Project was Class I asbestos work.  (1/30/09 Tr. at 182-83 (B. Shaffer).)

27.     Class I asbestos work consists of "activities involving the removal of sprayed-on or trowled-on SMs and TSI materials."[3]  (Pl. Ex. 653 at 1-15, Bates No. P653-029-030.)  "OSHA has found that SMs and TSI materials have the highest likelihood of releasing fibers when

---

[3]     "SMs" refers to asbestos-containing surface materials.  SMs "were often sprayed on ceiling surfaces to alter sound acoustics or troweled on structures for fireproofing purposes."  "TSI" refers to thermal system insulation.  TSI materials "were often used for insulation purposes" and, as such, were applied to "pipes, fittings, boilers, breeching, tanks, ducts, and other structural components to prevent heat loss or gain."  (Pl. Ex. 653 at 1-8, Bates No. P653-022.)

disturbed.  For this reason, **OSHA requires rigorous control methods when performing this type of work**," e.g., Class I asbestos work.  Id. (emphasis added).

28.    Asbestos abatement may only be performed by licensed or certified abatement contractors.  (2/2/09 Tr. at 64-65 (Dellovade); 3/30/09 Tr. at 13 (Burchick); Pl. Ex. 20).)

29.    Greenmoor is a licensed asbestos abatement contractor and has been so licensed since its inception in 1990.  (2/2/09 Tr. at 63-64 (Dellovade).)

30.    Burchick is not, nor has it ever been, licensed or certified as an asbestos abatement contractor.  (3/30/09 Tr. at 68 (Burchick).)

31.    Asbestos abatement is performed in "containment," the set-up of which is one of the first steps in the abatement process.  (Jt. Ex. 1 at ¶ 33.)

32.    A containment is intended to isolate the area from which the asbestos is being removed from the remainder of the building.  (Jt. Ex. 1 at ¶ 34.)

33.    Generally, plastic sheeting, called "poly," is placed over all of the outside walls of the floor.  (Jt. Ex. 1 at ¶ 35.)

34.    Thick rubber sheeting, called "EPDM", is rolled across the entire floor and up the walls, and each sheet is overlapped and sealed to prevent water (which is required in removing spray-on fine resistant material ("SOFRM")) from escaping from the containment.  (Jt. Ex. 1 at ¶ 36.)

35.    In addition, any heating, ventilating and air conditioning ("HVAC") vents or other ductwork penetrating the ceiling, through which asbestos fibers might escape, are sealed with poly and duct tape.  These seals are called "criticals."  (Jt. Ex. 1 at ¶ 37.)

36.     The contractor that is licensed to perform asbestos abatement – in this case, Greenmoor – is responsible for the custody and control of the containment.  (3/31/09 Tr. (Doc. 125) at 129 (Sekowski).)

37.     The Specifications for the Moorhead Project as to the procedures to set up containments were "over and beyond" the industry standards.  (2/4/09 Tr. (Doc. 111) at 103-04 (Mlecsko).)

38.     Prior to construction of the containment and decontamination units or areas, negative air machines or, "NAMs," are placed into the containment area and operated.  NAMs are referred to in a variety of ways, including air filtration units ("AFUs"), air filtration devices ("AFDs"), and the asbestos jargon term "hogs."  (Jt. Ex. 1 at ¶ 52.)

39.     NAMs are intended to draw a vacuum into containment, thereby directing the flow of air into, rather than out of, containment.  (Jt. Ex. 1 at ¶ 53.)

40.     Under applicable regulations, the negative pressure, or negative air, inside containment is measured by a device called a manometer.  NAMs filter the air through special asbestos abatement filters called "HEPA" filters, which are 99.97% effective at removing asbestos fibers that are 0.3 microns in diameter.  (Jt. Ex. 1 at ¶ 54.)

41.     The filtered air is then exhausted from the NAMs through a flexible plastic tube, called a "flex duct," and out of the building through blanks installed in three windows on the floor.  (Jt. Ex. 1 at ¶ 55.)

42.     The integrity of the containment, and primarily the criticals, is often checked using a "smoke test."  (Jt. Ex. 1 at ¶ 57.)

43.     Once containment has been constructed and the NAMs become sufficiently operational to achieve the required negative pressure, gross abatement or removal of asbestos may commence.  (Jt. Ex. 1 at ¶ 59.)

44.     This is typically done by adequately wetting the material (as required by the applicable regulations), and scraping or power-washing the ACM from the steel deck.  (Jt. Ex. 1 at ¶ 60.)

45.     The waste material is placed into plastic bags, called "poly bags" and then transported through the equipment decon, down the freight elevator, and placed into a dumpster that is ultimately hauled to a permitted asbestos disposal facility.  (Jt. Ex. 1 at ¶ 61.)

46.     Once abatement is complete, the area is subject to an inspection by URS and then the ACHD to ensure that the work was properly completed.  If ACHD certifies the floor as abated, the abatement work is completed and construction may begin.  (Jt. Ex. 1 at ¶ 62.)

### D.     The Role of URS Corporation In The Asbestos Abatement Work

47.     GSA retained URS Corporation ("URS") to be the construction manager on the Moorhead Project.  (Jt. Ex. 1 at ¶15.)  URS is a nationally-recognized construction management company and acted as an extension of GSA's staff to monitor and manage the project for the GSA or, stated simply, GSA's "eyes and ears" on the Moorhead Project.  (3/31/09 Tr. at 44 (Sekowski), 137-38 (M. Lewandowski).)  Mr. David Sekowski was the individual URS employee responsible for reporting to the GSA on a day-to-day basis.  (3/31/09 Tr. at 138 (M. Lewandowski).)

48.     In turn, URS, pursuant to an interoffice agreement, retained the Industrial Hygiene division of URS ("URS-IH") to monitor and inspect the asbestos abatement work throughout the Moorhead Project.  (3/31/09 Tr. at 42 (D. Sekowski); Jt. Ex. 1 at ¶16.)  URS-IH

primarily was responsible for conducting air monitoring inside and outside the areas where asbestos was being abated to confirm that abatement was proceeding in such a way that asbestos fibers remained within acceptable levels as provided in the specifications.  (3/31/09 Tr. at 43 (Sekowski); Jt. Ex. 1 at ¶16.)  In addition, URS-IH was to assist URS in ensuring that contract requirements were being followed.  (3/31/09 Tr. at 43 (Sekowski).)

49.     Much of Burchick's contact with the GSA was through URS.  (3/31/09 Tr. at 44 (Sekowski), 207-08 (Finney).)

50.     URS was involved in the day-to-day inspection of the asbestos work.  (3/30/09 Tr. at 199 (Burchick).)

51.     URS-IH inspectors would report either directly to Mr. Sekowski or to John Reiger, a URS-IH employee, who then would relay those reports to Mr. Sekowski.  (3/31/09 Tr. at 44 (Sekowski).)

52.     URS did not make any recommendation as to what abatement subcontractor Burchick used.  (3/31/09 Tr. at 105.)

53.     Because URS was acting on behalf of the GSA, consistent with GSAR 552.236-71, Burchick was obligated to follow URS's instructions and/or contractual interpretations on the Moorhead Project.  (3/31/09 Tr. at 61; Pl. Ex. 15.)

54.     GSAR 552.236-71, which is entitled "Authorities and Limitations," provides as follows:

> (a)  All work shall be performed under the general direction of the Contracting Officer, who alone shall have the power to bind the Government and to exercise the rights, responsibilities, authorities and functions vested in him by the contract documents, except that he **shall have the right to designate authorized representatives to act for him**.  Wherever any provision of this contract specifies an individual (such as, but not limited to, Construction Engineer, Resident Engineer, Inspector or Custodian) or organization,

whether Government or private, to perform any act on behalf of or in the interests of the Government, that individual or organization shall be deemed to be the Contracting Officer's authorized representative under this contract but only to the extent so specified.  The Contracting officer may, at any time during the performance of this contract, vest in any such authorized representative additional power and authority to act for him or designate additional representatives, specifying the extent of their authority to act for him; a copy of each document vesting additional authority in an authorized representative or designating an additional authorized representative shall be furnished to the Contractor.

(b)  The Contractor **shall perform the contract in accordance with any order (including but not limited to instruction, direction, interpretation, or determination) issued by an authorized representative** in accordance with his authority to act for the Contracting Officer; but the Contractor assumes all the risk and consequences of performing the contract in accordance with any order (including but not limited to instruction, direction, interpretation, or determination) of anyone not authorized to issue such order.

(Pl. Ex. 15; Def. Ex. 33 at BCCI 2212) (emphasis added).

55.     The GSA, i.e., the Contracting Officer, retained URS to act as the Construction Manager on the Moorhead Project.  Therefore, it follows that under GSAR 552.236-71(a), URS is the entity authorized or specified "to perform any act on behalf of or in the interests of the Government" and is the GSA's "authorized representative."  Id.

56.     Under GSAR 552.236-71(b), URS can issue an order, "including but not limited to instruction, direction, interpretation, or determination."  Id.

57.     An obligation, such as that outlined in GSAR 552.236-71, to follow the interpretations, directions, and instructions of the owner's representative, i.e., URS, is typical in the industry.  (4/3/09 Tr. (Doc. 128) at 42-43, 48 (Varga); Def. Ex. 476.)

II.     **THE BID PROCESS AND THE AGREEMENTS BETWEEN THE PARTIES**

    A.     **The Bid Process**

58.     In January 2003, Burchick responded to a Solicitation to Bid issued by the GSA for the Moorhead Project. (Jt. Ex. 1 at ¶ 17; 3/30/09 Tr. at 16, 177 (Burchick), 210-11 (Huber).) Burchick was among the many construction firms bidding for the entire project as a general contractor. (Jt. Ex. 1 at ¶ 18.)

59.     Although the GSA designed the Moorhead Project to be performed in the five phases set forth above, it was always contemplated that a single contract between the GSA and the successful bidder would be utilized to cover the entire Moorhead Project. (3/30/09 Tr. at 31-32, 170 (Burchick).)

60.     Burchick submitted Technical and Price proposals to the GSA, explaining its qualifications, experience, pricing and plans for the sequencing and means and methods of carrying out the work on the Moorhead Project.  (Jt. Ex. 1 at ¶ 20; 3/30/09 Tr. at 16-18, 21 (Burchick); Def. Ex.  21; Pl. Ex. 218.)

61.     To prepare the proposals it submitted to the GSA, Burchick prepared quantity take-offs to estimate costs for the work it would perform itself.  Burchick also solicited bids from subcontractors for those portions of the work that it anticipated would be performed by others. (Jt. Ex. 1 at ¶ 21; 3/30/09 Tr. at 19 (Burchick).)

62.     For nearly the next year, Burchick participated in the bid process, which required the company to submit, *inter alia*, Technical Proposals delineating not only past experience, but the manner in which the work would be performed, which included work that Burchick would perform and work that subcontractors would perform.  (Jt. Ex. 1 at ¶ 22.)

63.     Also in this process, Burchick identified subcontractors with whom it sought to work or "team" for several portions of the Moorhead Project, including the asbestos abatement

portion of the Moorhead Project.  Burchick contacted and began discussions with Greenmoor about the Moorhead Project in an effort to include Greenmoor on Burchick's "team" (which included Burchick's other major subcontractors) for purposes of planning and bidding on the Moorhead Project.  (3/30/09 Tr. at 19-20, 213-215 (Burchick).)

64.     Burchick sought to enter into contracts with subcontractors that covered the entire Moorhead Project, i.e., each contract that a subcontractor might enter into would cover all of the work to be performed by that subcontractor on the entire Moorhead Project.  (3/30/09 Tr. at 35-36 (Huber); 3/30/09 Tr. at  226-227 (Huber).)

65.     Greenmoor agreed to team with Burchick as one of Burchick's major subcontractors during the planning and bidding phase.  (3/30/09 Tr. at 18-19 (Burchick).)

66.     Burchick issued multiple invitations to bid to selected subcontractors being considered for services on the Moorhead Project, including Greenmoor.  (Jt. Ex. 1 at ¶ 23; 3/30/09 Tr. at 18-19 (Burchick).)

67.     In October 2003, Burchick issued to Greenmoor a formal invitation to bid.  (Jt. Ex. 1 at ¶ 24.)

68.     By letter dated October 13, 2003, Burchick notified Greenmoor that Burchick required "a payment and performance bond in the full amount of your contract value for the [Project]."  (Def. Ex. 11; 3/30/09 Tr. at 221-22 (Huber).)

69.     Greenmoor provided to Burchick a final lump sum bid for all of the asbestos abatement on the Moorhead Project, inclusive of Phases I through V.  (2/3/09 Tr. at 113-114 (Dellovade); 3/30/09 Tr. at 226 (Huber); Def. Exs. 22, 22a; Pl. Ex. 22.)

70.     At no time did Greenmoor ever give Burchick a price for anything less than all of the asbestos abatement work on the Moorhead Project, nor did any of Burchick's subcontractors

ever provide a price for anything less than the entirety of their respective scopes of work on the overall Moorhead Project.  (3/30/09 Tr. at 226-27 (Huber); Def. Exs. 16, 22, 22a; Pl. Ex. 22.)

71.    GSA awarded the contract for the entire Moorhead Project in the original principal amount of $53,817,607.00 to Burchick on March 15, 2004.  (Jt. Ex. 1 at ¶ 25; Pl. Ex. 16.)  As a result, Burchick became the general contractor for the Moorhead Project.

72.    The contract between Burchick and the GSA consisted of the GSA solicitation, Burchick's offer, and the written award.  Consequently, the contract between Burchick and the GSA included the specifications, the drawings and also the Federal Acquisition Regulations ("FARs") included in the solicitation as GSA Form 3506, Construction Contract Clauses.  (Pl. Ex. 15 at GR 3631, GR 3635.)

### B.    The Subcontract Agreements Between Burchick and Greenmoor

73.    On or about April 1, 2004, Burchick provided to Greenmoor a letter of intent to enter into a subcontract with Greenmoor.  (Def. Ex. 25 ("Letter of Intent").)  In the Letter of Intent, Burchick set forth Greenmoor's scope of work and the contract price for that work and indicated that a "complete contract" would be forthcoming:

> Please consider this correspondence as formal confirmation of Burchick Construction Company's intent to enter into [a] contract with Greenmoor Inc.  The scope of work will include all demolition, removal, abatement and disposal of asbestos containing materials including but not limited to the work identified in Division 2 of the specifications.  The contract price will be $7,267,500.  The complete contract will detail the quantities and unit prices applicable to the allowances, along with a detailed scope of work and any issues that were incorporated at bid time.

Id.

74.     In June, 2004, after Greenmoor had begun working on the Moorhead Project, Burchick forwarded the subcontract agreement to Greenmoor, which took the form of five (5) documents entitled "Moorhead Federal Building Subcontract Agreement" for Greenmoor to execute.  (Def. Ex. 33; 2/2/09 Tr. at 125, 128 (Dellovade).)

75.     Each of the five documents Burchick forwarded was dated May 19, 2004 and each corresponded to each of the five phases of the Moorhead Project.  (Def. Ex. 33.)  The five documents, collectively, total the $7,267,500.00 referenced in Burchick's April 1, 2004 Letter of Intent and represents the amount Burchick agreed to pay Greenmoor in exchange for Greenmoor performing the asbestos abatement work required on the entire Moorhead Project.  (Def. Ex. 33; 2/3/09 Tr. at 125-26 (Dellovade).)

76.     Each of the five documents consisted of four virtually identical attachments. (Def. Ex. 33.)  Attachment A consisted of the drawings, specifications, schedules, exhibits, attachments and other project-related documents.  Attachment B consisted of the Federal Acquisition Regulations ("FARS") and Attachment C consisted of the General Services Administration Regulations ("GSARS").  Finally, Attachment D provided the scope of work for the asbestos abatement portion of the Moorhead Project.  (Def. Ex. 33.)

77.     Burchick forwarded five documents (as opposed to one document) as an accommodation to Greenmoor for its inability to obtain a single performance bond for the entire Moorhead Project.  See infra ¶¶ 109-112.

78.     Despite its accommodation to Greenmoor, Burchick always intended to have one subcontract agreement with one asbestos abatement subcontractor for all of the asbestos abatement work in all five phases of the Moorhead Project.  (3/30/09 Tr. at 31-32 (Burchick).)

79.     Greenmoor never intended to enter into five separate subcontract agreements when it bid on the Moorhead Project and was indifferent as to the number of subcontract documents that existed.  (2/3/09 Tr. at 134-35 (Dellovade).)

80.     Greenmoor executed each of the five documents on June 9, 2004.  (Def. Ex. 33.)

81.     In December, 2004, in connection with audit of its business, Greenmoor sought confirmation from Burchick that it had a single "Original Contract Price" of $7,267,500 for the asbestos abatement work on the Moorhead Project.  (Def. Ex. 86; 2/3/09 Tr. at 119, 134.)

82.     In addition to the Subcontract Agreement itself, the parties' contractual relationship expressly was governed by the (i) the contract between Burchick and the GSA; (ii) the drawings and specifications, which were attached to the Subcontract Agreement as Attachment A; (iii) the FARS and the GSARS, which were attached as Attachments B and C, respectively; (iv) any other documents referenced in any of the other contractual documents; and (v) "[a]ny agreed upon and written modifications to any of the above listed documents issued after the date hereof."  (Def. Ex. 33, Art. I.)

83.     The description of the work to be performed by Greenmoor is set forth in Attachment D.  (Def. Ex. 33; see also infra ¶¶ 95-109 (setting forth the findings pertaining to Greenmoor's scope of work).)

### 1.     Key Provisions Under the Subcontract Agreement

84.     Under the Subcontract Agreement, Greenmoor had a duty to provide work safely and consistent with the highest generally accepted level of care.  All of the Agreement documents contain the following provision:

> Subcontractor warrants that **all Work performed** hereunto shall be (i) conducted **in a manner consistent with the highest generally accepted level of care and skill** ordinarily exercised by persons or

- 15 -

> entities performing services of a nature similar to that Subcontractor is performing on the Project, taking into account standards, state-of-the-art, laws and requirements existing at the time the Work is performed; (ii) in strict compliance with the Subcontract Documents; and (iii) safely, lawfully, efficiently and properly performed.  Subcontractor acknowledges and agrees that Contractor is relying upon Subcontractor's special and unique abilities and the accuracy, competence and completeness of Subcontractor's Work.

(Def. Ex. 33, Art. III.d) (emphasis added).

85.      In addition, under Article I.b. of the Subcontract Agreement, Greenmoor was contractually obligated to perform to the satisfaction of both Burchick and the GSA. Specifically, Article I.b. provides:  "**Subcontractor shall perform all work** . . . in strict accordance and full compliance with the terms of this Subcontract, and **to the satisfaction of Contractor and Owner**."  (Def. Ex. 33, Art. I.b) (emphasis added).

86.      Article IV of the Agreement outlines Greenmoor's liability for failing to perform consistent with the Subcontract.  In relevant part, paragraph b of Article IV provides:

> [Greenmoor] shall be liable to [Burchick] for all costs [Burchick] incurs as a result of [Greenmoor's] failure to perform this Subcontract in accordance with its terms. . . . [Greenmoor's] liability shall include, but not be limited to (1) damages and other delay costs payable to [Burchick] to [GSA]; (2) [Burchick's] increased costs of performance, such as extended overhead and increased performance costs resulting from Subcontractor-caused delays of improper Subcontractor work; (3) warranty and rework costs; (4) liability to third parties; and (5) attorney's fees and related costs.  [Greenmoor's] obligations under this Article IVb shall be in addition to any indemnity liability imposed by the Subcontract, including, without limitation, the Contract Documents.

(Def. Ex. 33, Art. IV.b.)

87.      Under the Subcontract, Burchick had the right to terminate the agreement for, inter alia, Greenmoor's failure to perform.  Specifically, Article VIII provides as follows:

> **If, in the opinion of the Contractor**, Subcontractor shall at any
> time (1) refuse or fail to provide sufficient properly skilled
> workmen or materials of the proper quality; (2) fail in any respect
> to prosecute the Work according to the current Work schedule; (3)
> cause, by any action or omission, the stoppage, or delay of or
> interference with the work of Contractor or of any other building
> or subcontract; or (4) **fail to comply with all provisions of this
> Subcontract or the Subcontract Documents**, including, without
> limitation, the Contract Documents, then, after serving three (3)
> day's notice Contractor may, at its option . . . (ii) **terminate the
> Subcontract for default**.

(Def. Ex. 33, Art. VIII) (emphasis added).

88.     The Subcontract additionally sets forth the process for making changes to the

scope of the work.  Article VII provides that Burchick "may, at any time, unilaterally or by

agreement with Subcontractor . . . make changes in the Work covered by this Subcontract.  Any

unilateral order, or agreement, under this Article VIIa shall be in writing.  Subcontractor shall

perform the Work as changed without delay."  (Def. Ex. 33, Art. VII.a.)

89.     In addition to being incorporated by reference, Greenmoor expressly represented

that it had read and agreed to be bound by the FARs and GSARs.  (Def. Ex. 33, Art. I & III.)

90.     GSAR 552.236-71 is expressly incorporated into the Subcontract Agreement.

91.     Under GSAR 552.236-71, Greenmoor (just the same as Burchick) is obligated to

follow URS's orders, including URS's "instruction, direction, interpretation, or determination."

(Def. Ex. 33 at BCCI 2212.)

### *2.      Key Payment Terms Under The Subcontract Agreement*

92.     The Subcontract Agreement specifically provides that Burchick is to pay

Greenmoor for work that it has performed approximately seven (7) days after Burchick receives

payment for that work from the GSA.  (Def. Ex. 33, Art. II.)  In relevant part, Article II provides:

> b.      Payment for Work performed shall be due on or about the 7th day following receipt of payment from Owner [e.g., GSA] by Contractor [e.g., Burchick].  Under no circumstances whatsoever shall Subcontractor [e.g., Greenmoor] be entitled to any payment whatsoever unless and until Contractor is paid by Owner.

*        *        *

> e.      Final payment shall be made after the Work has been accepted by Owner, satisfactory proof of payment of all amounts owed by Subcontractor in connection with this Subcontract has been provided, the Work is complete, and Contractor has been paid in full by Owner for the Work.  Acceptance of final payment by Subcontractor shall constitute a waiver of any and all claims by Subcontractor against Contractor for the Project.

(Def. Ex. 33, Art. II.)

93.     The Subcontract Agreement additionally outlines the terms for payment to the Subcontractor in the event the Contractor terminates the subcontract for default:

> In the case of termination for default, Subcontractor shall not be entitled to receive any further payment until the Work shall be fully completed and accepted by the Owner.  At such time, if the unpaid balance of the price to be paid to Subcontractor prior to its default shall exceed the expense incurred by Contractor, such excess shall be paid by Contractor to Subcontractor.  If the expense incurred by Contractor exceeds such unpaid balance, then Subcontractor shall pay to Contractor the difference within five (5) business days following demand by Contractor.  Subcontractor shall pay all reasonable costs of collection, if any.

(Def. Ex. 33, Art. VIII.)

94.     Finally, the Subcontract Agreement contemplates payment for extra work provided that such requests for payment are submitted as follows:

> Subcontractor shall submit **in writing** any claims for adjustment in the price, schedule or other provisions of the Subcontract claimed by Subcontractor for changes directed by Owner or as a result of deficiencies or discrepancies in the Contract documents, to Contractor **in time to allow Contractor to comply with the applicable provisions of the Contract Documents**.  Contractor

shall process said claims in the manner provided by the provisions
of the Contract Documents.

(Def. Ex. 33 at Art. VII.b) (emphasis added).

### C.   Greenmoor's Scope of Work

95.     A critical aspect of the Subcontract is Attachment D, which primarily defines and

delineates Greenmoor's scope of asbestos abatement work.  (Def. Ex. 33.)

96.     Attachment D provides that Greenmoor is to:

> Provide for the removal and proper disposal of all Asbestos
> Containing Material (ACM) reflected on the Contract documents
> including, but not limited to, Spray-On-Fireproofing, Pipe
> Insulation and Floor Tile.  The removal shall include the
> demolition above the ceiling line of all mechanical and electric
> appenditures in accordance with the contract documents, drywall
> partitions and barriers, ceiling tile and grid.

(Def. Ex. 33, Att. D.)

97.     Attachment D further defines Greenmoor's scope of work with respect to the

ceiling tile in the building:

> This Subcontractor shall remove the acoustical ceiling tile and
> vacuum clean ACM and palletize ceiling tile for removal by BCCI
> as construction debris.

Id.

98.     Pursuant to Attachment D, Greenmoor's scope of work included the disposal of

ceiling tile.[4]

99.     Attachment D was the culmination of extensive discussions during the bid

process.

---

[4]     In addressing Burchick's Rule 52(c) Motion at the conclusion of Greenmoor's case-in-chief, the Court
found that Attachment D was a part of the parties' Subcontract Agreement and that the removal of ceiling
tile was within the scope of Greenmoor's work under Attachment D.  See 2/11/09 Tr. (Doc. 113) at 114.

100.    In 2003 and early 2004, based on a series of eighteen (18) addenda updating the Plans and Specifications issued by the GSA, the technical aspects of the Moorhead Project and the projected pricing were revised.  (Def. Exs. 7, 8, 2, 26; Pl. Ex. 218.)

101.    Several of the addenda issued by the GSA affected the scope of work of the asbestos abatement work.  (2/4/09 Tr. at 53-55; 3/30/09 Tr. at 218-19; Def. Exs. 7, 8.)

102.    One significant addendum addressed Option 1 (one of several options on the Moorhead Project), which dealt with the renovation of the restrooms in the building.  A September 30, 2003 addendum clarified that "asbestos work associated with the Options shall be performed as part of the base building bid whether or not the Options are accepted."  (2/4/09 Tr. at 53-54; Def. Ex. 7.)

103.    As modifications were made to the Plans and/or Specifications, Burchick would provide that information, as applicable, to any bidders with whom it was negotiating, including Greenmoor.  (2/4/09 Tr. at 53-54 (Dellovade); 3/30/09 Tr. at 219-21, 225 (Huber); Def. Exs. 7, 8, 15, 16.)

104.    Burchick and Greenmoor discussed the scope of Greenmoor's work extensively prior to Burchick issuing the formal invitation to bid on October 1, 2003, and prior to the parties executing the Subcontract in May 2004.  These discussions included the manner in which both the architectural demolition and the asbestos abatement work would be performed.  (3/30/09 Tr. at 215-16 (Huber).)

105.    In this process, Burchick primarily dealt with Greenmoor's Chief Estimator and Project Manager, Joseph Mlecsko and to a lesser extent, with Greenmoor's President, Fred Dellovade.  (3/30/09 Tr. at 214-15 (Huber).)

106.    During the summer and fall of 2003, James Huber of Burchick met several times with Mr. Mlecsko to discuss Greenmoor's bid and the scope of Greenmoor's work.  In discussing the scope of Greenmoor's work, Mr. Huber and Mr. Mlecsko reviewed the H Drawings, AD drawings, Contract Specifications and other contract documents.  (3/30/09 Tr. at 214-215 (Huber); Pl. Exs. 6, 17, 21; Def. Exs. 7, 8.)

107.    Mr. Huber and Mr. Mlecsko discussed the manner in which architectural demolition would occur, including the sequence of the demolition of the corridor masonry walls and the methods for removal and disposal of ceiling tile.  (3/30/09 Tr. at 215-16, 221 (Huber).)

108.    On December 4, 2003, Burchick met with its potential subcontractors, including Greenmoor, to again discuss the scope of the bid and the manner in which the work was to be performed.  (3/30/09 Tr. at 223-24; Def. Ex. 16.)

109.    During this meeting, which was conducted by Mr. Huber on behalf of Burchick, Burchick and Greenmoor specifically discussed the sequence and procedure for ACM abatement and architectural demolition.  (3/30/09 Tr. at 223-24; 3/31/09 Tr. at 9-10, 37-38.)

D.    **The Performance Bonds and The Escrow Agreement**

110.    As Burchick was required to post both performance and payment bonds for the Moorhead Project, it required many of its subcontractors, including Greenmoor, to similarly obtain and post performance bonds.  (3/30/09 Tr. at 32 (Burchick).)  The bonds were intended to give Burchick protection that Greenmoor would complete the Moorhead Project.  (3/30/09 Tr. at 186 (Burchick).)

111.    Although Greenmoor attempted to obtain a bond for the entire Moorhead Project from United States Surety Company ("US Surety"), it was unable to do so.  (2/3/09 Tr. at 124-28 (witness).)  Ultimately, US Surety agreed to individually bond Phases I, II and III of the

Moorhead Project at the outset of the Moorhead Project, and then bond Phases IV and V once the first three phases of the Moorhead Project were complete.  (2/2/09 Tr. at 135 (Dellovade); 3/30/09 Tr. at 33 (Burchick).)

112.    Because Greenmoor could not obtain bonds for Phases IV and V at the outset of the Moorhead Project, Burchick required Greenmoor to set up an escrow account to ensure that Greenmoor would eventually produce the requisite bonds.  (2/2/09 Tr. at 136 (Dellovade); 3/30/09 Tr. at 34-35 (Burchick).)  As a result, Burchick and Greenmoor entered into and executed an Agreement to Establish Escrow Account.[5]  (Pl. Ex 14, Agreement to Establish Escrow Account ("Escrow Establishment Agreement").)

113.    Burchick agreed to execute five separate documents to evidence the subcontract as an accommodation to Greenmoor for its inability, at the outset of the Moorhead Project, to secure a single performance bond for the full amount of the subcontract.  (3/30/09 Tr. at 32-34 (Burchick).)

114.    Under the Escrow Establishment Agreement, Burchick agreed to place ten percent (10%) of payments otherwise due to Greenmoor under each payment application for Phases I, II and III into an escrow account:

> 4.      Within seven days of receipt by [Burchick] from the General Services Administration of progress payments which include sums earned by Greenmoor, Burchick shall pay 90% of the allocable amount to Greenmoor and deposit 10% of the allocable amount to the Escrow Account on behalf of Greenmoor.

(Pl. Ex. 14 at ¶ 4.)

115.    Also under the Escrow Establishment Agreement, Burchick agreed to release the escrowed funds to Greenmoor if, at the conclusion of Phase III of the Moorhead Project,

---

[5]      Greenmoor also entered into and executed an Escrow Agreement (a copy of which was attached as an exhibit to the Escrow Establishment Agreement) with its bank, Sky Bank.  See Pl. Ex. 14.

Greenmoor produced the bonds for Phases IV and V of the Moorhead Project. Specifically, the Escrow Establishment Agreement provided:

> 5. The monies deposited in the Escrow Account shall be remitted to Greenmoor by the Escrow Agent if and when it timely provides to [Burchick] the required bonds for both Phase IV and Phase V and [Burchick] certifies same to the Escrow Agent. The bond for Phase IV in the amount of $2,196,816 shall be timely only if evidence thereof is provided to [Burchick] by close of business on 11/01/2006 and the bond for Phase V in the amount of $1,654,982 shall be timely only if evidence thereof is provided to [Burchick] by close of business on 10/01/2007.
>
> 6. If and when Greenmoor provides to [Burchick] the required bonds, [Burchick] shall within five (5) business days issue to the Escrow Agent the Certification in the form at Exhibit B thereby causing the Escrow Agent to pay the entire Escrow Account balance to Greenmoor.

Id. at ¶¶ 5-6.

116. The escrow account "in essence became a retention account" containing monies that Greenmoor had already earned on completed work. (3/30/09 Tr. at 149-50 (Burchick).)

117. Burchick received a bond for Phases I, II, and III that was in an acceptable format, and Burchick accepted those bonds. (3/30/09 Tr. at 186 (Burchick); Def. Ex. 33.)

118. By letter dated August 18, 2006, Greenmoor forwarded the bonds for Phases IV and V. (Pl. Ex. 26.) These bonds were forwarded well before the November 1, 2006, and October 1, 2007 deadlines outlined in the Escrow Agreement. (Pl. Ex. 14.)

119. Burchick, however, considered the bonds to be improper. Accordingly, by letter dated August 23, 2006, Burchick identified specific changes it wanted Greenmoor to make to the bonds and stated that it was returning "the original bonds for [Greenmoor's] further action consistent with this letter." (3/30/09 Tr. at 187-89 (Burchick); Pl. Ex. 27.)

120.     By letter dated October 24, 2006, Greenmoor provided revised bonds to Burchick and noted that Greenmoor was "fully mobilized and prepared to commence work on Phase IV of this Project." (3/30/09 Tr. at 189 (Burchick); Pl. Ex. 28.)

121.     Greenmoor made all of the requested changes outlined in Burchick's August 23 letter. (3/30/09 Tr. at 189-90 (Burchick).)

122.     Burchick refused to accept the bonds for Phases IV and V because it had terminated Greenmoor and, as a result, "didn't have a contract" with Greenmoor. (3/30/09 Tr. at 190-92 (Burchick).)

123.     Burchick has not paid Greenmoor any monies from the escrow account.

## III.   **PHASE I**

124.     Phase I of the Moorhead Project encompassed the five top floors of the Moorhead Federal Building – floors 21 through 25. Work was to begin on floor 25 and proceed downward through the completion of the remaining floors. (Jt. Ex. 1 at ¶ 65.)

125.     The scope of abatement on each of the floors differed. (Jt. Ex. 1 at ¶ 66; Pl. Ex. 6.) Both the 25th and 24th floors were penthouse floors, with very little abatement to be done. (Pl. Ex. 6 at Bates No. GR 19344-45.) Although the 23rd floor was a full floor, it was necessary only to conduct abatement in and above the corridor hallway that runs nearly the entire length of each floor, which was roughly 200 feet. (Jt. Ex.1 at ¶ 67; Pl. Ex. 6 at GR 19343.) Floors 21 and 22 also were full floors, but little abatement had to be completed because significant portions of those floors previously had been abated, so-called "historically abated areas." The "historically abated areas," therefore, were not included in the scope of abatement. (Jt. Ex. 1 at ¶¶ 67-68.)

126.     Greenmoor's Project Manager on Phase I was Mr. Joe Mlecsko. (1/30/09 Tr. (Doc. 108) `at 186 (B. Shaffer); 2/3/09 Tr. at 92-93 (Dellovade).)

127.     Greenmoor's supervisors on Phase I were Messrs. Don Miller and Lawson Bell. (1/30/09 Tr. at 186 (B. Shaffer).)

128.     Greenmoor assigned one supervisor per shift.  (2/2/09 Tr. at 40 (Povelitis).)

129.     Greenmoor's supervisors were "working" supervisors who performed labor while they supervised a work force that could exceed fifty (50) people.  (2/5/09 Tr. at 90 (Mlecsko), 170-171 (Bell).)

130.     On March 31, 2004, the GSA issued to Burchick a Notice to Proceed with Phase I of the Moorhead Project.  (Jt. Ex. 1 at ¶ 63.)

131.     Greenmoor mobilized to the Moorhead Project around May 19, 2004, but began work in earnest in July, 2004.  (2/2/09 Tr. at 154 (Dellovade).)

132.     The primary work of abating floors 21 through 25 was completed in November, 2004.  (Pl. Ex. 78 at 1-8.)  Greenmoor completed all of its work on Phase I, including all of the work associated with the shafts on the Phase I floors, by December, 2004.  (2/2/09 Tr. at 150-51 (Dellovade); Pl. Ex. 78 at 1-10.)

133.     Each floor in Phase I passed inspection and was certified as abated by the Allegheny County Health Department ("ACHD").  (Jt. Ex.1 at ¶ 71; Pl. Ex. 9 at 78.)

134.     Burchick never refused to accept a floor that was abated and that Greenmoor turned over to it during Phase I.  (2/2/09 Tr. at 153 (Dellovade).)  Burchick moved onto each floor completed by Greenmoor and did the remainder of its Phase I work.  (2/2/09 Tr. at 153 (Dellovade).)

### A.     Deficiencies in Greenmoor's Work on Phase I

135.     Between July, 2004 and March, 2005, URS observed a number of deficiencies in Greenmoor's performance, which created the possibility that workers and tenants within the

Federal Building could have been exposed to asbestos.  (2/3/09 Tr. at 167-173 (Dellovade); 3/30/09 Tr. at 36-39, 53-55 (Burchick); Def. Exs. 45, 180.)

136.    URS, as the GSA's agent, brought these problems to Burchick's attention. (3/30/09 Tr. at 41-43 (Burchick); 3/31/09 Tr. at 45 (Sekowski).)

137.    As it learned of Greenmoor's various performance issues, Burchick notified Greenmoor.  (2/2/09 Tr. at 170 (Dellovade); 3/30/09 Tr. at 41-43, 48-51 (Burchick); 3/31/09 Tr. at 208-09 (Finney); 4/1/09 Tr. (Doc. 126) at 108-10, 115-16 (Finney); Def. Exs. 45, 66; Pl. Ex. 85.)

138.    Burchick relied upon the information supplied by URS with respect to these issues both because it was contractually obligated to respond to the concerns of the GSA and because it needed to rely upon information gathered by those with special knowledge of the abatement work.  (Def. Ex. 33 at BCCI 2212, GSAR 552.236-71.)

139.    On July 1, 2004, after learning that ACM may have been tracked outside of the containment on the 24th floor into a public stairwell, Greenmoor went to clean up the suspected material.  (Def. Exs. 45, 46, 180; 2/3/09 Tr. (Doc. 110) at 169 (Dellovade); 3/31/09 Tr. at 51-53 (Sekowski).)  Prior to cleaning it up, however, URS observed that Greenmoor was prepared to use improper equipment – a wet vacuum – rather than the proper equipment – a HEPA vacuum. Id.  URS, accordingly, directed Greenmoor to use the proper HEPA vacuum equipment to clean up the material.  Id.

140.    On July 21, 2004, URS observed that Greenmoor's EPDM installation did "not meet specs."  (Pl. Ex. 80 at Bates No. URS 000311.)  Specifically, Greenmoor had used spray adhesive, rather than butyl adhesive, to seal the EPDM seams.  (Pl. Ex. 79.)

141.    The notation to use butyl adhesive, rather than spray glue, appears in an annotation on the Abatement Details Drawing.  (Pl. Ex. 6 at GR 19346, Detail 2.)  The annotation provides as follows:  "1 layer 40 mil (min.) rubber EPDM membrane to be applied to walls and floors as denoted.  Seal seams w/ butyl adhesive glue…."  Id.

142.    Greenmoor overlooked the specific detail about the use of butyl prior to being notified during the construction of the containment on the 22nd floor.  (2/2/09 Tr. at 165 (Dellovade); Pl. Ex. 81.)

143.    On July 26, 2004, URS learned that Greenmoor had begun removing ceiling tile and scraping ACM fireproofing on the 22nd floor, contrary to URS's agreement with Burchick that abatement activities would not proceed until URS reinspected the containment on July 26, 2004.  (3/31/09 Tr. at 53-54 (Sekowski); Def. Ex. 180 at Bates No. BCCI 3937.)

144.    Upon inspecting the containment on July 26, 2004, URS discovered that the manometer readings, e.g., negative air readings, were below the required levels and that the floors had not been properly sealed.  (Def. Ex. 180 at Bates No. BCCI 3937.)

145.    URS notified Burchick of this incident by e-mail dated July 29, 2004.  (Def. Ex. 180 at Bates No. BCCI 3937.)

146.    Burchick provided its first formal written notice to Greenmoor about deficiency issues by letter dated July 26, 2004.  (3/30/09 Tr. at 36-39; Def. Ex. 45.)

147.    Prior to sending the July 26 letter, Mr. Burchick called Mr. Dellovade to discuss the situation, inform him that the GSA was displeased with Greenmoor's work to date, and to inform him that the letter would be forthcoming.  (3/30/09 Tr. at 37 (Burchick).)  Part of Burchick's motivation in sending the letter was to appease the GSA's concerns.  (3/30/09 Tr. at 36-38 (Burchick).)

148.    Greenmoor responded to Burchick's July 26 letter with a letter of its own dated July 29, 2004.  (Def. Ex. 46.)  In that letter, Greenmoor attempted to explain its position on the several deficiencies URS observed and that Burchick relayed.  Id.  Also in that letter, Greenmoor "assured" Burchick that "Greenmoor will do everything possible to get this project to where it should be."  Id.

149.    By e-mail correspondence dated August 4, 2004, Burchick notified Greenmoor that URS had observed that the flex ducts on the negative air machines had been off every night for approximately seven (7) consecutive nights, which had caused Greenmoor's manometer readings to be low.  (Def. Ex. 51.)

150.    In early to mid-August 2004, upon learning from URS of additional abatement procedure deficiencies on the 22nd floor, Burchick and Greenmoor discussed various steps that Greenmoor would take to remedy those issues.  (Def. Ex. 53.)

151.    By letter dated September 29, 2004, Burchick informed Greenmoor that the recurring deficiencies might result in termination of the subcontract.  Burchick specifically noted Greenmoor's "lack of supervision, the lack of adherence to proper safety protocols and procedures" as problems that create a "risk by jeopardizing the health and welfare of all the construction workers and the tenants of the building."  (3/30/09 Tr. at 39-42 (Burchick); Def. Ex. 66.)

152.    Burchick's understanding of Greenmoor's recurring deficiencies included, among other things, lack of supervision.  (3/30/09 Tr. at 41 (Burchick).)

153.    In response to the September 29 letter, Messrs. Burchick and Finney of Burchick and Messrs. Dellovade and Mlecsko of Greenmoor met for lunch on October 1, 2004.  During that lunch meeting, Mr. Dellovade gave Burchick his commitment that the deficiencies would

not continue and that Greenmoor would get the job would get back on track.  (3/30/09 Tr. at 42 (Burchick); 4/1/09 Tr. at 86-87 (Finney).).

154.    Despite Mr. Dellovade's assurances at the October 1 lunch meeting, concerns with Greenmoor's performance continued.

155.    By e-mail dated October 8, 2004, Burchick notified Greenmoor that it had noticed that Greenmoor's manpower had been reduced and expressed concern about the work being completed consistent with Mr. Dellovade's commitments.  (Def. Ex. 67.)

156.    On October 26, 2004, URS observed that Greenmoor re-used EPDM flooring in the 20th floor restroom that appeared to contain ACM residue and that this activity occurred outside of containment.  (Def. Ex. 180 at Bates No. BCCI 3939.)  URS noted that this occurred despite having previously instructed Greenmoor that EPDM may be reused so long as it is "properly cleaned, bagged, transported and installed under the proper conditions."  Id.

157.    URS notified Burchick of this incident by e-mail dated October 27, 2004.  (Def. Ex. 180 at Bates No. BCCI 3939.)

158.    In that e-mail, URS noted that the EPDM incident was "at least the third occasion on which ACM has been encountered outside a containment or in an incomplete containment . . . Errors such as the one described . . . will not be tolerated on occupied floors."  (Def. Ex. 180 at BCCI 3939.)

159.    More significantly, URS informed Burchick:

> It should be noted . . . that there have been at least 3 incidents involving Greenmoor that could have jeopardized the health and safety of workers and/or building occupants.  It is strongly recommended that Burchick address Greenmoor's failures to properly execute their work directly with Greenmoor's home office.

(Def. Ex. 180 at BCCI 3939.)

160.    By e-mail dated October 27, 2004, Burchick notified Greenmoor of the additional

concerns that URS had observed with the installation of EPDM flooring in the 20th floor

restroom.  (Def. Ex. 70.)

### B.    The Interim Period Between Phases I and II

161.    Following completion of the primary abatement work Phase I on

November 1, 2004, Greenmoor performed out of sequence work throughout the Moorhead

Federal Building.  (Jt. Ex. 1 at ¶ 70.)

162.    After the work on Phase I ended, and before work on Phase II was to begin in

March 2005, Burchick requested Greenmoor to submit a comprehensive plan of action for Phase

II that would identify the "changes in means and methods that Greenmoor proposes to utilize in

phase 2 that are different than those conducted during phase 1."  (4/1/09 Tr. at 90-91 (Finney);

Def. Exs. 77, 95.)  By email dated November 8, 2004, Burchick requested Greenmoor to submit

the plan of action by December 10, 2004.  (Def. Ex. 77.)

163.    After Greenmoor failed to submit the plan of action by the requested date, by e-

mail dated December 20, 2004, Burchick inquired about the plan.  (Def. Ex. 77.)

164.    Greenmoor ultimately submitted the plan of action by letter dated

January 6, 2005, but Burchick found it deficient.  Burchick notified Greenmoor of the problems

it had with the proposed plan of action by letter dated January 10, 2005.  (Def. Ex. 95.)

165.    As Burchick reflected upon and assessed the recurring problems with

Greenmoor's performance on Phase I, Burchick determined that Greenmoor was either unwilling

or unable to perform its work properly, safely and timely.  (3/30/09 Tr. at 47, 54-55 (Burchick).)

Burchick perceived that Greenmoor's problems might result in personal harm to the tenants or

the other workers in the Moorhead Federal Building and increasingly became concerned about

the problems having a negative impact on its relationship with the GSA.  (3/30/09 Tr. at 47, 54-55 (Burchick); 4/1/09 Tr. at 113 (Finney).)

166.    As a result, on February 28, 2005, Burchick contacted Greenmoor and offered to amicably sever the parties' contractual relationship.  Greenmoor refused.  (3/30/09 Tr. at 47 (Burchick).)

167.    By letter dated March 4, 2005, Burchick followed up with Greenmoor and with Greenmoor's surety, on the offer to amicably sever the relationship.  In that letter, Burchick identified a non-exhaustive list of fifteen (15) deficiencies in Greenmoor's performance on Phase I.  (3/30/09 Tr. at 48-49 (Burchick); 4/1/09 Tr. at 116-17 (Finney); Pl. Ex. 85.)  To its March 4 letter, Burchick attached relevant correspondence, including e-mail correspondence from URS to Burchick wherein URS identified for Burchick problems with Greenmoor's performance.  (Pl. Ex. 85.)

## IV.    **PHASE II**

168.    Phase II of the Moorhead Project consisted of the 19th and 20th floors.  Both were full floors, requiring some level of asbestos abatement throughout the entire floor.  (Jt. Ex. 1 at ¶ 72.)

169.    On March 9, 2005, Greenmoor began work in earnest on Phase II with the set-up of containment on the 19th floor.  (Jt. Ex. 1 at ¶ 74.)

170.    On March 10, 2005, Greenmoor set off a fire alarm in the Building.  (Def. Ex. 180.)  This occurred when a smoke detector was activated as a result of a Greenmoor worker cutting metal studs with a grinder.  (Id.; Pl. Ex. 89; 2/5/09 Tr. (Doc. 112) at 120-21.)

171.    The fire alarm resulted in the 21st floor of the building being evacuated.  (3/31/09 Tr. at 55-56 (Sekowski); Def. Ex. 180.)

172.     There was a procedure in place at the time, pursuant to which any contractor or subcontractor was required to obtain a hot work permit to conduct metal grinding activities such as the ones conducted by Greenmoor.  (3/31/09 Tr. at 55-56 (Sekowski).)

173.     Had Greenmoor obtained a hot work permit, the fire alarm system could have been disabled, and the fire alarm may not have occurred.  (3/31/09 Tr. at 55-56 (Sekowski).)

174.     The GSA formally notified Burchick of the hot work permit incident by letter dated March 14, 2005.  (Def. Ex. 180.)

175.     Even before receiving formal notification from the GSA, however, Burchick had already been apprised of the hot work permit incident.  By letter dated March 11, 2005, Burchick notified Greenmoor that the hot work permit incident illustrated a "continued lack of supervision."  (Def. Ex. 148.)  Burchick informed Greenmoor that it would be "assigning additional [Burchick] personnel to each Greenmoor crew" in an effort to "address concerns that Burchick and the GSA have with Greenmoor's obvious neglect of proper procedures despite numerous warning in the past."  Id.

176.     In its March 11 letter, Burchick further informed Greenmoor that it "intend[ed] to declare Greenmoor in default" and requested a meeting with Greenmoor to be scheduled for March 21, 2005 at 10:00 am at Burchick's offices.  Id.  Burchick requested Greenmoor's confirmation as to whether it could attend the March 21 meeting.  Id.

177.     By letter dated March 14, 2005, Burchick formally notified Greenmoor's surety that it intended to declare Greenmoor in default and requested a meeting for March 21, 2005 at 10:00 am.  (Def. Ex. 150.)

178.     On March 24, 2005, during a walk through and smoke testing on the 19th floor, URS noted that a critical shaft ("Shaft 2") was not properly sealed.  (Def. Ex. 180.)  As a result,

- 32 -

URS directed Mr. Mlecsko of Greenmoor not to begin any work with the 19th floor perimeter demolition and critical barriers until Shaft 2 was properly sealed <u>and</u> until URS had an opportunity to "collect[] and review[] a day[']s worth of reliable manometer readings and had a chance to re-smoke test." <u>Id.</u>

179.    Shaft 2 is a return air shaft that takes air from all of the floors in the building back into the shaft to all the other air handlers and distributes it back to the other floors.  (3/31/09 Tr. at 56-58 (Sekowski); Def. Ex. 180.)  Given the manner in which it distributes air to the building, if Shaft 2 is exposed to asbestos, the occupants of the building also may be exposed to asbestos. <u>Id.</u>

180.    Contrary to its directions to Mr. Mlecsko, URS determined that work had been done with the 19th floor perimeter demolition and critical barriers **before** URS had the opportunity to confirm whether Shaft 2 was properly sealed.  (3/31/09 Tr. at 56-57 (Sekowski); Def. Ex. 180.)

181.    From URS's perspective, Greenmoor failed to follow a procedure that URS and Greenmoor had agreed would be followed.  (3/31/09 Tr. at 57 (Sekowski); Def. Ex. 180.)

182.    URS notified Burchick of this issue by e-mail dated March 30, 2005.  (Def. Ex. 180 at Bates No. BCCI 3947.)

183.    As a result of the problems on the 19th floor, on March 29, 2005, URS directed Greenmoor to obtain written authorization from URS before removing ceiling tile.  (3/31/09 Tr. at 58-59 (Sekowski); Def. Ex. 180.)

184.    Mr. Mlecsko of Greenmoor acknowledges that he and Mr. Sekowski of URS agreed that "URS was to provide written authorization after smoke testing the shaft before the work could proceed with the ceiling tile removal."  (2/4/09 Tr. at 205-06 (Mlecsko).)

Mr. Mlecsko, however, failed to convey this information to Mr. Lawson Bell, his fellow
supervisor and co-worker, because Mr. Mlecsko "went home, fell asleep, didn't call Lawson."
Id.

185.    URS did not give any authorization – verbal or otherwise – to remove the ceiling
tiles that were the subject of the March 29, 2005 agreement between URS and Greenmoor (per
Mr. Mlecsko).  (Def. Ex. 180.)

186.    On the morning of March 30, URS learned that Greenmoor (specifically,
Mr. Lawson Bell) had proceeded to remove ceiling tile without first obtaining written
authorization from URS.  (3/31/09 Tr. at 59.)  From URS's perspective, the problems were two-
fold in that URS did not have a chance to determine that Shaft 2 was properly sealed and a
disregard for an agreement that it felt it had reached with Mr. Mlecsko.  Id.

187.    From URS's perspective, the removal of ceiling tile without authorization on
March 30 was "significant;" URS conveyed to Mr. Burchick that the removal without
authorization was a "serious incident."  Id.

188.    URS notified Burchick of the March 30 incident in an e-mail correspondence
dated March 30, 2005.  In that correspondence, URS expressed to Burchick:

> The limitations and contract requirements that we set are to protect
> the occupants and construction workers in this building.  Failure to
> follow those directions could jeopardize the health and safety of all
> the occupants and put Burchick and Greenmoor at risk of serious
> financial liability.  Greenmoor ignored our direction on the two
> occasions noted above.  Incidents such as these cannot be tolerated.

(Def. Ex. 180 at Bates No. BCCI 3947.)

189.    In its March 30 e-mail, URS also directed Burchick to "take whatever steps are
necessary to correct the management or communication deficiencies that exist that have resulted

in this problem" and asked that Burchick submit a corrective action plan "no later than close of business on 4/1/05."  (Def. Ex. 180 at Bates No. BCCI 3947.)

190.    As previously noted, under GSAR 552.236-71, Greenmoor was obligated to follow URS's direction.  (Pl. Ex. 15; Def. Ex. 33 at BCCI 2212).

191.    Greenmoor failed to follow URS's direction not only by proceeding to engage in work on the 19th floor perimeter demolition and critical barriers, but also by proceeding to remove ceiling tile on the 20th floor without first receiving written authorization from URS.

192.    During the course of the Moorhead Project, URS was not able to maintain a good working relationship with Greenmoor because direction and agreements were "not being met." (3/31/09 Tr. at 62 (Sekowski).)  Mr. Sekowski testified that it was "difficult to work day-to-day [with Greenmoor] when you are giving direction and direction is not being – and agreements are not being met."  Id.  URS conveyed this feeling to Burchick.  Id.

## V.    BURCHICK'S TERMINATION OF GREENMOOR

193.    Relying upon the information relayed by URS, and faced with the possibility (and potential liability) that occupants of the building may have been placed in harm's way, Burchick refused Greenmoor entry to the Moorhead Project on March 30, 2005.  (3/30/09 Tr. at 52-53 (Burchick); Pl. Ex. 93.)

194.    After spending several days reflecting on Greenmoor's overall performance, Joseph Burchick decided that Greenmoor was unwilling to correct its recurring performance deficiencies.  (3/30/09 Tr. at 15-17 (Burchick).)

195.    As a result, by letter dated April 4, 2005, Burchick exercised its rights under Article VIII of the Subcontract Agreement and terminated Greenmoor.  (Def. Ex. 163; Jt. Ex. 1 at ¶ 75.)  In that letter, Burchick stated:

> Greenmoor's violation of safety protocol and disobedience to
> specific direction from URS exhibited in this recent episode,
> together with the habitual and recurring deficiencies, only some of
> which are mentioned in Burchick's previous correspondence,
> leaves me with no option but to declare Greenmoor in default and
> to terminate Greenmoor's work on this Project.

Id.

196.    Greenmoor's asbestos abatement work passed the inspections conducted by the

Allegheny County Health Department.  (3/31/09 Tr. at 3.)

197.    After Burchick terminated Greenmoor, GSA acknowledged that Burchick's action

was proper corrective action to address Greenmoor's "unacceptable past performance issues."

(Def. Exs. 183, 195; 3/31/09 Tr. at 148 (Lewandowski).)

198.    Mr. Kurt Varga, an asbestos abatement expert, testified during Burchick's case-

in-chief about Greenmoor's performance.  (Def. Ex. 476.)

199.    Mr. Varga opined that the number of instances where URS raised concerns about

asbestos outside of containment was surprising and unusual.  (4/3/09 Tr. at 46 (Varga); Def.

Ex. 476.)

200.    Under the Project Specifications, Greenmoor was required to "[c]ompletely

isolate the Work Area from other parts of the building so as to prevent asbestos-containing dust

or debris from passing beyond the isolated area."  (Pl. Ex. 17 at GR 002286, Section 02526, Part

4.A.)  Although the Project Specifications contemplate a process for cleaning up asbestos-

containing dust or debris outside of containment (id.), the occurrence of asbestos (or asbestos-

containing material) outside of containment should be "infrequent.'  (4/3/09 Tr. at 82 (Varga).)

201.    If material is found outside of containment that has the appearance of asbestos, it

must be treated as asbestos.  (2/5/09 Tr. at 58 (Mlecsko).)  The material need not be tested to

determine whether it is asbestos.  (2/5/09 Tr. at 58 (Mlecsko).)

202.     Under the Project Specifications, Greenmoor is required to "continuously maintain" air pressure differential in containment that must "equal or exceed" 0.02 inches of water, e.g., negative pressure.  (Pl. Ex. 17 at GR 2279, Section 02513, Part 2.4.)

203.     Mr. Varga explained that, in his opinion, "continuously maintained" means that the pressure ought to "not drop below .02 inches, and we do what we have to do in order that that not occur."  (4/3/09 Tr. at 82 (Varga).)

204.     The creation of negative pressure "is designed to restrict air flow so that airborne asbestos fiber does not migrate from an asbestos abatement work area to occupied areas outside of the work area."  (Def. Ex. 476 at 3.)  As Mr. Varga explained, the "establishment and maintenance of [negative pressure] is crucial to prevent contaminating areas outside of the work area and exposing building occupants to airborne asbestos fiber."  Id.

205.     Mr. Varga also explained that "[i]t is standard practice in the abatement industry to establish and maintain negative pressure, and to anticipate problems that may arise in an attempt to do so.  This includes calculating the volume of air in a contained work area, estimating the number of [air filtration devices] needed to establish negative pressure, providing for additional [air filtration devices] in case conditions change or are unanticipated, and having enough electric amperage to power [air filtration devices], temporary lighting and other electrical equipment needed to run the job."  (Def. Ex. 476 at 4.)

206.     The ability to maintain negative pressure is particularly important in an occupied building because asbestos fibers can get in the HVAC system and "there can be asbestos fibers throughout [the occupied] building."  (4/3/09 Tr. at 84 (Varga).)

207.     Mr. Varga opined that "Greenmoor consistently failed to meet [the] negative pressure requirement at various times throughout this Project, even after warnings by URS to correct the problem."  (Def. Ex. 476 at 5.)

208.     As an example, Mr. Varga reviewed Greenmoor's manometer readings in August, 2004, and observed that Greenmoor failed to meet the negative pressure requirement on at least 15 occasions.  (Def. Ex. 476 at 5.)

209.     Mr. Varga also reviewed the manometer readings for November, 2004 – during Greenmoor's work on Phase I of the Moorhead Project – and determined that Greenmoor failed to maintain or achieve the contractually required negative .02 of water column in at least 50% of the readings.[6]  (4/3/09 Tr. at 84 (Varga); Def. Ex. 476.)

210.     Mr. Varga opined that Greenmoor's work was not in compliance with federal and local regulations, contract agreements and standard practices.  (Def. Ex. 476.)

211.     Mr. Varga opined that Greenmoor's performance created a potential substantial safety hazard to the personnel working on the Moorhead Project as well as the tenants in the building.  (Def. Ex. 476.)

212.     Mr. Varga opined that Greenmoor did not follow the highest generally accepted level of care.  (4/3/09 Tr. at 49 (Varga); Def. Ex. 476.)

## VI.     POST-TERMINATION AND PROJECT DEVELOPMENT GROUP, INC. AS THE REPLACEMENT ASBESTSOS ABATEMENT SUBCONTRACTOR

213.     At the same time that Burchick sought to amicably sever its relationship with Greenmoor in February 2005, Burchick also contacted Project Development Group, Inc.

---

[6]     Mr. Varga counted approximately 2,365 total readings, of which 1,158 were normal and 1,270 were abnormal.  (4/3/09 Tr. at 85 (Varga).)

("PDG") to gauge its interest and availability to perform the remaining asbestos abatement work on the Moorhead Project.  (3/30/09 Tr. at 57.)

214.    On May 19, 2005, after it had terminated Greenmoor, Burchick entered into a subcontract agreement with PDG for PDG to perform the remaining asbestos abatement work on Phase II of the Moorhead Project.  (3/30/09 Tr. at 58.)

215.    On or about June 27, 2005, the parties also executed a single subcontract for Phases III, IV and V of the asbestos abatement work on the Moorhead Project.  (4/1/09 Tr. at 126-27.)

216.    Although PDG utilized laborers from the same union as Greenmoor (and, in fact, utilized some of the very same laborers), PDG's supervisory workforce differed from that of Greenmoor.  Most notably, PDG did not employ Joe Mlecsko, Lawson Bell or Don Miller.

217.    Instead, PDG assigned Keith Pisani to the Moorhead Project as PDG's General Superintendent.  (4/1/09 Tr. at 11-12 (Semega).)  Unlike Messrs. Mlecsko, Bell and Miller, Mr. Pisani was not a "working" superintendent, but instead focused primarily on supervising PDG's labor forces in the field.  (4/1/09 Tr. at 130-31 (Finney).)

218.    From the perspective of Richard Semega, a supervisor for PDG, PDG experienced some of the same issues as Greenmoor, including flex ducts becoming detached; negative air machines being unplugged; maintaining containment; painting clothes; fire alarms; holes in spray poly; hazard signage; cut equipment cables; elevated air readings; ACM outside of containment; and the need for a corrective action plan.  (4/1/09 Tr. at 36-62 (Semega).)

219.    From URS's perspective, PDG maintained cleaner and better organized containments than Greenmoor.  (3/31/09 Tr. at 65 (Sekowski).)

220.    From URS's perspective, PDG had a better ability to meet schedule requirements than Greenmoor.  (3/31/09 Tr. at 65 (Sekowski).).

221.    From URS's perspective, PDG responded to incidents more quickly than Greenmoor.  (3/31/09 Tr. at 65 (Sekowski).)

222.    From URS's perspective, PDG followed direction better than Greenmoor. (03/31/09 Tr. at 65.)

223.    From URS's perspective, PDG supervised its workforce better than Greenmoor. (3/31/09 Tr. at 65 (Sekowski).)

224.    From the GSA's perspective, there were not safety and performance concerns or issues with PDG's work.  (3/31/09 Tr. at 143, 146, 164, 172-73 (Lewandowski).)

225.    Just as he had done with Greenmoor's work, Mr. Varga also reviewed the manometer readings for April, 2005 – during PDG's work on Phase II – and determined that PDG failed to maintain or achieve the contractually required negative .02 of water column in 1% of the readings.[7]  (4/3/09 Tr. at 85 (Varga); Def. Ex. 476.)

226.    PDG's performance was a substantial improvement over Greenmoor's performance in terms of improved safety, improved efficiency and improved supervision. (3/30/09 Tr. at 58-59 (Burchick); 3/31/09 Tr. at 63-66, 68 (Sekowski); 3/31/09 Tr. at 142-143 (Lewandowski); Def. Ex. 183.)

---

[7]    Mr. Varga counted approximately 2,235 total readings, of which 2,179 were normal and 56 were abnormal. (4/3/09 Tr. at 85-86 (Varga).)  Of the 56 abnormal readings, Mr. Varga eliminated 37 because of a notation that the reference tube was pulled out.  Id.  Even without eliminating the 37 readings for this reason, only 3% of the readings in April, 2005 were below the required .02 level.

## VII.   THE INJUNCTION, GREENMOOR'S REINSTATEMENT AND GREENMOOR'S WORK ON PHASE III

227.    Upon being terminated, Greenmoor commenced an action in the Court of Common Pleas of Washington County, Pennsylvania through which it sought, inter alia, to obtain an injunction requiring reinstatement of Greenmoor to the Moorhead Project.

228.    On September 20, 2005, the Court of Common Pleas of Washington County granted Greenmoor's request for an injunction and ordered Burchick to reinstate Greenmoor to the Moorhead Project, effective as of the commencement of Phase III.  (Pl. Ex. 95.)  Burchick appealed the decision of the Court of Common Pleas to the Pennsylvania Superior Court.

229.    At the time that the preliminary injunction was granted, the Moorhead Project was close to the start of Phase III.

230.    By letter dated September 28, 2005, the GSA acknowledged the Court of Common Pleas's Order requiring Burchick to reinstate Greenmoor, but also notified Burchick that it had to "provide an acceptable corrective action plan on how the unacceptable past performance issues of Greenmoor shall be addressed."  (Def. Ex. 195.)  The GSA further stated:

> Your original corrective action to replace Greenmoor was effective, and resulted in correction of their safety violations and other performance issues.  Now that you are being ordered to reinstate them, you must submit a meaningful corrective action plan, as required via email on March 30, 2005, to ensure that the unacceptable past performance issues of Greenmoor shall not occur.

Id.  The GSA asked that the corrective action plan be submitted by October 6, 2005, and reminded Burchick that Phase III was scheduled to begin on October 24, 2005.  Id.

231.    Burchick notified the GSA that it did not believe it would be able to meet the requirements of a corrective action plan so long as Greenmoor was involved.  (3/30/09 Tr. at 59-60 (Burchick); 3/31/09 Tr. at 146-47 (Lewandowski); Def. Ex. 197; Pl. Ex. 97.)

232.    By letter dated October 13, 2005, GSA threatened to terminate Burchick for default if it failed to continue with the work, and further indicated that any start on Phase III later than the contractual start date of October 24, 2005, was likely to result in substantial financial harm to the GSA, since the ACM abatement work was critical to the schedule of the Moorhead Project.  (3/31/09 Tr. at 146-147 (Lewandowski); Def. Ex. 197.)

233.    On October 18, 2005, Burchick authorized Greenmoor to perform work on Phase III provided a corrective action plan satisfactory to the GSA was submitted by Greenmoor.  (3/30/09 Tr. at 59 (Burchick); Pl. Ex. 97.)

234.    After much discussion and negotiation, a corrective action plan was submitted to the GSA on or about November 4, 2005.  (Def. Ex. 208.)  The GSA accepted the corrective action plan by letter dated November 9, 2005.  (Def. Ex. 213.)

235.    Phase III consisted of floors 12 through 17.  Although floor 18 was originally part of Phase III, PDG had completed it by the time Greenmoor was reinstated.  (Jt. Ex. 1 at ¶ 83.)

236.    In addition to requiring changes in the manner in which Greenmoor supervised its work, a number of other special accommodations were required.  (4/1/09 Tr. at 133-36 (Finney).)

237.    In addition to the regularly scheduled Progress Meetings URS held and that Burchick and all subcontractors attended to discuss the progress of the work, URS also began to hold new separate "Abatement Progress Meetings" in an attempt to avoid the problems on Phase I of the Moorhead Project.  These asbestos abatement meetings were attended by only the GSA,

URS, Burchick and Greenmoor.  (3/31/09 Tr. at 152-53 (Lewandowski); Pl. Ex. 246; Def.

Ex. 206.)

## VIII.   BURCHICK'S REINSTATEMENT OF THE TERMINATION DECISION AND PHASES IV AND V OF THE PROJECT

238.    On September 11, 2006, the Pennsylvania Superior Court reversed the grant of the

preliminary injunction.  (Pl. Ex. 96.)

239.    At the time of the reversal, Burchick continued to have a contractual obligation

to PDG for the remainder of the entire Moorhead Project.  (3/30/09 Tr. at 60-61 (Burchick); 4/1/09

Tr. at 22-23 (Semega).)

240.    Given the Superior Court's ruling and Burchick's contractual obligations to PDG,

Burchick reinstated its earlier termination of Greenmoor.  (3/30/09 Tr. at 60-61 (Burchick).)

241.    PDG completed the remaining portions of Phase III that Greenmoor had not

completed.

242.    PDG also completed Phases IV and V of the Moorhead Project.  (3/31/09 Tr. at

68, 152; Jt. Ex. 1 at ¶ 90.)

243.    PDG did not have the additional supervision and oversight that was added during

Greenmoor's involvement on Phase III of the Moorhead Project.  (3/31/09 Tr. at 68, 152.)

244.    The GSA did not hold separate asbestos abatement meetings with PDG on Phases

II, IV and V of the Moorhead Project.  (3/31/09 Tr. at 68 (Sekowski), 152 (Lewandowski).)

245.    The principal work on the Moorhead Project was completed in October, 2008.

(Jt. Ex. 1 at ¶ 91.)

246.    As it currently stands, Burchick remains on the Moorhead Project performing

additional work pursuant to change orders requested by the GSA.  (3/30/09 Tr. at 61-62

(Burchick).)

IX.     **GREENMOOR'S DAMAGE CLAIMS**

247.    Greenmoor claims three general categories of damages:  (1) payments it contends it is owed for work it completed under the Subcontract Agreement; (2) lost profits on those portions of the Moorhead Project that it contends it wrongfully was precluded from performing; and (3) costs associated with labor inefficiencies allegedly caused by Burchick and URS on Phase III of the Moorhead Project.  (2/5/09 Tr. at 200-01 (Dellovade); Pl. Ex. 412.)

A.      **Payment Alleged To Be Owed To Greenmoor**

248.    Within this category, Greenmoor asserts that it is owed three types of payments for work it contends it completed under the Subcontract Agreement before it was terminated from the Moorhead Project:  (i) payments due under the Escrow Agreement; (ii) payments due on unpaid payment applications; and (iii) payments for backcharges and extra work.

1.      *Payments Under the Escrow Agreement*

249.    Burchick acknowledges and admits that it owes Greenmoor the value of the escrow account balance and the accumulated interest in the escrow account.  (Def. Ex. 500.)

250.    The full escrow account balance was due to be paid to Greenmoor by October 31, 2006.  (Pl. Exs. 14, 28, 29; Pl. Ex. 410 at 114.)

251.    The escrow account balance as of October 31, 2006, was $275,510.27.  (App. A to Pl's Findings of Fact and Concl. of Law.)

252.    By the terms of the escrow account, the accumulated interest as of December 31, 2008, was $8,855.85.  Id.

2.      *Payment Applications*

253.    Burchick's practice to process payment applications required subcontractors, including Greenmoor, to submit draft "pencil copy" invoices for services performed on a monthly basis.  (2/2/09 Tr. at 176 (Dellovade); 2/3/09 Tr. at 39-40 (Dellovade).)

254.    Regardless of when the work was performed, Greenmoor was required to prepare a separate invoice for each Phase and bill the services performed on any particular floor to the specific Phase with which that floor was associated (e.g., work performed on the 12th floor during Phase I had to be billed on a Phase III invoice).  (2/3/09 Tr. at 40-41 (Dellovade).)

255.    Upon receipt of Greenmoor's pencil copies, Burchick would review Greenmoor's pencil copies and, often times, revise the pay applications and return them to Greenmoor to be revised and resubmitted for payment.  (2/2/09 Tr. at 176-77 (Dellovade); 2/3/09 Tr. at 40 (Dellovade).)

256.    After Greenmoor resubmitted a payment application, Burchick would mark-up the revised payment application and return it to Greenmoor for further revisions.  (2/3/09 Tr. at 176-77 (Dellovade); Pl. Exs. 77, 662, 663; Def. Ex. 93.)

257.    Although Burchick may have sought revisions only on a portion of the pay application, or only disputed certain line items on any given pay application, Burchick did not compensate Greenmoor for those portions of the pay application that it did not dispute.  (3/30/09 Tr. at 147-48 (Burchick); 4/2/09 Tr. at 43-44 (Finney).)

258.    If a payment application was not completed to its satisfaction, Burchick did not pay the amounts due, even if those amounts were not disputed by Burchick as being owed.  (3/30/09 Tr. at 147 (Burchick); 4/2/09 Tr. at 79-80 (Finney).)

259.    Greenmoor seeks payment on the following payment applications:  (1) Payment Application dated 2/28/2005 for Phase I work in the amount of $5,582.00; (2) Payment

Application dated 2/28/2005 for Phase IV work in the amount of $7,500.00. (3) Payment

Application dated 3/31/2005 for Phase II work in the amount of $38,000.00; (4) Payment

Application dated 6/30/2006 for Phase III work in the amount of $46,325.00; (5) Payment

Application dated 7/31/2006 for Phase III work in the amount of $53,891.00; and (6) Payment

Application dated 8/31/2006 for Phase III work in the amount of $63,059.00.  (Pl. Ex. 411; Att.

A to Pl's Proposed Findings of Fact and Concl. of Law.)

260.    Burchick acknowledges that it owes Greenmoor certain of the amounts due on the

payment applications dated 2/28/2005, 3/31/2005, 6/30/2006, 7/31/2006, and 8/31/2006.  (Def.

Ex. 500.)

261.    Burchick did not pay the amounts due on the February 28 pay application for

Phase I work in the amount of $5,582.00 and for Phase IV work in the amount of $7,500.00

because it did not receive a "final revised notarized stamped" copy of the February 28, 2005

application.  (Def. Ex. 500.)

262.    Burchick received pencil copies of the February 28, 2005 payment application.

(4/1/09 Tr. at 173-174 (Finney); 4/2/09 Tr. at 76-77 (Finney).)

263.    Burchick did not pay the amounts due on the March 31, 2005 payment application

because by the time the application came due, it had terminated Greenmoor and withheld further

payment to Greenmoor under Article VIII of the Subcontract Agreement.  (Def. Ex. 500.)

264.    Burchick withheld the amounts due on the June 30, 2006 payment application

because it determined that Greenmoor did not properly complete the application.  (Def. Exs. 341,

500.)

265.    Burchick informed Greenmoor that the payment application was improper by

letter dated July 19, 2006.  (Def. Ex. 341.)  Burchick specifically informed Greenmoor that it

was returning the pay application because "it does not reflect your current contract amount through Change Order No. 7 as requested." Id.

266.    Burchick acknowledges that it would have paid Greenmoor the amounts due on the June 30 pay application if Greenmoor properly completed the application.  (4/1/09 Tr. at 152 (Finney).)

267.    Burchick withheld the amounts due on the July 31, 2006 payment application because it determined that Greenmoor did not properly complete the application.  (Def. Ex. 500.)

268.    After Greenmoor submitted its pencil copy of the July 31 application, Burchick revised it and returned it to Greenmoor.  (Def. Ex. 341.)

269.    By letter dated August 7, 2006, Burchick returned Greenmoor's July 31 application because it did not "reflect [Greenmoor's] current contract amount and incorporate Burchick comments on the pencil copy forwarded to [Greenmoor] via fax on 8/1/06."  (Def. Ex. 351.)  Burchick refused to process the July 31 application.  Id.

270.    Burchick acknowledges that it would have paid Greenmoor the amounts due on the July 31 payment application if Greenmoor had made the requested corrections.  (4/1/09 Tr. at 156-57 (Finney).)

271.    Burchick withheld the amounts due on the August 31, 2006 payment application because Greenmoor did not properly complete the application.  (Def. Ex. 500.)

272.    After Greenmoor submitted its pencil copy of the August 31 application, Burchick revised it and returned it to Greenmoor.  Greenmoor re-submitted the application without incorporating any of Burchick's requested changes.  (4/1/09 Tr. at 159-60, 177-78 (Finney); Def. Exs. 367, 383.)

273.   Burchick acknowledges that it would have paid Greenmoor $54,706.00 under the August 31 payment application if Greenmoor had made the requested corrections.  (4/1/09 Tr. at 160-61 (Finney); Def. Ex. 383.)

274.   The difference between the amounts Greenmoor seeks ($63,059.00) and what Burchick acknowledges it owes ($54,706.00) on the August 31, 2005 payment application is $8,353.00.  This amount relates to the bond premium for the 18th Floor, which floor PDG (not Greenmoor) completed.  (4/2/09 Tr. at 80-82 (Finney); Def. Ex. 245.)

275.   Burchick issued Greenmoor a credit change order for Phase III base contract work on the 18th Floor that Greenmoor did not perform.  Id.  Burchick included in this change order a "credit for the bond" on the 18th Floor.  Id.  This credit is reflected in Change Order No. 1 for Phase III.  (Def. Ex. 245.)

276.   Prior to issuing the credit change order, Mr. Finney of Burchick discussed it with Mr. Dellovade of Greenmoor and negotiated the ultimate amount of the credit.  (4/2/09 Tr. at 80.)

277.   Greenmoor agreed to Change Order No. 1, including the $8,353.00 credit for Greenmoor's portion of the bond for the 18th floor.  (Def. Ex. 245.)

278.   In addition to the individual reasons for withholding payment on each of the applications, Burchick also has withheld the amounts due on the payment applications either under the terms of the Subcontract Agreement or because of an asserted right to a set-off.  (Def. Ex. 500.)

### 3.   Backcharges and Extra Work

279.   Greenmoor seeks to recover for the following backcharges and extra work orders: (a) RFP-15; (b) RFP-68; (c) RFP-51; (d) RFP-10; (e) Change Order No. 1; (f) Change Order

No. 3; (g) Backcharge No. 1; (h) Beers Meeting; (i) Extra Work Order No. 9; (j) Extra Work Order No. 12; (k) Extra Work Order No. 7; (l) Corridor Walls; and (m) disposal of ceiling tile.

280.     Extra work, or work beyond the original scope of the base contract, is captured in a "Request for Proposal" or "RFP."  (4/1/09 Tr. at 75 (Finney).)

281.     An "RFP" is a request from the GSA to Burchick, as the general contractor, for extra work to be performed on the Moorhead Project.  (4/1/09 Tr. at75-78 (Finney).)

282.     When Burchick received an RFP, it would distribute the RFP to the subcontractors who would be involved with the extra work and request the subcontractors to submit a price for completing the extra work.  (4/1/09 Tr. at75-78 (Finney).)

283.     After receiving the pricing from the relevant subcontractor(s), Burchick would submit and discuss the pricing with URS.  (4/1/09 Tr. at75-78 (Finney).)

284.     After Burchick and URS had an agreement on the pricing, URS would forward this information on to the GSA.  (4/1/09 Tr. at75-78 (Finney).)

285.     After the GSA approved the pricing, the GSA would issue a "change order" to Burchick, which consisted of a modification to Burchick's contract with the GSA.  (4/1/09 Tr. at75-78 (Finney).)

286.     Burchick would then issue a "change order" to the appropriate subcontractor(s), which consisted of a modification to the subcontractor's contract with Burchick.  (4/1/09 Tr. at75-78 (Finney).)

### a.     RFP-15

287.     Greenmoor seeks $10,695.00 for work associated with RFP-15.  (Pl's App. A.)

288.     RFP-15 involved a change order for modifications to the out-of-sequence plumbing work on the Moorhead Project, which included the re-routing of water risers and

abatement work in rooms 1704 and 1804 and on the 12th floor.  This RFP additionally involved a deduction (or credit) because certain mini-containments that Greenmoor otherwise would have provided were no longer needed.  (Pl. Exs. 33, 426; Def. Ex. 326.)

289.    After negotiations with the GSA and URS, by letter dated June 5, 2006, Burchick forwarded a change order to Greenmoor for, inter alia, RFP-15.  (Def. Ex. 326.)  Under that change order, Burchick indicated that Greenmoor's contract would be adjusted upward in the amount of $6,413.00, which reflected an "[a]dd for final negotiations with GSA and URS for miscellaneous Time and Material abatement per RFP #15 (PC70) at the 1/31/06 meeting."  Id.

290.    The GSA paid Burchick $6,413.00 for Greenmoor's work on RFP-15.  (4/1/09 Tr. at 182-84 (Finney); Def. Ex. 326.)

291.    Burchick acknowledges that it owes Greenmoor $6,413.00 for work associated with RFP-15.  (Def. Exs. 499, 500.)

### b.    RFP-68

292.    Greenmoor seeks $14,336.56 for work associated with RFP-68.  (Pl. Ex. A.)

293.    RFP-68 consisted of a change order for miscellaneous demolition and abatement work done by Greenmoor in Phase I.  (Pl. Exs. 35, 428.)

294.    Greenmoor submitted a change order proposal to Burchick on or about February 25, 2005.  (Pl. Ex. 35.)

295.    After a negotiation meeting between GSA, URS and Greenmoor on January 31, 2006, URS agreed to a change order of $13,392.09 for the miscellaneous demolition and abatement work done by Greenmoor.<sup>8</sup>  (Def. Ex. 274; Pl. Ex. 36.)

---

[8]    In its February, 2006 correspondence to the GSA on RFP-68, URS noted that "negotiations to determine the final amount [of RFP-68] were delayed by the contractor due to an unrelated dispute between the contractor and his subcontractor."  (Pl. Ex. 36.)

296.    Burchick acknowledges that it owes Greenmoor $13,392.09 under RFP-68. (Def. Exs. 499, 500.)

297.    Burchick withheld this amount under the terms of the Subcontract Agreement and because it asserted a right of set-off.  Id.

### c.    RFP-51

298.    Greenmoor seeks $1,605.00 for work associated with RFP-51.  (Pl. Ex. A.)

299.    RFP-51 involved additional abatement work in Room 1321 (the women's room on the 13th floor).  (Pl. Ex. 38.)

300.    Greenmoor submitted its proposal to Burchick and estimated that the additional work would cost $1,605.00.  (Pl. Ex. 37.)

301.    By letter dated March 11, 2005, URS recommended that the GSA accept the quoted price and issue an amendment.  (Pl. Ex. 38.)

302.    Burchick acknowledges that it owes Greenmoor $1,605.00 for RFP-51.  (Def. Exs. 499, 500.)

303.    Burchick withheld payment of this amount because Greenmoor had not submitted a proper payment application.  It further withheld this amount under the terms of the Subcontract Agreement and because it asserted a right of set-off.  Id.

### d.    RFP-10

304.    Greenmoor seeks $209.00 in connection with work it completed under RFP-10. (Pl. Ex. A.)

305.    RFP-10 consisted of work on an elevator shaft on the 23rd floor.  (Def. Ex. 74.)

306.    In July 2004, Greenmoor proposed to complete this work for $1,440.00.[9]  (Pl. Ex. 39.)

307.    On its pay application submitted in October, 2004 (and subsequently revised in January, 2005), Greenmoor billed $1,231.00 for RFP-10.[10]  (Def. Ex. 74.)

308.    Burchick paid Greenmoor the sum of $1,231.00 for work RFP-10.  (Pl. Ex. 410-012; Pl. Prop. FOF at ¶ 537.)

### e.    Change Order No. 1

309.    On February 10, 2005, Burchick issued to Greenmoor its first change order as a $45,395 deduction, which included an $18,266.66 backcharge for supervision.  (Pl. Ex. 42.)

310.    This backcharge of $18,266.66 accounted for the time Burchick spent providing extra supervision for Greenmoor's work in light of Greenmoor's repeated deficiencies in Phase I. (2/03/09 Tr. at 72-73; Pl. Ex. 42; Def. Ex. 134.)

311.    On February 14, 2005, Joe Mlecsko, on behalf of Greenmoor, signed Change Order No. 1, thereby agreeing to this deduction.  Id.

312.    As Greenmoor's Project Manager, Mr. Mlecsko was authorized to sign change orders on behalf of Greenmoor.  (2/3/09 Tr. at 92-93 (Dellovade); 2/4/09 Tr. at 91-92 (Mlecsko).)

---

[9]    Greenmoor asserts that it issued a lump sum proposal in January, 2005 and cites to Plaintiff's Exhibit 49 in support.  (Pl's Proposed Findings of Fact at ¶ 536.)  However, Plaintiff's Exhibit 49 provides no information relevant to RFP-10, let alone supports a finding that Greenmoor issued a lump sum proposal of $1,440.00 in January, 2005.  Rather, an independent review of Plaintiff's exhibits (specifically, Plaintiff's Exhibit 39) shows that Greenmoor submitted such a proposal in July, 2004.

[10]    Greenmoor's expert (Cogent) prepared a compilation of its damages.  In that compilation, Cogent asserts that Greenmoor quoted $1,440.00 for RFP-10 and that it "carried the $1,440 on its schedule of values."  (Pl. Ex. 410-012.)  However, Cogent cites to no documents in support of this proposition and Greenmoor has not cited to credible evidence to support this proposition.  See supra n. 9.  Nothing in the relevant pay application, however, refers to a scheduled value of $1,440.00 for RFP-10.  Instead, the only amount associated with RFP-10 is $1,231.00.  (Def. Ex. 74.)

f.        Change Order No. 3

313.    Greenmoor claims that it is due an additional $17,477.00 for work associated with an RFP that was a part of Change Order No. 3.  (Pl. Exs. 411, 410-013, 410-014.)  Specifically, Greenmoor claims that it was underpaid for work that it performed in Phase I because Burchick improperly took a credit from Greenmoor of $11,477.00 for 20th floor isolation work and $6,000.00 for perimeter demolition work.  Id.

314.    During the bid process, through a January 12, 2004 addendum, Greenmoor was notified that under the H-Drawings, a perimeter containment barrier was to be installed above the ceiling on the 20th floor to isolate the 20th and 21st floors during the demolition of the perimeter wall on the 21st floor.  (Def. Ex. 16 at GR 002524; 4/1/09 Tr. at 191-93 (Finney).)

315.    The isolation work on 20th floor was necessary for the abatement activities that were to be performed on the 21st floor.  (Def. Ex. 16 at GR 002524; 4/1/09 Tr. at 191-93 (Finney).)

316.    Abatement work on the 21st floor was within Greenmoor's scope of work under Phase I of the Moorhead Project.  Id.; see also Pl. Ex. 6 at H-501.

317.    Greenmoor's expert admits that if the work for Change Order No. 3 was associated with work completed on the 21st Floor, then Greenmoor's position is incorrect.  (2/11/09 Tr. at 47 (M. Shaffer).)

318.    The credit in the amount of $6,000.00 was requested by Mr. Sekowski of URS.

319.    Joseph Mlecsko, on behalf of Greenmoor, agreed to the credit of $6,000.00 at a meeting between URS, Burchick and Greenmoor.  (4/1/09 Tr. at 193-94 (Finney).)

g.      **Backcharge No. 1**

320.    In Backcharge No. 1, Greenmoor sought to be paid sums for alleged extra work, including:  (i) demolition of the walls of the 23rd floor holding cell ($1,720.00); (ii) re-cleaning of the 22nd floor ($14,065.00); (iii) work associated with Options 1A, 1B, and 1C (collectively, $60,866.00); (iv) the 21st floor ceiling tile ($5,138.00); (v) damper isolation ($3,376.00); (vi) water clean-up ($679.00); and (vii) shaft isolation ($28,677.00).

321.    Greenmoor seeks to be paid $1,720.00 for the demolition of walls of the 23rd floor holding cell.  (Pl. Ex. 411; Pl. Ex. A to Prop. FOF and Concl. of Law.)

322.    During the course of the Moorhead Project, Greenmoor ordinarily was responsible for removing the top three courses of block wall so that it could conduct its abatement work, as in the case of corridor walls.  (4/2/09 Tr. at 94-95 (Finney); see also infra at ¶¶ 376-393 (discussing corridor walls).)

323.    After Greenmoor completed its abatement work, Burchick would demolish the entire block wall as part of its demolition work.  (4/2/09 Tr. at 94-95 (Finney); see also infra at ¶¶ 376-393 (discussing corridor walls).)

324.    The walls of the 23rd floor holding cell were "hot" walls, meaning that the walls were within containment and might have asbestos behind them.  (4/2/09 Tr. at 94-95 (Finney).)

325.    Burchick directed Greenmoor to demolish the entire wall, rather than removing just the top courses of block.  (Pl. Ex. 50.)

326.    In Backcharge No. 1, Greenmoor also seeks to be paid $14,065.00 for the "Re-cleaning [of the] 22nd floor."  (Ex. A, Pl's Prop. FOF & Concl. of Law; Def. Ex. 500.)

327.    Greenmoor incurred the re-cleaning costs as a result of having failed the first ACHD inspection of the 22nd floor.  (2/5/09 Tr. at 108-11 (Bell); Pl. Exs. 48, 52, 410-34; 4/1/09 Tr. at 197-98 (Finney).)

328.    After failing the initial inspection of the 22nd floor, URS directed Greenmoor to conduct additional cleaning to prepare the 22nd floor for re-inspection.  (2/5/09 Tr. at 108-11 (Bell); Pl. Exs. 48, 52, 410-34; 4/1/09 Tr. at 197-98 (Finney).)

329.    Burchick did not direct Greenmoor to perform the additional cleaning.  (4/1/09 Tr. at 197-98 (Finney).)

330.    Mr. Mlecsko, on behalf of Greenmoor, agreed to submit the charge directly to URS for payment.  (Pl. Ex. 50.)

331.    In Backcharge No. 1, Greenmoor also seeks to be paid $60,866.00 for work related to Options 1A, 1B and 1C, which involved the demolition of the walls in the restrooms on various floors.  (Pl. Ex. 411; Ex. A to Pl's Prop. FOF & Concl. of Law; 2/3/09 Tr. at 78-79 (Dellovade).)

332.    During the bid process, through correspondence dated September 30, 2003, Burchick informed all bidders, including Greenmoor, of Amendment No. 8.  As to the Options, the Amendment clarified:

> 22.  Sheets "H" drawings:  Asbestos work associated with the Options shall be performed as part of the base building bid whether or not the Options are accepted.

(Def. Ex. 7 at GR 002560.)

333.    The work related to the Options involved, among other things, demolition work to access the asbestos that was required to be abated.  (2/4/09 Tr. at 56 (Dellovade).)

334.    Prior to the start of the Moorhead Project, Greenmoor was aware that asbestos was behind the block walls involved with the Options.  (2/4/09 Tr. at 56 (Dellovade).)

335.    On or about September 12, 2006, Greenmoor submitted an extra work order for demolition work related to Options 1A, 1B and 1C.  (Pl. Ex. 54.)

336.     In support of its request to be paid for the Options work, Greenmoor submitted only the bid proposals it submitted to Mascaro Construction Company and Massaro Company in 2004 during the bidding process.  (Pl. Exs. 54, 55, 56; 2/3/09 Tr. at 79 (Dellovade).)

337.     In Backcharge No. 1, Greenmoor also seeks to be paid $5,138.00 plus interest and penalties for the removal of ceiling tile in the historically abated area on the 21st Floor.  (Pl. Prop. Findings of Fact & Concl. of Law, Ex. A; Pl. Ex. 411.)

338.     Burchick acknowledges that it owes Greenmoor $5,138.00 for this work.  (Def. Exs. 499, 500.)

339.     Burchick withheld this amount under the terms of the Subcontract Agreement and because it asserted a right of set-off.  Id.

340.     In Backcharge No. 1, Greenmoor also seeks to be paid $3,376.00 plus interest and penalties for damper isolation work.  (Pl. Prop. Findings of Fact & Concl. of Law, Ex. A; Pl. Ex. 411.)

341.     On or about December 12, 2004, Greenmoor submitted to Burchick a backcharge in the amount of $3,376.00 for this work.  (Pl. Ex. 48.)

342.     By letter dated December 28, 2004, Burchick denied Greenmoor's request for extra payment, noting that the damper isolation work was "contract work required by your coordination to isolate the floors you are working on per the sequence of operations."  (Pl. Ex. 49.)

343.     As such, the Court finds that damper isolation work was part of Greenmoor's base contract work.

344.   In Backcharge No. 1, Greenmoor also seeks to be paid $679.00 plus interest and penalties for water clean-up work.  (Pl. Prop. Findings of Fact & Concl. of Law, Ex. A; Pl. Ex. 411.)

345.   On or about December 12, 2004, Greenmoor submitted to Burchick a backcharge in the amount of $679.00 for this work.  (Pl. Ex. 48.)

346.   After Burchick denied Greenmoor's request for extra payment, by letter dated January 10, 2005, Mr. Mlecsko (on behalf of Greenmoor) stated that this line item of Greenmoor's December 12, 2004 backcharge could be omitted.  (Pl. Ex. 50.)

347.   In Backcharge No. 1, Greenmoor also seeks to be paid $28,677.00 plus interest and penalties for work it performed related to shaft isolation.  (Pl. Prop. Findings of Fact & Concl. of Law, Ex. A; Pl. Ex. 411.)

348.   Shaft isolation work on the Moorhead Project involved the preparation of the containments to separate them from the shafts in the Moorhead Building.  (4/2/09 Tr. at 4-5 (Finney).)

349.   Greenmoor categorized its shaft isolation work in Phase I as extra work insofar as it involved cutting and capping ductwork on the shaft and Greenmoor invoiced it to Burchick on or about December 12, 2004.  (Pl. Ex. 48; Pl. Ex. 410-37.)  Specifically, Greenmoor's expert explained that this work was required to be done after Greenmoor completed the construction of the mini-containment to isolate the mechanical shaft.  (Pl. Ex. 410-37.)

350.   After Burchick denied Greenmoor's request for extra payment, Mr. Mlecsko of Greenmoor curiously noted, and effectively conceded, that the "bid documents also state that all contractors are responsible for cutting and capping of all openings contiguous with their work." (Pl. Ex. 50.)

351.    The Court finds that work related to the isolation of the shaft, including cutting and capping the ductwork related to the shaft, was part of the base contract work for the asbestos abatement contractor, e.g., Greenmoor.  (4/2/09 Tr. at 4-5 (Finney).)

### h.    Beers Meeting

352.    Greenmoor seeks $1,632.00 plus interest and penalties in connection with a meeting with Greenmoor's bonding company, United States Surety Company, on February 13, 2006.  (Pl. Ex. 411.)

353.    After the meeting was scheduled, Greenmoor sought to cancel it on the grounds that it was unnecessary and advised Burchick that it would seek reimbursement for the costs associated with the February, 2006 meeting unless the meeting was cancelled.  (Pl. Exs. 62, 63.)

354.    Mr. Rob Beers of Beers Construction Consultants, Inc. attended the meeting on February, 13, 2006, on behalf of Greenmoor's bonding company and invoiced Greenmoor for costs related to the meeting.  (Pl. Exs. 62, 64.)

355.    After Greenmoor paid this invoice, in July 28, 2006, Greenmoor backcharged these costs to Burchick.  (Pl. Ex. 62.)

### i.    Extra Work Order No. 9

356.    Greenmoor seeks $23,710.00 plus interest and penalties for the removal of MEP on the 12th Floor of the Moorhead Project.  (Pl. Ex. 411; Pl's Prop. Findings of Fact & Concl. of Law, Ex. A.)

357.    The MEP work included duct work on the 12th Floor.  (2/3/09 Tr. at 28-29, 82-83 (Dellovade).)

358.    On or about September 12, 2006, Greenmoor submitted Extra Work Order No. 9 to obtain payment for the removal and disposal of MEP on the 12th Floor.  (Pl. Ex. 65.)

359.     Greenmoor did not provide any documentation to Burchick to support its request for extra payment under Extra Work Order No. 9.  (Pl. Ex. 65.)

360.     To the extent that Greenmoor calculated the labor costs associated with this work (2/3/09 Tr. at 82-83 (Dellovade)), Greenmoor did not submit these calculations to Burchick. (4/2/09 Tr. at 5 (Finney).)

### j.     Extra Work Order No. 12

361.     Greenmoor seeks $1,413.00 plus interest and penalties for overtime it paid to eighteen workers as a result of a water shutdown in the Moorhead Building.  (Pl. Ex. 411; Pl's Prop. Findings of Fact & Concl. of Law, Ex. A.)

362.     By letter dated February 10, 2006, Greenmoor requested a backcharge in the amount of $1,413.40 for overtime pay.  (Pl. Ex. 68.)

363.     On or about September 19, 2006, Greenmoor submitted Extra Work Order No. 12 for $1,413.40.  (Pl. Ex. 67.)

364.     Greenmoor paid its workers overtime because its workers were unable to shower and, therefore, unable to leave containment for the period of time that the water was shut down. (Pl. Ex. 68.)

365.     Mr. Dellovade testified that "[f]or some reason, the water was shut off."  (2/3/09 Tr. at 83-84.)

366.     Greenmoor does not know the reason for, or the entity responsible for, the water shut off.  (Pl. Ex. 68; 2/3/09 Tr. at 83-84 (Dellovade).)

### k.     Extra Work Order No. 7

367.     Greenmoor seeks $89,052.00 plus interest and penalties for equipment and materials.  (Pl. Ex. 411; Pl's Prop. Findings of Fact & Concl. of Law, Ex. A.)  Through this item,

Greenmoor seeks to recover rental costs (as opposed to costs associated with the equipment and materials being damaged or not being returned) from Burchick for PDG's use, in Phase II only, of the equipment and materials that were left on the job site after Greenmoor was terminated. (2/4/09 Tr. at 48 (Dellovade).)

368.     By Extra Work Order No. 7 dated September 12, 2006, Greenmoor sought $89,052.62 for material and equipment "confiscated by [Burchick] and used by PDG."  (Def. Ex. 439.)

369.     Greenmoor sought to recover for material and equipment purchased between May, 2004, through April, 2005.  (Def. Ex. 439.)

370.     After Burchick had terminated Greenmoor, by letter dated June 24, 2005, Burchick contacted Greenmoor regarding equipment and tools that remained at the Moorhead Building.  (Pl. Ex. 579.)

371.     Burchick notified Greenmoor that it could pick up the items, with the exception of "consumables," which Burchick noted "are considered paid for and part of the work."  Id.

372.     "Consumables" included, among other things, material used to set up the floors for the abatement work.  (4/2/09 Tr. at 7-8 (Finney).)

373.     Burchick paid Greenmoor for all of the set-up on Phases I and II.  (4/2/09 Tr. at 7-8 (Finney).)

374.     PDG did not use any EPDM that Greenmoor left at the Moorhead Building. (4/1/09 Tr. at 21-22 (Semega).)

375.     PDG did not use any polybags that Greenmoor left at the Moorhead Building. (4/1/09 Tr. at 21-22 (Semega).)

376.     Although PDG used some of the equipment (e.g., negative air machines and some of the decontamination unit configurations), PDG returned the equipment to Burchick after it was able to get its own equipment on site.  (4/1/09 Tr. at 21-22 (Semega).)

377.     With the exception of consumables, Burchick returned all of Greenmoor's material and equipment left at the Moorhead Building.  (2/4/09 Tr. at 47-48 (Dellovade).)

### l.     Corridor Walls

378.     Greenmoor seeks $111,866.00 plus interest and penalties for the installation of poly and EPDM on corridor masonry walls prior to conducting asbestos abatement.  (Pl. Ex. 411; Pl's Prop. Findings of Fact & Concl. of Law, Ex. A.)

379.     In 2003, Mr. Mlecsko (on behalf of Greenmoor) and Mr. Huber (on behalf of Burchick) had several conversations about the manner in which the architectural demolition and asbestos abatement work would progress, including the manner and sequence of removal of drywall partitions and the masonry walls in the corridors.  (3/30/09 Tr. at 215-16 (Huber).)

380.     Mr. Mlecsko and Mr. Huber discussed that Burchick, prior to any asbestos abatement, would perform architectural demolition on the drywall partitions that penetrated the ceiling tile by cutting the drywall below the ceiling level, thus leaving that portion of the drywall that penetrated the ceiling tile hanging from the ceiling and also leaving any asbestos above the ceiling undisturbed.  (3/30/09 Tr. at 215-16 (Huber).)

381.     Because the masonry walls are built from the floor up and because spray-on asbestos may exist on top of the masonry walls, Burchick could not conduct architectural demolition in the same manner, e.g., demolishing the wall below the ceiling level.  (3/30/09 Tr. at 216 (Huber); 3/31/09 Tr. at 21 (Huber).)

- 61 -

382.    Mr. Mlecsko and Mr. Huber thus agreed that the masonry walls in the corridors would remain until the asbestos abatement was completed.  (3/30/09 Tr. at 216 (Huber).)

383.    In addition, because it was anticipated that spray-on asbestos may exist on top of the walls just below the ceiling level and to allow Greenmoor access to the area above the ceiling, Mr. Mlecsko and Mr. Huber also agreed that Greenmoor would remove the top three courses of the masonry walls.  (3/30/09 Tr. at 216 (Huber); 3/31/09 Tr. at 20-21 (Huber).)

384.    Mr. Mlecsko and Mr. Huber further agreed that Burchick would remove the remainder of the corridor walls after Greenmoor completed its abatement work.  (3/30/09 Tr. at 216 (Huber).)

385.    Consistent with its discussions with Greenmoor, in its October 10, 2003 Technical Proposal (which Burchick submitted in the same timeframe that it issued Greenmoor a formal invitation to bid), Burchick set forth its plan for the Moorhead Project, noting that each floor would begin with demolition.  (Pl. Ex. 218 at BCCI 036898-036899.)  Significantly, however, Burchick stated that the "initial demolition will not include the perimeter wall and masonry walls in the corridor.  This work will be performed after the abatement has been completed."  Id.

386.    In April, 2004, Greenmoor submitted a plan of action for its abatement work in which it indicated that the masonry walls would have to be removed prior to its abatement work, but Burchick struck this portion of the plan of action as being inconsistent with what the parties had contemplated and, in its place, indicated that "[m]asonry [walls] removed after abatement clearance is achieved."  (Def. Ex. 27; 3/31/09 Tr. at 23 (Huber).)

387.    Burchick provided Greenmoor with a draft demolition plan by e-mail dated May 24, 2004, and sought Greenmoor's comments.  (Def. Ex. 498.)  In that plan, Burchick, consistent with its conversations with Greenmoor in 2003, stated:

- 62 -

Architectural demolition activities will take place before and after asbestos abatement." The scope of architectural demolition that take place before beginning asbestos abatement on a given floor will be limited to activities below the existing ceiling grid system. These activities include, but are not limited to, removal of carpet tile, access flooring, doors, hardware, metal partition walls, furniture, toilet partitions, millwork, and/or gypsum partitions terminating below the ceilings. **Architectural demolition that takes place after asbestos abatement will include removal of masonry walls, gypsum column covers and/or perimeter walls.**

Id. (emphasis added).

388.    In the draft demolition plan, Burchick also indicated that Greenmoor "will also remove the top 3 courses of any masonry walls present within the containment." Id.

389.    Greenmoor did not express any concerns over Burchick's plan regarding the masonry walls in the corridors that it set forth in the draft demolition plan.

390.    In June, 2004, Greenmoor again submitted a plan of action for its abatement work, which notably did not include any statement or suggestion (as it had in April, 2004) that the masonry walls had to be removed prior to asbestos abatement.  (Def. Ex. 36.)

391.    On June 17, 2004, Burchick submitted its final demolition plan to the GSA which was, in relevant part, identical to the draft demolition plan Burchick provided to Greenmoor by e-mail dated May 24, 2004.  Most relevantly, Burchick specifically stated that "[a]rchitectural demolition that takes place after asbestos abatement will include removal of masonry walls, gypsum column covers and/or perimeter walls." (Def. Ex. 38.)

392.    The Court finds Mr. Huber's testimony on the parties' agreement on the corridor walls to be credible, particularly when that testimony is considered along with the documentary evidence concerning the plan of action for the demolition of the corridor walls.  This is particularly so in light of the fact that Greenmoor offered no testimony from Mr. Mlecsko – the

Greenmoor representative with whom Mr. Huber discussed this issue – rebutting or refuting

Mr. Huber's testimony.

393.    For the same reasons, and because Mr. Dellovade neither had any conversations

with anyone at Burchick concerning the issue (2/3/09 Tr. at 145-46 (Dellovade) nor was privy to

the discussions between Messrs. Mlecsko and Huber, the Court does not find credible

Mr. Dellovade's testimony that Burchick was required to demolish the corridor walls prior to

Greenmoor beginning its abatement work.

394.    The parties, at all relevant times, contemplated that Burchick would demolish the

masonry walls in the corridors after Greenmoor completed its asbestos abatement work and,

thus, Greenmoor was to conduct its abatement work with the masonry walls in place.

395.    Greenmoor first submitted an invoice for the alleged extra work with the corridor

walls on or about November 13, 2006, and again on or about June 27, 2007 (Def. Exs. 424, 437.)

### m.    Disposal of Ceiling Tile

396.    Greenmoor seeks a total of $47,562.00 for the disposal of ceiling tile, which

includes $18,060.00 for the disposal of ceiling tile on floors 21-25 and $29,502.00 for the

disposal of ceiling tile on floors 12-17.  (Pl. Ex. 411.)  Greenmoor seeks these sums for the

purported cost of transporting the material from each floor to the loading dock at the Moorhead

Building.

397.    Attachment D of the Subcontract Agreement provides that Greenmoor is to

"remove the acoustical ceiling tile and vacuum clean ACM and palletize ceiling tile for removal

by [Burchick] as construction debris."  (Def. Ex. 33, Att. D.)

398.    The Project Specifications provide that ceiling tile is to be treated as ACM.  (Pl.

Ex. 17; Def. Ex. 14 at Section 02063, BCCI 253.)

399.    On or about October 7, 2003, Burchick sent a notice to all bidders in which it clarified Section 02063 of the Project Specifications to note that ceiling tiles were to be disposed of as asbestos containing material.  (Def. Ex. 8.)

400.    On December 4, 2003, Mr. Huber of Burchick met with Mr. Mlecsko of Greenmoor and specifically discussed the sequencing of work and the manner by which the ceiling tile was going to be disposed, namely having Greenmoor physically move the ceiling tiles to the loading dock of the Moorhead Building for disposal by Burchick as construction debris. (3/30/09 Tr. at 223-24 (Huber); 3/31/09 Tr. at 9-10, 37-38 (Huber).)

401.    In its April 1, 2004 letter of intent, Greenmoor stated that the scope of its work included "all demolition, removal, abatement and **disposal** of asbestos containing materials including but not limited to the work identified in Division 2 of the Specification [e.g., Specification 02063]."  (Def. Ex. 25) (emphasis added).

402.    Burchick initially sought to treat and dispose of the ceiling tiles as construction debris so that the material could be recycled.  (3/30/09 Tr. at 45-46 (Burchick).)

403.    To that end, Burchick had an arrangement with Armstrong Ceiling to haul the ceiling tiles from the Moorhead Building to their plant for recycling.  (3/30/09 Tr. at 172 (Burchick).)

404.    URS rejected Burchick's plan and instead wanted that the ceiling tiles be treated as ACM.  (3/30/09 Tr. at 45-46 (Burchick).)

405.    At the same time that URS was rejecting Burchick's plans to recycle the ceiling tiles, Greenmoor was expressing concern to Burchick over the methodology for removing the ceiling tiles from containment.  Greenmoor specifically expressed that palletizing was time-

consuming and that bagging the material in poly bags would be more efficient.  (3/30/09 Tr. at 44-46 (Burchick).)

406.    At minimum, there was no difference in cost between the two methods of treating the ceiling tile, e.g., cleaning and palletizing it or bagging it and treating it as ACM.  (3/30/09 Tr. at 121 (Huber); 3/31/09 Tr. at 37 (Huber).)  If anything, as the work progressed, Greenmoor expressed that it was cheaper to use the "bagging" method.   (3/30/09 Tr. at 45-46 (Burchick).)

407.    For Burchick to retrieve the removed ceiling tiles from the particular floor would require Burchick (an unlicensed abatement contractor) to enter into containment to transport the ceiling tiles to the loading dock.  (3/31/09 Tr. at 10 (Huber).)

408.    The Court finds that the disposal of the ceiling tile from the floor to the loading dock was within Greenmoor's scope of work, as outlined in Attachment D of the Subcontract Agreement.

409.    The Court additionally finds that under Attachment D, Greenmoor was responsible for removing or transporting the ceiling tile from containment to the loading dock or garage of the Moorhead Building.[11]

### B.    Lost Profits

410.    Greenmoor seeks lost profits as a result of being terminated from the Moorhead Project and thus, being precluded from performing Phases II, III, and IV, as well as the 18th floor on Phase II which was completed by PDG.  (Pl. Ex. 410 at 115-20, 285-88; Pl. Ex. 412.)

411.    In support of its lost profits claim, Greenmoor offered the testimony of Mr. Mark Shaffer, an economic expert.  (Pl. Ex. 410 at 115-20, 285-88; Pl. Ex. 412.)

---

[11]    In connection with Burchick's Rule 52(c) Motion made after Greenmoor's case-in-chief, the Court found that under Attachment D, Greenmoor was responsible for removing the ceiling tile.  See 2/11/09 Tr. (Doc. 113) at 114.

412.     Mr. Shaffer opined that Greenmoor suffered lost profits in the amount of $1,565,667.93.  (Pl. Ex. 410-290.)

## C.     Labor Inefficiencies

413.     Greenmoor seeks the cost of labor inefficiencies it allegedly experienced in performing its work on Phase III of the Moorhead Project.

414.     In support of its labor inefficiencies claim, Greenmoor offered the testimony of Mr. Mark Shaffer.  (Pl. Ex. 410 at 120-123, 288-89.)

415.     Mr. Shaffer applied a measured mile methodology to determine the value of the alleged labor inefficiencies.  (Pl. Ex. 410 at 120-23, 288-29.)

416.     Mr. Shaffer relied only upon statements made to him by Mr. Dellovade, the volume of correspondence from Burchick to Greenmoor, and the fact that Greenmoor had a smaller field office on Phase III than on Phase I.  (2/11/09 Tr. at 74-75 (Shaffer).)

417.     Mr. Shaffer did not analyze the impact, if any, of a smaller office on the efficiency of Greenmoor's employees in the field who were performing the asbestos abatement work. (2/11/09 Tr. at 75 (Shaffer).)

418.     Mr. Shaffer acknowledges that the efficiency of employees performing the asbestos abatement work would not be impacted by the volume of correspondence being received by Greenmoor from Burchick.  (2/11/09 Tr. at 75 (Shaffer).)

419.     Mr. Shaffer did not analyze whether any alleged inefficiencies were caused by factors other than Burchick or Greenmoor.  (2/11/09 Tr. at 75-76 (Shaffer).)

420.     Mr. Shaffer submitted a total cost claim.  (2/11/09 Tr. at 75-76 (Shaffer).)

421.     Mr. Shaffer did not analyze whether the GSA's requirements in a corrective action plan for Phase III impacted Greenmoor's efficiency.  (2/11/09 at 78 (Shaffer).)

422.    Greenmoor's supervisor, Lawson Bell, testified that the only on-site interaction with Burchick during Phase III of which he was aware involved a single Burchick employee talking to a single Greenmoor employee for about twenty minutes per shift on Phase III.  (2/5/09 at 144 (Bell).)

## X.    FACTUAL FINDINGS AS TO BURCHICK'S ALLEGED DAMAGE CLAIMS

423.    Defendant/Counterclaimant Burchick asserts that it is owed three categories of damages:  (1) outstanding backcharges or credits; (2) additional costs incurred for work in Greenmoor's scope which the replacement subcontractor, PDG, did not complete; and (3) attorneys' fees.[12]

### A.    Backcharges/Credits

424.    In this category of damages, Burchick seeks to recover $79,925.77, which it asserts is the total amount due under the following outstanding Change Orders:  (i) Change Order 3 (Phase I); (ii) Change Order 6 (Phase III); (iii) Change Order 7 (Phase III); (iv) Change Order 8 (Phase III); (v) Change Order 9 (Phase III); (vi) Change Order 11 (Phase III); (vii) Change Order 12 (Phase III); (viii) Change Order 13 (Phase III); and (ix) Change Order 14 (Phase III).

### 1.    *Change Order No. 3:  Temporary Platform Costs*

425.    Burchick issued Change Order 3 dated March 3, 2005.  (Def. Exs. 134, 143.)

426.    In Change Order 3, Burchick, inter alia, back-charged Greenmoor $8,471.00, which represented the cost to "construct the temporary shaft platform for Greenmoor in Shaft 2." (Def. Ex. 134 at GR009578.)

---

[12]    In light of the rulings set forth herein, the Court will defer its ruling on either party's ability to recover attorneys' fees until after the parties submit additional materials relevant to the ability to recover such fees and the appropriate amount, if any, of such fees.

427.    The GSA wanted both a temporary platform and a permanent platform constructed in the shafts.  (4/2/09 Tr. at 97-98 (Finney).)

428.    Greenmoor was responsible for constructing a temporary platform and Burchick was responsible for constructing a permanent platform.  (4/2/09 Tr. at 97-98 (Finney).)

429.    Greenmoor never constructed a temporary platform.  (4/2/09 Tr. at 97-98 (Finney).)

430.    Burchick "devised a way to put an alternate, permanent platform in to use because Greenmoor could not come up with a way to provide a temporary platform."  (4/2/09 Tr. at 97 (Finney).)

431.    As such, Burchick constructed the only platform in the shaft, which was a type of permanent platform.  (4/2/09 Tr. at 97 (Finney).)

432.    Although Greenmoor did not construct a temporary platform, Burchick rejected Greenmoor's offer of a $1,440.00 credit for not constructing a temporary platform.  (4/2/09 Tr. at 98 (Finney).)

433.    Burchick did not present evidence of its bid for constructing the permanent platform, or any other evidence of its anticipated costs for constructing a permanent platform.  (4/2/09 Tr. at 99-100 (Finney).)

434.    Burchick back-charged Greenmoor one-half the cost of the platform that it ultimately constructed.  (4/2/09 Tr. at 99-100 (Finney); Def. Ex. 134 at GR009578-GR009579; Def. Ex. 143; Pl. Ex. 551.)

### 2.    *Change Order No. 6*

435.    Change Order No. 6 involves two items for which Burchick seeks to recover: (i) a charge of $10,539.77 for overtime shift supervision for Phase III and (ii) a charge of

$772.00 for welding repair that Bryan Mechanical (another subcontractor) performed on wind ties cut during abatement activities.  (Def. Ex. 334.)

436.    By letter dated March 21, 2006, Burchick notified Greenmoor of the additional overtime labor costs it incurred by having a Burchick supervision "on site during additional overtime hours and shifts conducted by Greenmoor Inc. that were implemented as part of your Phase 3 abatement recovery plan."  (Def. Ex. 308.)

437.    Under the Subcontract Agreement, Greenmoor is not obligated to pay the cost of Burchick's supervision of its work.  (Def. Ex. 33.)

438.    Greenmoor did not otherwise agree to compensate Burchick for any supervision during Phase III.  (4/2/09 Tr. at 104 (Finney).)

439.    Under the Project Specifications, Greenmoor was permitted to work twenty-four hours per day, seven days per week.  (4/2/09 Tr. at 103-04 (Finney); Pl. Ex. 17 at GR 2089.)

440.    By letter dated June 13, 2006, Bryan Mechanical submitted a change order request to Burchick for costs it incurred in re-installing wind ties "on the 15[th] & 18th Floor [of the Moorhead Building], that were inadvertently removed by Greenmoor during Asbestos Abatement."  (Def. Ex. 330 at GR009848.)

441.    By letter dated June 13, 2006, Burchick forwarded to Greenmoor Bryan Mechanical's change order request and stated that a "deduct change order to your Phase 3 contract in the amount of $772.00 will be forthcoming" for repairs that Bryan Mechanical had to make to the "existing steel wind ties on Floors 15 and 18 that were incorrectly cut by Greenmoor during Phase 3 abatement activities."  (Def. Ex. 330 at GR009845.)

442.    Greenmoor did not perform any work on the 18th Floor.  (Jt. Ex 1 at ¶ 83.)

443.     Bryan Mechanical did not distinguish between the repair work it completed on the 15th floor versus that which it completed on the 18th floor.  (Def. Ex. 330.)

### 3.     Change Order No. 7

444.     By letter dated June 27, 2006, Bryan Mechanical submitted a formal change order request through which it sought to be reimbursed for costs incurred in having to furnish and re-install fire dampers in Shafts 1 and 2.  (Def. Ex. 336.)

445.     Greenmoor inadvertently removed the fire dampers during asbestos abatement. (Def. Ex. 336.)

446.     Burchick notified Greenmoor of Bryan Mechanical's change order request by letter dated June 28, 2006, and indicated that a "deduct change order to your Phase 3 contract  in the amount of $977.00 will be forthcoming."  (Def. Ex. 336.)

447.     Burchick issued Change Order No. 7 dated July 7, 2006 to seek, inter alia, a deduction of $977.00, which consisted of a charge of $872.00 for the work and a 12% mark-up of $105.00, for a "backcharge to [Bryan Mechanical] to furnish and install 3 fire damper assemblies that were inappropriately removed during abatement."  (Def. Ex. 338.)

448.     In Change Order No. 7, Burchick also sought a deduction in the amount of $12,300.00 "for [the] construction of mini containment and abatement to support out of phase plumbing not performed in Phase 3."  (Def. Ex. 338.)

449.     Burchick sought the deduction because it "was able to perform the plumbing relocations through other means not requiring this abatement work to be done."  (Def. Ex. 353.)

450.     By letter dated July 28, 2006, Greenmoor disputed the $12,300.00 deduction and noted that the same amount had been listed on the Schedule of Values.  (Def. Ex. 343.)

451.   By letter dated August 9, 2006, Burchick explained to Greenmoor that the "contract scope of work was reduced by the value [Greenmoor] established for work [Greenmoor] did not have to perform."  (Def. Ex. 353.)

452.   Burchick does not dispute that Greenmoor performed some out-of-sequence during the Moorhead Project and admits that Greenmoor should be paid for any out of sequence plumbing work that Greenmoor performed.  (4/2/09 Tr. at 112 (Finney).)

453.   Greenmoor acknowledges that it did not have to perform certain out-of-sequence plumbing work, specifically the construction of mini-containments.  (2/3/09 Tr. at 68 (Dellovade).)

454.   In connection with RFP-15, through a proposal dated February 25, 2005, Greenmoor proposed to offer a credit in the amount of $8,700.00 for mini-containments that it did not have to construct for out-of-sequence plumbing work.  (Pl. Ex. 33; 2/3/09 Tr. at 68 (Dellovade).)

455.   The credit later was adjusted to a sum of $12,982.00, rather than $8,700.00, for the mini-containments that Greenmoor did not have to construct.  (Pl. Exs. 32, 426.)

456.   Burchick proffered no evidence of the amount or value of out-of-sequence work Greenmoor performed in Phase III.

457.   Burchick proffered no evidence of the amount or value of out-of-sequence work that Greenmoor did not perform in Phase III.

### 4.   *Change Order No. 8*

458.   Burchick issued Change Order No. 8 dated July 31, 2006, to Greenmoor, seeking a deduction from Greenmoor's contract in the amount of $799.00 for masonry repairs that it completed in Shaft 1 during Phase III of the Moorhead Project.  (Def. Ex. 346.)

459.    Burchick issued Work Authorizations dated July 10, 2006, July 14, 2006, and July 18, 2006, in which it described the work that it was completing and that it was performing work for Greenmoor.  (Def. Ex. 346 at GR009874-GR009876.)

460.    Each of the Work Authorizations is signed by both a representative of Burchick and a representative of Greenmoor.  (Def. Ex. 346 at GR009874-GR009876.)

461.    As such, Greenmoor authorized Burchick to perform the work that is the subject of Change Order No. 8.  (Def. Ex. 346 at GR009874-GR009876.)

462.    By letter dated July 31, 2006, Burchick forwarded to Greenmoor the summary of costs to complete the masonry repairs, including the Work Authorizations.  (Def. Ex. 346.)

463.    By letter dated July 31, 2006, Burchick forwarded Change Order No. 8 to Greenmoor.  (Def. Ex. 346 at GR009882.)

### 5.    *Change Order No. 9*

464.    Burchick issued Change Order No. 9 dated August 25, 2006, to Greenmoor through which it sought, inter alia, four separate deductions to Greenmoor's contract totaling $3,945.00.  (Def. Ex. 372.)

465.    The deductions included:  (i) a backcharge for masonry repairs in the elevator lobby on the 14th floor $841.00; (ii) a deduction of $750.00 for demolition and abatement work that Greenmoor did not need to complete; (iii) a backcharge for $1,944.00 for repairs to elevator cables; and (iv) a deduction of $410.00 for adjustments to Greenmoor's billing.  (Def. Ex. 372.)

466.    Burchick's deductions in the amounts of $750.00 and $410.00 are appropriate (Def. Exs. 362, 363) and Greenmoor so concedes (Pl's Prop. Findings of Fact & Concl. of Law at ¶ 688).

467.     Burchick issued Work Authorizations dated August 7, 2006 and August 9, 2006, in which Burchick described the masonry repair work that it was completing for Greenmoor at a cost of $841.00.  (Def. Ex. 373 at GR009893-GR009894.)

468.     Both of the Work Authorizations are signed by both a representative of Burchick and a representative of Greenmoor.  (Def. Ex. 373 at GR009893-GR009894.)

469.     As such, Greenmoor authorized Burchick to perform the masonry repair work in the elevator lobby of the 14th Floor.  (Def. Ex. 373 at GR009893-GR009894.)

470.     By letter dated August 25, 2006, Burchick forwarded the summary of costs to Greenmoor to complete the masonry repairs in the elevator lobby of the 14th Floor, including the Work Authorizations.  (Def. Ex. 373.)

471.     The elevator cables that are the subject of the $1,944.00 backcharge in this change order were damaged during the abatement of the 14th Floor.  (Def. Ex. 364.)

472.     Miller Electric Construction, Inc. repaired the elevator cables that were damaged and invoiced Burchick for the work.  (Def. Ex. 364.)

473.     By letter dated August 22, 2006, Burchick forwarded Miller Electric's invoice to Greenmoor and indicated that it would be issuing to Greenmoor a deduct change order for $1,944.00.  (Def. Ex. 364.)

474.     By letter dated August 25, 2006, Burchick forwarded Change Order No. 9 to Greenmoor.  (Def. Ex. 372.)

### 6.     *Change Order No. 11*

475.     Burchick issued Change Order No. 11 dated October 4, 2006, to Greenmoor through which it sought four deductions to Greenmoor's contract totaling $35,596.77 as follows: (i) $28,964.00, which consisted of a charge of $25,861.00 for the work and a 12% mark-up of

$3,103.00, "to take over Floor 12 abatement work;" (ii) $2,643.00, which consisted of a charge of $2,360.00 for the work and a 12% mark-up of $283.00, "to demo[lish] damaged masonry and install a critical barrier at the Floor 16 elevator lobby;"(iii) $2,914.00, which consisted of a charge of $2,602.00 for the work and a 12% mark-up of $312.00, "to remove debris from the Floor 13 perimeter windows;" and (iv) $900.00, which consisted of a charge of $804.00 for the work and a 12% mark-up of $96.00, "to repair marble panels on Floor 16 at Elevator Lobby." (Def. Ex. 398.)

476.    Burchick backcharged Greenmoor $28,694.00 for the costs of completing the abatement work on the 12th Floor.  (Def. Ex. 399.)

477.    PDG took over the 12th floor abatement work after Burchick reinstated Greenmoor's termination from the Moorhead Project.  (Def. Ex. 399.)

478.    PDG submitted to Burchick time and material sheets for abatement and clean-up of the 12th Floor.  (Def. Ex. 399 at BCCI 013204, BCCI 013207.)

479.    Burchick backcharged Greenmoor $2,643.00 for costs incurred in demolishing damaged masonry and installing a barrier to facilitate new masonry installation on the 16th Floor. (Def. Ex. 400.)

480.    PDG completed masonry demolition and barrier installation and submitted a time and material sheet documenting its costs to Burchick.  (Def. Ex. 400 at BCCI 013183.)

481.    The 16th Floor work at issue in Change Order No. 11 was discovered after the floor passed ACHD inspection during new masonry work on the floor.  (4/2/09 Tr. at 121 (Finney).)

482.    Burchick backcharged Greenmoor $2,914.00 for costs related to asbestos removal from the perimeter windows on the 13th Floor.

483. The 13th Floor was historically abated. (4/2/09 Tr. at 115 (Finney); Pl. Ex. 6.)

484. Greenmoor primarily was responsible for completing perimeter wall work on the 13th Floor. (4/2/09 Tr. at 115 (Finney).)

485. The perimeter wall work included the removal of insulation, plaster and any ACM overspray from the perimeter walls. (4/2/09 Tr. at 120 (Finney); Pl. Ex. 213.)

486. The Court finds that the removal of asbestos on the perimeter windows was part of the perimeter wall work and, therefore, part of Greenmoor's scope of work.

487. Burchick backcharged Greenmoor $900.00 for the costs of the repairs to the marble panel plus a 12% mark-up. (Def. Ex. 397.)

488. Greenmoor disputes the 12% mark-up.

489. Mr. Dellovade testified that "it was understood" that the parties would not mark-up backcharges. (2/3/09 Tr. at 76-77 (Dellovade).)

490. Mr. Finney acknowledged that "most of the time," an agreement existed between Burchick and its subcontractors that the 12% mark-up would not be assessed. (4/2/09 Tr. at 93 (Finney).)

491. Greenmoor admits that it damaged the marble panels that are the subject of Change Order No. 11. (Pl. Ex. 410 at 79-80.)

### 7. Change Order No. 12

492. Burchick issued Change Order No. 12 dated October 9, 2006, through which it sought $4,306.00, which consisted of a charge of $3,845.00 for the work and a 12% mark-up of $461.00, for the costs of repairing damage by Greenmoor to the loading dock. (Def. Ex. 410.)

493. The GSA made the repairs to the loading dock, which repairs cost the GSA $3,845.00. (Def. Ex. 410.)

494.     Burchick backcharged Greenmoor for the costs of the repairs plus a 12% mark-up.  (Def. Ex. 410.)

495.     Greenmoor disputes the 12% mark-up.

496.     Greenmoor admits that it damaged the loading dock.  (2/3/09 Tr. at 75-76 (Dellovade).)

497.     Greenmoor admits that it owes Burchick the GSA's costs, e.g., $3,845.00, for repairing the damage to the loading dock.  (Pl. Ex. 410.)

### 8.     Change Order No. 13

498.     Burchick issued Change Order No. 13 dated October 30, 2006 through which it sought to backcharge Greenmoor a sum of $672.00 for the recycling of three lead doors.  (Def. Ex. 415.)

499.     Under RFP-145, Greenmoor was contractually obligated to recycle the lead doors.  (Def. Ex. 416.)

500.     At the time that it was terminated, three lead doors remained.  (Def. Ex. 416.)

501.     Burchick subcontracted the work to PDG after Greenmoor was terminated.  (Def. Ex. 416.)

502.     Greenmoor acknowledges that it was required to recycle the lead doors.  (Pl. Ex. 411 at 66.)

503.     Greenmoor, accordingly, has reduced the amount of the money it seeks under RFP-145 by $699.00 to account for the fact that it did not recycle the lead doors at issue in Change Order No. 13 and, thus, did not complete the work under RFP-145.  (Pl. Ex. 411 at 66.)

504.     Burchick admits that it would be improper to seek an additional deduction or backcharge from Greenmoor if it already has been deducted from Greenmoor's claim.  (4/2/09 Tr. at 123-24 (Finney).)

### 9.     Change Order No. 14

505.     Burchick issued Change Order No. 14 dated November 1, 2006, in which it sought a backcharge in the amount of $1,723.00 for masonry repairs in the elevator lobby on the 16th floor and plaster removal from the perimeter window frames on the 13th floor.  (Def. Ex. 415.)

506.     Burchick performed both the masonry repairs on the 16th floor and the plaster removal on the 13th floor in September, 2006.  (Def. Ex. 391.)

507.     Although it completed work authorizations for this work, Burchick did not obtain signed authorizations from Greenmoor because it was unable to contact a representative as Greenmoor no longer was on site at the time the work was performed.  (Def. Ex. 391.)

508.     By letter dated September 13, 2006, Burchick notified Greenmoor that a "deduct change order to [Greenmoor's] Phase 3 contract in the amount of $1,723.00 for these two corrective actions will be forthcoming."  (Def. Ex. 391.)

### B.     Work That PDG Did Not Complete

509.     Burchick seeks to recover the costs it incurred "for the removal of duct work from the shafts for the phases that Greenmoor did not do the work."  (4/2/09 Tr. at 11 (Finney); Def. Ex. 499.)

510.     The shaft duct work at issue was within Greenmoor's scope of work.  (4/2/09 Tr. at 17, 30 (Finney).)

511.    After Burchick terminated Greenmoor, Burchick tendered the balance of Greenmoor's work to PDG for the balance of the value of Greenmoor's subcontracts.  (4/2/09 Tr. at 30 (Finney).)

512.    Burchick issued a draft contract to PDG which included, among other things, a provision that PDG was responsible for removal of "ductwork in the shafts."  (Def. Ex. 170 at BCCI016071.)

513.    PDG agreed to take over Greenmoor's remaining work, but maintained that the demolition of duct work located in the shafts was not within the scope of PDG's work.  (4/2/09 Tr. at 24 (Finney); Pl. Ex. 151.)

514.    By letter dated May 18, 2005, PDG submitted a quotation for the demolition of the shaft duct work, specifically offering to do the work on Shaft 1 for $76,800.00 and on Shaft 3 for $78,600.00.  (Pl. Ex. 159.)  PDG did not submit a quotation for the work on Shaft 2.  Id.

515.    There is no evidence that Burchick accepted PDG's May 18 quotation for the shaft duct work.

516.    PDG executed a contract to complete the asbestos abatement work on the Moorhead Project on May 18, 2005 and Burchick executed the same on May 19, 2005.  (Def. Ex. 170.)

517.    PDG's contract with Burchick does not include any provision expressly requiring PDG to remove the duct work in the shafts.  (Def. Ex. 170.)

518.    Although the shaft duct work was included in an earlier version of the contract, Burchick struck this provision after its discussions with PDG.  (Compare Def. Ex. 170 at BCCI016071 with Def. Ex. 170 at BCCI016068; 4/2/09 Tr. at 29 (Finney).)

519.    Although PDG performed some of the shaft duct work to start, Burchick eventually completed the work on its own.  (4/2/09 Tr. at 17 (Finney).)

520.    Greenmoor did not complete any of the shaft duct work at issue in Burchick's claim prior to being terminated from the Moorhead Project.

521.    Burchick determined that it had incurred $102,876.70 in additional costs to complete the shaft duct work based on both its actual and estimated costs for the work.  (4/2/09 Tr. at 18 (Finney).)

## CONCLUSIONS OF LAW AND DISCUSSION

### I.    BACKGROUND

This Court has jurisdiction over the instant action under the Miller Act, 40 U.S.C. § 3131, et. seq. and has supplemental jurisdiction over the parties' state law claims.  See 28 U.S.C. § 1367; Lyon v. Whisman, 45 F.3d 758, 759-61 (3d Cir. 1995).  Venue is proper in this Court because this suit has been brought in the District where the Moorhead Project was located. 28 U.S.C. § 1391 (b); 40 U.S.C.S. § 3133(b)(3)(B).  In actions brought under the Miller Act, issues not involving the construction of the Act will be resolved by the law of the state where the contract is performed.  United States ex rel. McFadden Mech., Inc. v. FSEC, Inc., 2001 U.S. Dist. LEXIS 24201, at *17-18 (E.D. Pa. 2001).  The Court finds that Pennsylvania substantive law applies to the non-Miller Act claims.

### II.    LIABILITY

#### A.    Number of Contracts:  There Is One Agreement Governing The Parties' Relationship.

A threshold issue before the Court is whether the parties entered into a single contract to govern their performance or whether they entered into five contracts, e.g., one contract for each of the five phases of the Moorhead Project.  Plaintiff Greenmoor asserts that the parties entered

into five contracts, while Defendant Burchick asserts that the parties entered into only one contract. The Court finds that the parties entered into a single contract to govern their performance.

To begin, the construction and interpretation of contracts is a question of law for the Court. Midomo Co. v. Presbyterian Hous. Dev. Co., 739 A.2d 180, 187 (Pa. Super. Ct. 1999). It is well-established that the "'intent of the parties to a written contract is contained in the writing itself.'" Id. at 92. Under Pennsylvania law, where the parties have entered into an agreement that represents the parties' "entire contract" or an integrated contract, evidence of prior oral or written negotiations, i.e., parole or extrinsic evidence, is inadmissible to explain or vary the terms of the agreement. Yocca v. Pittsburgh Steelers Sports, Inc., et al., 854 A.2d 425, 436 (Pa. 2004). Parole evidence, however, can be introduced in cases of fraud, accident or mistake or in cases where the contract is ambiguous. Id. (stating that "parole evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances"). Thus, while a court must interpret an unambiguous contract "according to the natural meaning of its terms," a court may "look outside the 'four corners' of a contract" when interpreting an ambiguous contract. Bohler-Udeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 93 (3d Cir. 2001).

### 1. The Subcontract Agreement Is Ambiguous On The Issue Of The Number of Contracts.

An ambiguity exists in a contract if the contract "'is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning.'" Id. (quoting Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 614 (3d Cir. 1995)). To determine whether an ambiguity exists, a "court may consider 'the words of the contract, the

alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning.'" Id. (quoting Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1011 (3d Cir. 1980)).  An ambiguity can be either patent, i.e., on the face of the contract, or latent.  A latent ambiguity "'arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous.'"  Id. (quoting Duquesne Light Co., 66 F.3d at 614).  Thus, a latent ambiguity must be based on a "contractual hook" in that the extrinsic evidence "must support an alternative meaning of a specific term or terms contained in the contract, rather than simply support a general claim that the parties meant something other than what the contract says on its face."  Id. at 96.  Regardless of whether parole evidence may be introduced to clarify an ambiguity, "[c]ourts may consider the subsequent actions of the contracting parties to ascertain the parties' intentions and resolve any ambiguities."  Pacitti v. Macy's, 193 F.3d 766, 775 (3d Cir. 1999).

      An equally relevant principle of contract interpretation is that "when two or more writings are executed at the same time and involve the same transaction, they should be construed as a whole."  Black v. T.M. Landis, Inc., 421 A.2d 1105, 1107 (Pa. Super. Ct. 1980); see also Neville v. Scott, 127 A.2d 755, 757 (Pa. Super. Ct. 1956) ("where several instruments are made as part of one transaction they will be read together, and each will be construed with reference to the other; and this is so although the instruments may have been executed at different times and do not in terms refer to each other"); McCarl's Inc. v. Beaver Falls Mun. Auth., 847 A.2d 180 (Pa. Commw. 2004) (holding that a subsequent letter agreement did not alter the arbitration clause in the original contract).  Federal courts, applying Pennsylvania law, similarly have concluded that two or more writings can constitute a single agreement.  Sanford

<u>Inv. Co. v. Ahlstrom Mach. Holdings, Inc.</u>, 198 F.3d 415, 421 (3d Cir. 1999) (stating that "[u]nder Pennsylvania law, when two or more writings are executed at the same time and involve the same transaction, they should be construed as a whole"); <u>Korblin Refrigerated Xpress, Inc. v. Pitterich</u>, 805 F.2d 96, 107 (3d Cir. 1986) (same); <u>CGU Life Ins. Co. v. Metro. Mortgage & Sec. Co., Inc.</u>, 131 F.Supp. 2d 670, 675 (E.D.Pa. 2001) (noting that "Pennsylvania has long held that when two or more writings are executed at the same time and involve the same transaction, they should be construed as a whole").  The presence of an integration clause does not disrupt this conclusion because the subsequent agreements do not fully express the essential elements of the parties' undertaking.  <u>Neville</u>, 127 A.2d at 757 (holding that two agreements must be read together despite the presence of an integration clause in the second contract and despite the fact the terms of the two instruments do not refer to each other).

In the present matter, the Court finds as a matter of law that the five subcontract documents are ambiguous as to the critical issue of whether each of the subcontract documents represents a separate contractual obligation or transaction or whether the five subcontract documents, collectively, are a single agreement for all five phases of work on the Moorhead Project.  Specifically, the overall structure of the five subcontract agreement is ambiguous in that, while each of the subcontract documents refers to a single phase of work on the Moorhead Project, various other documents that are incorporated by reference into the subcontract documents refer to the work as a single project to be completed in five phases.

For example, the Project Specifications themselves interject ambiguity on the issue. Incorporated within each of the subcontract documents is not only the contract between Burchick and the GSA, but also the "drawing, specifications, schedules, exhibits, attachments and other documents."  (Art. I, Def. Ex. 33.)  Also incorporated are "[a]ny documents which are referenced

in any of the other Subcontract Documents as being part of or incorporated into the Subcontract Documents which are intended to be binding upon [Greenmoor]." Id.  By this provision, then, the Project Specifications and the Escrow Agreement are incorporated into the subcontract between Burchick and Greenmoor.

Part 1.1.B of Section 01100 of the Specifications provides the description of the entire Moorhead Project.  The Specifications provide that the "work includes abatement of friable asbestos material present in the sprayed on fireproofing on the majority of the underside of the floor decks and structural steel.  Also included in the work is new fireproofing of the decks and structural steel." (Pl. Ex. 17 at 01100-1 (Bates No. GR 002083).)  Part 1.2 then describes the "Work Sequence," stating that the "work shall be completed in phases, in the following order, with an earlier phase substantially complete before beginning the next phase." Id. at 01100-1 – 01100-2 (Bates Nos. GR 002083-002084).  This Part then specifically outlines the floors contained in each of the five phases of work.  Part 1.2 further provides that the "contractor shall substantially complete and turn over no less than one floor per week with the last floor of the phase being turned over on or before the phase completion milestone." Id.

In addition, the contract between the GSA and Burchick – which the Court again notes is incorporated by reference and expressly made part of the subcontract between Burchick and Greenmoor – provides for a single project to be completed in five phases.  Similarly, the Escrow Agreement contemplates a single project to be completed in five phases insofar as it provides that Burchick's contract with the GSA requires Burchick "to perform certain construction work, **including asbestos abatement**, in five (5) phases over a period of 56 months" and then proceeds to describe the anticipated dates for each of the five phases.  (Pl. Ex. 14) (emphasis added).

Indeed, the very existence of the Escrow Agreement creates an ambiguity on the issue of the number of subcontracts.  The Escrow Agreement was devised to protect Burchick's financial interests, namely to ensure that Greenmoor would complete the Moorhead Project.  If, as Greenmoor asserts, a separate subcontract existed for each phase of the work, there seemingly would be no reason for the escrow arrangement as there would be no reason for Burchick to ensure that Greenmoor complete subsequent phases of the Moorhead Project.  That the Escrow Agreement, however, exists suggests that the agreement between the parties contemplated a single agreement under which Greenmoor would complete all five phases of the Moorhead Project.

The Court finds that all of these portions of the Subcontract provide the necessary "contractual hook" that supports Burchick's view of the nature of its contractual relationship with Greenmoor.  That is, these provisions demonstrate the existence of a latent ambiguity in the overall structure of the contractual agreement between Greenmoor and Burchick.  As such, notwithstanding the integration clause in each of the documents, the five subcontract documents are ambiguous as to whether the five subcontract documents constituted a single contractual obligation to complete the asbestos abatement work in five phases or whether they represented five separate (and self-contained) contractual obligations.  Moreover, the Court observes that the five subcontract documents were executed on the same day by Greenmoor.  As such, under Pennsylvania law, the five subcontract documents must be construed as a whole.  Because the Court finds that the five subcontract documents are ambiguous as a matter of law, extrinsic evidence is admissible to decipher the intent of the parties and to resolve the ambiguity.

## 2.       *The Subcontract Agreement Constitutes A Single Agreement.*

The Court, sitting as fact-finder, concludes that the parties intended to enter into a single transaction under which Plaintiff agreed to complete the asbestos abatement work for the entire

Moorhead Project, which consisted of five phases of work.  Although there are five documents with integration clauses and with a specific sum of money to be paid to Greenmoor identified in each of those documents, the weight of the evidence introduced at trial clearly demonstrates the parties' intent to enter a single agreement for a single contract price.  Thus, the Court finds that the five separate subcontract documents, along with the Agreement to Establish Escrow Agreement and the Escrow Agreement, are part of a single contractual agreement whereby Plaintiff agreed to perform asbestos abatement work for the Moorhead Project in exchange for the base payment of $7,267,500.00.

The Moorhead Project consisted of the renovation of the entire Moorhead Federal Building, which included the abatement of asbestos throughout the building.  It is undisputed that the Moorhead Project was broken into five phases.  Despite the fact that it was broken into five phases, the evidence illustrates that the Moorhead Project always was intended to be a single project and indeed, was bid by both Defendant (vis-à-vis the GSA) and Plaintiff (vis-à-vis Defendant) as one project.  Moreover, the parties introduced evidence to illustrate that the impetus behind the creation of five separate documents was Plaintiff's difficulties in obtaining the necessary payment and performance bonds for the Moorhead Project.  Specifically, Plaintiff was unable to obtain a single payment and performance bond for the entirety of the Moorhead Project, but instead obtained a bond for the first three phases of the work and a second bond for the final two phases of the work.  The evidence clearly shows that this was the reason that the parties devised the escrow arrangement by which Burchick would place 10% of Greenmoor's earnings into an escrow account.  This reason, coupled with the sheer existence of the escrow arrangement, further supports the conclusion that a single agreement existed between the parties.

More significantly, the evidence shows that the parties clearly intended to enter into a single agreement for the entire Moorhead Project. Every bid that Greenmoor submitted to Burchick was for a single lump sum for the entirety of the Moorhead Project. There is no evidence that Greenmoor ever bid the Moorhead Project by phase. Mr. Dellovade, Greenmoor's President, testified that he was indifferent as to the number of subcontracts between Burchick and Greenmoor which, if nothing else, illustrates that Mr. Dellovade did not necessarily intend to enter into five separate subcontracts with Burchick. Not surprisingly, then, on or about April 1, 2004, Burchick sent Greenmoor a letter of intent in which Burchick confirmed that Greenmoor's scope of work would include "**all** demolition, removal, abatement and disposal of asbestos containing materials including but not limited to the work identified in Division 2 of the specifications" and that the "contract price will be $7,267,500." (Def. Ex. 25) (emphasis added). In addition, the Court finds credible Mr. Burchick's testimony that Burchick always intended that the documents related to the Moorhead Project – regardless of form – constitute a single agreement between the parties.

Additionally, Greenmoor's post-contract formation conduct demonstrates that the parties intended to enter into a single agreement. Specifically, Mr. Dellovade admitted on cross-examination that Greenmoor's December 15, 2004 letter (which was sent in connection with an audit) indicated that Greenmoor had one agreement with Burchick with a total value of $7,267,500. Also telling is the fact that Greenmoor repeatedly performed "out-of-sequence" work, having performed work on floors that were part of Phase IV of the Moorhead Project during Phase I. Given that Greenmoor performed work from another phase in an earlier phase can only mean that the Moorhead Project was considered to be a single project and that the parties intended to enter into a single agreement for the work on that project.

For all of these reasons, the Court finds that the five Subcontract Agreement documents constitute a single agreement between Burchick and Greenmoor for the asbestos abatement portion of the Moorhead Project.

### B.      Burchick's Termination of Greenmoor.

Having concluded that the parties entered into a single agreement for the asbestos abatement work, the Court must determine whether either party breached its respective contractual obligations under that Agreement.  Specifically, the Court must determine whether Greenmoor breached the Subcontract Agreement by failing to perform in accordance with the Agreement and whether Burchick properly terminated Greenmoor under the Agreement.[13]

Greenmoor maintains that it performed its obligations under the Agreement and that Burchick's termination of the Agreement was improper and done in bad faith.  Burchick, on the other hand, asserts that it properly terminated Greenmoor for failing to fulfill contractual obligations, including failing to perform to the highest standard of care and failing to heed URS's instructions and direction.  The Court concludes that Greenmoor breached the Subcontract Agreement by failing to perform consistent with the Agreement and that, therefore, Burchick properly terminated Greenmoor.

To establish a breach of contract under Pennsylvania law, the party alleging breach must establish the following:  (1) the existence of a contract, including its essential terms; (2) the breach of a duty imposed by the contract; and (3) damages.  Church v. Tentarelli, 953 A.2d 804, 808 (Pa. Super. Ct. 2008), appeal denied, 960 A.2d 835 (Pa. 2008).  In addition, the party

---

[13]      Burchick asserts that Greenmoor, as the party alleging breach, maintained the burden of proving that it complied with all of its obligations under the Subcontract Agreement.  The Court observes that Burchick has asserted a counterclaim for breach of contract in this case against Greenmoor.  As the counterclaimant, Burchick likewise bears the burden of establishing that Greenmoor breached the Subcontract Agreement by failing to perform.  Thus, Greenmoor must establish that Burchick breached by terminating it and Burchick must establish that Greenmoor breached by failing to perform to the standards set forth in the Subcontract Agreement.

alleging breach must "prove that he has performed all of his own obligations under the contract." Trumbull Corp. v. Boss Construction, Inc., 801 A.2d 1289, 1292 (Pa. Commw. Ct. 2002). Further, "[a]lthough any contractual default may be considered a breach, it is only when the breach constitutes a material failure that the non-breaching party is discharged from all further obligations under the contract and is free to terminate the contract." Tyro Industries, Inc. v. Trevose Constr. Co., 737 F. Supp. 856, 864 (E.D. Pa. 1990) (citing Oak Ridge Constr. Co. v. Tolley, 504 A.2d 1343, 1348 (Pa. Super. Ct. 1985), Restatement (Second) of Contracts §§ 235(a), 237 (1981)).

Whether a breach is so substantial as to justify an injured party regarding the whole transaction as at an end "is a question of degree; and it must be answered by weighing the consequences in the light of the actual custom of men in the performance of contracts similar to the one that is involved in the specific case." Easton Theatres, Inc. v. Wells Fargo Land & Mortg. Co., 401 A.2d 1333, 1338 (Pa. Super. Ct. 1979).  In determining the materiality of a breach of contract, Pennsylvania courts consider the following factors, as outlined in Restatement (Second) of Contracts § 241: (1) "the extent to which the injured party will be deprived of the benefit which he reasonably expected;" (2) "the extent to which the injured party can be adequately compensated for that part of the benefit of which he will be deprived;" (3) "the extent to which the party failing to perform or to offer to perform will suffer forfeiture;" (4) "the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;" and (5) "the extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing." Widmer Engineering, Inc. v. Dufalla, 837 A.2d 459, 467 (Pa. Super. Ct. 2003) (quoting Restatement (Second) of Contracts § 241 (1981)).

The Court of Appeals for the Third Circuit has provided some additional guidance on these factors.  The first factor, and the second factor as a "corollary" of it, involves an assessment of what the non-breaching party, i.e., Burchick, "subjectively expected to get out of the contract" and whether "those expectations were reasonable." Norfolk Southern Railway Co. v. Basell USA, Inc., 512 F.3d 86, 94-96 (3d Cir. 2008) (discussing materiality factors under Restatement (Second) of Contracts § 241).  As for the third factor concerning forfeiture, the Third Court has observed that "there is a risk of forfeiture when the breaching party 'has relied substantially on the expectation of the exchange, as through preparation or performance.'" Id.  Stated differently, a "breach is 'less likely to be regarded as material if it occurs late, after substantial preparation or performance.'" Id.  In analyzing the third factor, consideration also should be given to whether "any resulting forfeiture would have been of [the breaching party's] own making." Id. at 94-95. "[T]he fourth materiality factor asks whether it is likely that the breaching party will perform its contractual duties going forward, not merely whether such performance is theoretically possible." Id. at 95.  This fourth factor "entails an assessment of whether [the breaching party] intends to perform its contractual obligations in the future, and, if the answer is yes, whether it can be trusted to do so." Id. at 96.  Finally, under the fifth factor, an assessment must be made of the breaching party's motivation, specifically whether the party "committed the breach in good faith or in bad faith." Id. at 95-96.

The Court finds that Greenmoor failed to fulfill its obligations under the Subcontract Agreement and that such failure was a material breach of the Subcontract Agreement.  The Subcontract Agreement outlines Greenmoor's obligations.  Under the Agreement, Greenmoor was obligated to perform its asbestos abatement work "to the satisfaction of [Burchick] and [the GSA." (Def. Ex. 33.)  More specifically, under the Agreement, Greenmoor had a duty to provide

work safely and consistent with "**the highest generally accepted level of care and skill ordinarily exercised by persons or entities** performing services of a nature similar to that Subcontractor is performing . . . ."  (Def. Ex. 33) (emphasis added).  Greenmoor also expressly acknowledged that Burchick was relying on its specific expertise and experience in asbestos abatement and warranted that it would perform its work "safely, lawfully, efficiently and properly."  Id.

Not only did Greenmoor promise to perform to Burchick's satisfaction and to the "highest" level of care and skill, it also agreed to abide by the direction of URS – the GSA's agent and the entity unequivocally hired to oversee Greenmoor's asbestos abatement work.  Specifically, under GSAR 552.236-71, which was incorporated into the Subcontract Agreement, Greenmoor promised to perform "in accordance with any order (including but not limited to instruction, direction, interpretation, or determination) issued by an authorized representative in accordance with his authority to act for the Contracting Officer."  Thus, Greenmoor contractually was required to perform the work consistent with URS's instructions and directions.[14]

The weight of the evidence adduced at trial demonstrates that although some of Greenmoor's performance problems may have been relatively minor, e.g., overlooking the requirement to use butyl adhesive, rather than spray adhesive to seal the EPDM, other problems

---

[14]    In this regard, the Court finds Greenmoor's argument that Mr. Sekowski and URS "did not have the authority to issue a directive" because there was no evidence specifying "the extent of the delegation of authority to Mr. Sekowsky [sic]" (Greenmoor's Proposed Findings of Fact at ¶¶ 348-49; Greenmoor's Proposed Concl. of Law at ¶ 138) wholly unpersuasive.  The parties jointly stipulated to the fact that "GSA retained URS Corporation to be the construction manager on the project." (Jt. Ex. 1 at ¶ 15.)  In light of this stipulation, under GSAR 552.236-71(a), URS is the organization authorized or specified "to perform any act on behalf of or in the interests of the Government" and, indeed, is the GSA's "authorized representative."  As such, under GSAR 552.236-71(b), URS can issue an order, "including but not limited to instruction, direction, interpretation, or determination."  It follows, then, that Greenmoor, under its Subcontract Agreement, is obligated to follow URS's order, which, as GSAR 552.236-71 clearly provides, can include an instruction, direction, interpretation or determination.  At trial, much was made of whether URS had the right to issue "directives" and the circumstances under which this could occur.  The Court finds this issue irrelevant because the GSARs clearly provide that Burchick and, by extension, Greenmoor, is contractually obligated to follow URS's orders, which can include instructions and directions.

posed a far larger concern to URS and, in turn, to Burchick.  For example, contrary to Greenmoor's assertions, Greenmoor was unable to "continuously maintain" negative air at or better than negative .02.  Greenmoor attempts to minimize the negative air issue by arguing that it is a common occurrence and particularly problematic during the course of the Moorhead Project and, further, notes that PDG also experienced the problem.  Greenmoor's arguments are belied by Mr. Varga's unrebutted testimony, which the Court finds compelling and illustrative of the magnitude of the negative air problem.  Mr. Varga compared Greenmoor and PDG's respective abilities to maintain negative air by reviewing the negative air readings over the course of one month during which each of the companies performed.  He chose to analyze PDG's ability to maintain negative air because he questioned whether any subcontractor could maintain negative air in the building.  His analysis revealed that Greenmoor was unable to maintain negative air approximately 50% of the time in the span of a single month.  In contrast, PDG, also in the span of a single month, was unable to maintain negative air only approximately 1% of the time.  Although it may have been difficult to maintain negative air and although PDG experienced issues with this, such a stark contrast between Greenmoor and PDG is significant.  Greenmoor's negative air readings hardly demonstrate a compliance with the Project Specifications, which required negative air to be "continuously maintained."

Similarly problematic is the presence of asbestos – or the presence of material appearing to be asbestos – outside of containment.  It cannot be disputed that asbestos is a dangerous substance and that its handling and removal is highly regulated by a number of agencies, including the EPA, OSHA and ACHD.  In addition, Greenmoor was engaged in the most dangerous class of asbestos abatement work.  When viewed in this context, the presence of asbestos outside of containment cannot be taken lightly, as Greenmoor seems to have done

throughout its time on the Moorhead Project.  Greenmoor's repeated reliance on the fact that the

Project Specifications contemplated a process by which to clean-up asbestos found outside of

containment is misplaced.  The mere fact that there is a process in place to handle such incidents

hardly renders the occurrence of those incidents acceptable, particularly when those incidents

occurred several times in a relatively short period of time.  Indeed, for the safety of the workers

and the tenants and to minimize the health risks of those exposed to the material, it is perfectly

logical and sensible to maintain a process in the event asbestos is released outside of

containment.  The existence of such procedures is hardly dispositive of whether Greenmoor's

performance complied with the Subcontract Agreement.

Another recurring problem – and, indeed one that seems to have permeated the entire

relationship between Burchick, Greenmoor and URS – was Greenmoor's repeated failure to

follow URS's direction.  The Court finds, as a factual matter, that Greenmoor had a contractual

obligation to follow URS's instructions and that its failure to repeatedly do so violated that

obligation.  Indeed, this failure, which incidentally exemplifies Greenmoor's inability to heed

URS's instructions, seems to have been the proverbial "straw that broke the camel's back" that

led Burchick to finally terminate Greenmoor for default.  Specifically, after Burchick already had

notified Greenmoor that it intended to declare Greenmoor in default, Greenmoor failed – on two

consecutive days – to follow URS's instructions relative to certain work on the 19th floor.  URS

first instructed Greenmoor to not perform any additional work on the 19th floor until URS was

satisfied that Shaft 2 (a critical return air shaft) had been sealed.  As the evidence demonstrated,

the shaft at issue was of particular importance to the health and safety of the workers and tenants

in the Moorhead Building because if that shaft became contaminated with asbestos fibers as a

result of inadequate sealing, then those fibers could easily travel throughout the building and

potentially expose others to asbestos.  Rather than heed these instructions, Greenmoor conducted

work on the 19th floor.  As a result, URS instructed Greenmoor, through Mr. Mlecsko, that it was

not to remove any ceiling tile without written authorization from URS.  Mr. Mlecsko, having

gone home and fell asleep, admittedly failed to convey URS's instructions to the appropriate

personnel.  Because of this blatant (and admitted) failure, Greenmoor personnel removed ceiling

tile without first obtaining written authorization from URS.  Greenmoor's only argument seems

to be that URS had no authority to direct Greenmoor.  But the Court finds that this argument is

not supported by the evidence and, in fact, is disingenuous in light of GSAR 552.236-71.[15]

Regardless of whether Greenmoor remedied issues raised by URS, those and other issues

continually arose and URS continually relayed them to Burchick.  After eight months of

continual problems, which notably were the first eight months of Greenmoor's active work on

the Moorhead Project, Greenmoor gave Burchick no reason or basis to believe that it would do a

"good" job.  From Burchick's perspective, it was unsatisfied with Greenmoor's performance and

the repeated problems demonstrated a disregard for, and a violation of, Greenmoor's contractual

obligation to perform to the "highest" standard of care.  The Court, accordingly, finds that

Greenmoor's repeated deficiencies and its repeated need for direction and correction, was a

material breach of the Subcontract Agreement and justified Burchick's termination of

Greenmoor.  See Cervetto Bldg. Maintenance Co. v. U.S., 2 Cl. Ct. 299, 301-02 (Cl. Ct. 1983).

---

[15]    It is further disingenuous insofar as Greenmoor does not always distance itself from URS's directions.  In fact, in several instances, Greenmoor has asserted that it did not breach the Subcontract Agreement because it corrected deficiencies or problems raised by URS.  In these instances, Greenmoor seems to concede that URS had the ability to direct it in its work.  At the very least, Greenmoor concedes that URS had the ability to identify deficiencies in its work.  Yet, in this specific instance where Greenmoor blatantly ignored URS's directions and where Greenmoor's supervisor admits that he had agreed to URS's direction but failed to convey that direction to his colleagues because he went home and fell asleep, Greenmoor argues that URS did not have the contractual right to direct it.  GSAR 552.236-71 is clear that both Greenmoor and Burchick were required to heed URS's directions and instructions, and Greenmoor cannot have it both ways.

In Cervetto, the Court of Claims upheld the government's termination of a janitorial services contract for default and stated:

> Despite its elegance, plaintiff's argument must be rejected as leading to an absurd result.  The contract plainly contemplates that minor deficiencies in performance will be addressed through remedies short of termination for default.  Equally plainly, it was intended that minor deficiencies be the exception and that performance be satisfactory on most days.  When deficiencies become the rule . . . overall performance under the contract can be deemed unsatisfactory even though individual problems are resolved.  In such a case, the repeated need for correction itself may serve as the default, making termination an appropriate remedy.

Id.  See also 5 Bruner & O'Connor, Bruner and O'Connor on Construction Law § 18:25 ("It usually is not defective work itself, but the consequences of defective work, that can affect materially the parties' interests in future contract performance.  Numerous continuing instances of irreparable and materially defective work, of the type precluding substantial completion, and well in excess of 'normal' nonconforming work routinely corrected as punch list or warranty items, can rise to the level of a material breach that impairs the prospect of future performance.").

A review of the Widmer factors supports the Court's finding that Greenmoor's performance deficiencies were a material breach.  First, based on Greenmoor's performance and, significantly, the views of GSA's "eyes and ears," e.g., URS, of Greenmoor's performance, Burchick was deprived of the benefits it reasonably expected to receive from the subcontract.  Burchick reasonably expected that the asbestos abatement work – which it subcontracted to an experienced subcontractor – would be executed to the "highest" level of care.  In this regard, it is significant that the subcontract at issue involved asbestos abatement and, even more significantly, abatement in an occupied building.  Asbestos abatement is unquestionably a high-

risk venture.  Indeed, it is of such high risk that, typically, abatement work is not the subject of a subcontract; rather, it is a direct contract between the owner of a project and the asbestos abatement contractor.  When viewed in this context, the fact that Burchick repeatedly was alerted to problems with Greenmoor's performance by the agency empowered to assess Greenmoor's performance demonstrates that Burchick was deprived of the benefits of the subcontract.

Second, Burchick terminated Greenmoor just eight (8) months after Greenmoor had begun its abatement work on the Moorhead Project in earnest – during the second phase of a five phase project that spanned approximately five years.  Therefore, Greenmoor still had a substantial amount of work to perform on the Moorhead Project.  As the Third Circuit has noted, a breach is more likely to be material if it is early in the contractual relationship – prior to substantial performance.  Norfolk Southern Railway Co. v. Basell USA, Inc., 512 F.3d 8696 (3d Cir. 2008).

Third, Greenmoor provided no real assurances that it intended to cure its failure to perform.  Despite its assertions that it was ready to perform and that it fixed the deficiencies brought to its attention, the Court, as fact-finder, concludes that Greenmoor did not actually evidence an intent to cure its failure to perform and, based on the sheer recurrence of some of the problems (e.g., negative air), did not actually cure its failure to perform.  The evidence adduced at trial illustrates that Greenmoor was more concerned with challenging URS's authority than with cooperating with URS.  Greenmoor's response to Burchick's various letters concerning performance was similar.  From early on, Greenmoor sought to deny wrongdoing – or at least sought evidentiary proof that it caused a problem – rather than accept responsibility.

As for whether the parties acted in good faith, the Court finds that this particular Widmer factor favors neither party.  Although neither party acted in bad faith, it also is apparent that the

parties quickly came to strongly disagree with one another soon after the work began on the Moorhead Project. Undoubtedly, the parties had reached impasse on several occasions such that it became difficult for both parties to communicate reasonably with one another. It is without question that the parties' relationship became contentious at an early point in the Moorhead Project and that the relationship quickly deteriorated into a litigious one.

Finally, although the second <u>Widmer</u> factor – the ability for Burchick to be adequately compensated for the part of the benefit that it was deprived – may favor Greenmoor insofar as Burchick can (and, indeed, has) quantified its damages, the remaining factors weigh in favor of a finding that Greenmoor materially breached the terms of the Subcontract Agreement.

This conclusion is buttressed by the contractual language itself which permits Burchick, as the contractor, to terminate Greenmoor for default if "at **any** time" Burchick felt that Greenmoor did not comply with the Agreement. Specifically, under the express provisions of the Subcontract Agreement, Burchick could terminate Greenmoor for default if "in its opinion," Greenmoor failed to fulfill any part of the Subcontract Agreement. (Def. Ex. 33, Art. VIII.) In this case, Burchick's perception – and opinion – was that Greenmoor's repeated deficiencies, coupled with its failure to heed URS's instructions and directions, violated Greenmoor's obligation to provide Burchick with performance of the "highest" level of skill and care in the industry. Burchick, accordingly, exercised its contractual right to terminate Greenmoor for default.

Greenmoor primarily argues that there is no evidence that it violated any of the specifications or that it was ever cited for a safety violation by the relevant authorities. It additionally argues that, to the extent URS alerted it to problems, it corrected those problems in a timely fashion. The Court does not find these arguments compelling.

As discussed above, it is the recurring nature of Greenmoor's deficiencies and Burchick becoming repeatedly aware of them that properly led to Greenmoor's termination.  In addition, as a sophisticated business entity, Greenmoor could have included terms in the contract that would preclude Burchick from terminating it if its work merely passed ACHD inspection or otherwise complied with the Project Specifications.  But it did not.  Certainly, compliance with the specifications was an integral part of the contractual agreement between the parties.  But, contrary to Greenmoor's position, the Agreement requires more than a mere compliance with the specifications.  The Agreement specifically requires Greenmoor to perform to the "highest" standards in the industry.  The term "highest" certainly requires more than a bare-bones compliance with the specifications.  Greenmoor not only had to satisfy the specifications, but it had to satisfy the specifications by utilizing the highest level of skill and care.  There is no question that URS and the GSA were difficult to please and that they were particularly picky in their assessment of Greenmoor's work.  Ultimately, however, Greenmoor promised to perform to the "highest" standards in the industry and failed to deliver on that promise.

Greenmoor also argues that Burchick improperly relied upon Phase I issues because Burchick waived those issues by not terminating Greenmoor after the completion of Phase I.  The Court does not find Greenmoor's argument compelling.  See Cervetto Bldg. Maintenance Co. v. U.S., 2 Cl. Ct. 299, 301-02 (Cl. Ct. 1983).  In Cervetto, the Court of Claims rejected an argument similar to that advanced by Greenmoor here, specifically, that the government could not rely on reports documenting deficient performance because those issues had either been corrected or addressed through a deduction in the contract price.  Id.  In rejecting this argument, the court stated:

> Any other construction would place defendant in an extremely
> awkward position and make it unreasonably difficult to terminate

> the contract for inadequate performance.  Under plaintiff's
> analysis, defendant would be precluded from requiring the
> contractor to correct deficiencies if it wished to rely upon them as a
> basis for termination. . . . Moreover, defendant could never rely
> upon more than one month's deficiencies because at the end of the
> month defendant would be required either to take a deduction for
> them or to make payment. . . . The court rejects this strained
> interpretation which could force defendant to prematurely default
> contracts which might be salvageable with the passage of more
> time.

Id.

Greenmoor further argues that its performance "was entirely consistent with that of PDG" and that this "provides the best measure of the materiality of the acts alleged by Burchick to constitute a material breach" of the Agreement.  The Court disagrees.  As an initial matter, the Court disagrees with the fundamental premise that Greenmoor's performance "was entirely consistent with that of PDG."  The weight of the evidence adduced at trial does not compel the conclusion that Greenmoor and PDG performed the same.  In making its argument, Greenmoor primarily relies on the testimony of Richard Semega.  But Mr. Semega is not in a position to compare PDG's performance with that of Greenmoor.  In any event, Mr. Semega did not establish that PDG performed the same as Greenmoor.

More relevant than Mr. Semega's perspective are the perspectives of both URS and Burchick.  The evidence certainly does not support the conclusion that either URS or Burchick viewed Greenmoor's performance to be consistent with that of PDG.  The evidence revealed that, on two separate occasions, URS notified Burchick that Greenmoor's performance – or lack thereof – could have jeopardized the health and safety of the tenants in the Moorhead Federal Building.  In October 2004, in conveying the issue of ACM being found outside of containment, URS informed Burchick that "there have been at least 3 incidents involving Greenmoor that could have jeopardized the health and safety of workers and/or building occupants."  (Def.

Ex. 180.)  Similarly, in March 2005 – just before Greenmoor's termination – URS reminded

Burchick that URS's job is to protect the occupants and construction workers in the building"

and that Greenmoor's failure to follow "directions could jeopardize the health and safety of all

the occupants."  (Def. Ex. 180 at BCCI 3947.)  Moreover, Burchick was compelled to add more

supervision while Greenmoor was working in an effort to have additional personnel monitor

Greenmoor's actions.  No evidence has been presented to the Court that URS conveyed similar

sentiments to Burchick concerning PDG's performance or that Burchick had to take similar

measures of added supervision with PDG.

Even assuming PDG suffered from the same deficiencies as Greenmoor and that

Greenmoor's performance was "entirely consistent" with that of PDG, it does not follow that

Greenmoor did not breach its obligations under the Subcontract Agreement or that Burchick

improperly terminated Greenmoor.  Greenmoor and PDG had separate agreements with

Burchick.  PDG's performance perhaps may illustrate that PDG also was in breach of certain

aspects of its agreement with Burchick.  Assuming that is true, Burchick obviously was not

compelled to terminate PDG for default.  The fact that Burchick did not exercise its right to

terminate PDG for default has no bearing on whether it was within its contractual rights to

terminate Greenmoor for default.  Original Great Am. Chocolate Chip Cookie Co. v. River

Valley Cookies, Ltd., 970 F.2d 273, 279 (7th Cir. 1992) (finding evidence of how franchisor

treated other franchisees irrelevant in context of breach of franchise agreement matter, stating

that "[t]he fact that the [franchisor] may . . . have treated other franchisees more leniently is no

more a defense to the breach of contract than laxity in enforcing the speed limit is a defense to a

speeding ticket."); Dunkin' Donuts, Inc. v. Romanias, No. 00-1886, 2002 WL 32955492, at *1

(W.D. Pa. May 29, 2002) (Ambrose, C.J.) (relying on the Seventh Circuit's decision in Original

<u>Great American Chocolate Chip Cookie Company</u> to grant motion in limine to exclude evidence of another franchisee alleged to have engaged in the same conduct in an effort to support a claim for the breach of the duty of good faith and dealing); <u>I'Mnaedaft, Ltd. v. Intelligent Office System, LLC</u>, No. 08-01804, 2009 WL 1537975, at *6 n. 1 (D. Colo. May 29, 2009) (finding insufficient support for the notion that evidence of preferential treatment can support a contract claim and providing following hypothetical:  "A enters into identical contracts with B and C. A's failure to enforce B's contractual obligations does not result in a breach of A's contract with C.") (citing cases, including <u>Original Great American Chocolate Chip Company</u>).  Greenmoor's argument essentially would force this Court to analyze Greenmoor's termination under the guise of an employment discrimination claim where a terminated employee argues that the employer improperly discriminated when the employer terminated him or her and, as evidence, cites to "similarly situated" employees who were not terminated for similarly deficient performance. Quite clearly, however, the present case is neither an employment discrimination claim nor has Greenmoor cited to any authority for the proposition that the present situation ought to be treated as one.  This is particularly true here where the record is devoid of any evidence of discrimination.  Although Greenmoor argued that Burchick (or URS) was motivated by bias, the Court finds that the evidence does not support such a theory.[16]

For all of these reasons, the Court finds that Greenmoor materially breached not only its obligation to perform to the "highest generally accepted level of care" and to the satisfaction of

---

[16]     Indeed, the Court finds that the evidence did not support any of Greenmoor's theories as to Burchick's motivation, other than Greenmoor's repeatedly deficient performance.  One of Greenmoor's overarching theories was that Burchick terminated Greenmoor over money disputes, specifically, the dispute over ceiling tile, which Greenmoor submitted via a change order in December 2004.  But the evidence clearly shows that Burchick's concerns about Greenmoor's performance arose well before December 2004.  In fact, in October 2004, Burchick felt sufficiently concerned about Greenmoor's performance that Mr. Burchick and Mr. Dellovade – the principals of the companies – met to discuss Greenmoor's performance.  During that meeting, Mr. Dellovade agreed to address those concerns.  Thus, Greenmoor's theory that Burchick was motivated by money-related issues is not well-taken.

both Burchick and the GSA, but also its obligation to heed URS's direction.  More specifically, the Court concludes that Greenmoor's repeated and recurring deficiencies, coupled with its inability to heed URS's direction, constituted a material breach of the Subcontract Agreement. The Court further concludes that Burchick, therefore, properly exercised its right to terminate Greenmoor for default.

      C.      **Burchick Breached The Escrow Agreement**

Plaintiff Greenmoor additionally asserts that Burchick breached the Escrow Agreement by failing to release the escrow funds to Greenmoor after Greenmoor obtained the performance bonds for Phases IV and V of the Moorhead Project.  The Court now turns to this issue.

Based on the unambiguous language of the Escrow Agreement, the only conditions precedent to Greenmoor receiving the escrowed funds was producing the bonds required for Phases IV and V in a timely manner, specifically by the close of business on November 1, 2006 and October 1, 2007, respectively.  (Pl. Ex. 14.)  Thus, once Greenmoor produced the bonds in the form required by Burchick in October, 2006, Burchick was obligated to perform and provide the certification for release of the escrow account balance.  Burchick's obligation to release the escrowed funds is unqualified.  Indeed, Burchick admits that the money in the escrow account consists of money that Greenmoor already has earned on the Moorhead Project and, therefore, is money that Greenmoor is rightfully owed.

To be sure, under the Escrow Agreement, Greenmoor is required to not only establish an escrow account, but is required to fund that account "from the progress payments made on the Moorhead Project during Phases I, II, and III at the rate of 10% per each progress payment."  (Pl. Ex. 14 at ¶¶ 2-3.)  Thus, after Burchick receives progress payments from the GSA for work that Greenmoor has performed, Burchick is required to pay 90% of those payments to Greenmoor "and deposit 10% of the allocable amount to the Escrow Account **on behalf of Greenmoor**."  Id.

at ¶ 4 (emphasis added).  As such, even though Burchick may have forwarded the money to the escrow account, because the account is established by Greenmoor and Burchick deposits the money in the account on behalf of Greenmoor, Greenmoor is the depositor of the escrow account.  Knoll v. Butler, 675 A.2d 1308, 1312 (Pa. Commw. Ct. 1996), aff'd, 693 A.2d 198 (Pa. 1997) (noting that under Pennsylvania law, money in an escrow account remains the property of the depositor).  As such, the Court finds that Greenmoor is rightfully entitled to the escrowed funds.

Burchick argues that it had a right to withhold the escrowed funds under Article II(c), which provides that "Contractor may withhold amounts otherwise due under this Subcontract or any other arrangement between the parties to cover any costs or liability Contractor has incurred or may incur for which Subcontractor may be responsible hereunder."  (Def. Ex. 33.)  The Court finds that Burchick's argument that it could withhold payment of the escrowed funds under Article II(c) of the Subcontract Agreement to be without merit.

It is a well-established principle of contract construction that a contract must be "'construed as a whole, which is to say that individual provisions of a contract must be read in context.'"  M.F. Restoration Co. v. Elliott, Bray & Riley, No. 92-0049, 1994 WL 719731, at *2 (E.D. Pa. Dec. 22, 1994) (quoting Meeting House Lane, Ltd. v. Melso, 628 A.2d 854, 857-59 (Pa. Super. Ct. 1993)).

Article II of the Subcontract Agreement addresses payment.  Article II(c), in its entirety, provides as follows:

> Subcontractor shall ensure that all sub-subcontractors, employees
> and suppliers, at all times, are paid all amounts due in connection
> with the performance of this Subcontract.  After the first partial
> payment hereunder, Contractor shall have the right to withhold any
> subsequent partial payment until Subcontractor submits evidence
> satisfactory to Contractor that all previous amounts owed in

connection with performance of this Subcontract have been paid.
Subcontractor shall also immediately reimburse Contractor for any
amounts paid by Contractor or under contractor's payment bond in
connection with this Subcontract caused by failure by
Subcontractor to make payment as provided in this Article.
Contractor may withhold amounts otherwise due under this
Subcontract or any other contractual arrangement between the
parties to cover any costs or liability Contractor has incurred or
may incur for which Subcontractor may be responsible hereunder.

(Def. Ex. 33.)

Burchick relies on the very last sentence of this provision to withhold the escrowed

amounts, but this reliance is misplaced.  The very first sentence of Article II(c) reveals that this

specific payment provision addresses situations in which the Subcontractor, e.g., Greenmoor,

may fail to pay its own sub-subcontractors, employees or suppliers.  The next two sentences also

unambiguously address the Contractor's rights in the event that there is some issue with whether

"amounts owed in connection with performance of this Subcontract have been paid" and/or

where the Contractor incurs liability as a result of a "failure by Subcontractor to make payment

as provided in this Article [II]."  The final sentence – the very sentence upon which Burchick

relies – must be read within this context.  Thus, although Article II(c), in fact, permits Burchick

to withhold payments to Greenmoor, it may do so under this provision where Burchick "has

incurred or may incur" costs as a result of Greenmoor's failure to pay its "sub-subcontractors,

employees and suppliers."

Stated differently, Article II(c) is designed to provide Burchick, as the general contractor,

recourse if Greenmoor, as the subcontractor, fails to fulfill its obligations vis-à-vis its own

subcontractors, employees or suppliers.  The record is devoid of any evidence that Greenmoor

failed to pay its sub-subcontractors, employees or suppliers, or that Burchick incurred any cost or

liability as a result thereof.  The Court, therefore, finds that Burchick cannot invoke Article II(c)

of the Subcontract Agreement to justify its withholding of the escrowed funds.  The Court further

finds that Burchick breached the Escrow Agreement by failing to release the escrowed funds to

Greenmoor upon timely receipt of the bonds for Phases IV and V of the Moorhead Project.

## III.    DAMAGES

### A.    Applicable Legal Standards

It is a fundamental principle of contract law that the party asserting breach "has the

burden of proving damages resulting from the breach." Spang & Co. v. U.S. Steel Corp., 545

A.2d 861, 866 (Pa. 1988).  In the instant case, then, Greenmoor bears the burden of proving its

damages and Burchick bears the burden of proving the damages it seeks through its

counterclaim.  Equally fundamental is the principle that damages cannot be based on guesses or

speculation, but instead be based on evidence that must "with a fair degree of probability,

establish a basis for assessment of damages." Id.  Stated differently, damages are "not

recoverable if they are too speculative, vague or contingent and are not recoverable for loss

beyond an amount that the evidence permits to be established with reasonable certainty." Id. at

866.  Although "mathematical certainty is not required, the [parties] must introduce sufficient

facts upon which a [fact-finder] can determine the amount of damages without conjecture."

Delanhanty v. First Pennsylvania Bank, N.A., 464 A.2d 1243, 1257 (Pa. Super. Ct. 1983).  With

these basic principles in mind, the Court turns to the parties' damage claims.

### B.    Contractor and Subcontractor Payment Act ("CSPA")

For each item of damages it claims it is owed, Greenmoor also seeks interest and penalty

payments under Pennsylvania's Contract and Subcontractor Payment Act, 73 P.S. § 501, et seq.

("CSPA").  The CSPA, which provides for payment deadlines and penalties on construction

projects, is designed "to encourage fair dealing among parties to a construction contract."

Ruthrauff, Inc. v. Ravin, Inc., 914 A.2d 880, 890 (Pa. Super. Ct. 2006), appeal denied, 962 A.2d

1197 (Pa. 2008).  Section 507 of the CSPA sets forth the contractor and subcontractor's payment

obligations.  73 P.S. § 507.  Section 507(a) provides that "[p]erformance by a subcontractor **in accordance with the provisions of the contract** shall entitle the subcontractor to payment from the party with whom the subcontractor has contracted."  Id. at 507(a) (emphasis added).  Section 507 further provides that if a subcontractor performs "in accordance with the provisions of the contract," then the contractor is required to pay the subcontractor.  Id. at 507(c).  Payments must be made 14 days after "receipt of each progress or final payment or 14 days after receipt of subcontractor's invoice, whichever is later."  Id.

Notwithstanding the provisions of Section 507, the CSPA allows a contractor or subcontractor to withhold payments otherwise due and owing under certain circumstances.  A contractor or subcontractor may properly withhold payments otherwise due and owing where the subcontractor is "responsible for a deficiency item."  Id. at §§ 507(c), 511(a).  A "deficiency item" consists of "[w]ork performed but which the owner, the contractor or the inspector will not certify as being completed according to the specifications of a construction contract."  Id. at § 502.  A contractor also may withhold payments otherwise due and owing "to the extent [the amount being withheld] bears a reasonable relation to the value of any claim held in good faith by the owner, contractor or subcontractor against whom the contractor or subcontractor is seeking to recover payment."  Id. at § 512.

Under the CSPA, three categories of damages are available for a contractor or subcontractor's failure to make timely payments:  (1) interest; (2) penalty payments; and (3) reasonable attorneys' fees and expenses.  73 P.S. §§ 507(d), 512; see also John B. Conomos, Inc. v. Sun Co., Inc., 831 A.2d 696, 708 (Pa. Super. 2003).  If payments are properly due and owing and are not timely made under Section 507, the subcontractor is entitled to be paid interest at the rate of 1% per month on the balance that is due and owing.  73 P.S. §§ 507(d), 505(d).

In addition to recovering interest on the past due payments, a subcontractor also may recover penalty payments. Specifically, the CSPA provides:

> (a) Penalty for failure to comply with act. – **If** arbitration or **litigation is commenced** to recover payment due under this act **and it is determined that** an owner, **contractor** or subcontractor **has failed to comply with the payment terms of this act, the arbitrator or court shall award, in addition to all other damages due, a penalty equal to 1% per month of the amount that was wrongfully withheld**. An amount shall not be deemed to have been wrongfully withheld to the extent it bears a reasonable relation to the value of any claim held in good faith by the owner, contractor or subcontractor against whom the contractor or subcontractor is seeking to recover payment.

Id. at ¶ 512(a) (emphasis added). As the emphasized language indicates, to recover a penalty payment, the subcontractor must establish that the amounts due and owing were wrongfully withheld. Under the plain terms of the statute, a contractor does not wrongfully withhold a payment that it otherwise owes if the contractor has a claim against the subcontractor and if the value of such a claim bears a reasonable relationship to the subcontractor's claim against the contractor. Id. at § 512. Thus, payments that are withheld in good faith are not "wrongfully withheld" under Section 512 and, thus, are not "subject to the interest and penalty provisions of the [CSPA]." Quinn Construction, Inc. v. R.N. Dolner, LLC, 187 Fed. Appx. 129, 130 (3d Cir. June 9, 2006) (finding that district court did not err in denying interest and penalty payments under the CSPA in a breach of contract action brought by a subcontractor against the general contractor) (citing John B. Conomos, Inc. v. Sun Co., 831 A.2d 696, 711 (Pa. Super. 2003)).

Finally, the "substantially prevailing party in any proceeding to recover any payment under [the CSPA]" may recover reasonable attorneys' fees and expenses. Id. at § 512(b).

In response to Greenmoor's claim for interest, penalties and attorneys' fees under the CSPA, Burchick asserts that it had a right to withhold payment – even if such payment admittedly was owed – because of its contractual and common law rights to set-off. Thus,

Burchick not only asserted that it had a right to withhold Greenmoor's payments under the Subcontract Agreement, but also asserts that it had the right to set-off what it owed to Greenmoor against those amounts it claims Greenmoor owed to it.  Burchick also asserts various other reasons for withholding certain payments, including that Greenmoor failed to submit timely invoices or proper payment applications.  In certain other instances, Burchick disputes Greenmoor's right to the amounts it claims under the various invoices or change orders.

The Court concludes that Greenmoor, in some instances, may recover interest payments under the CSPA.  Those specific instances are discussed below in connection with each of Greenmoor's damage claims.

The Court concludes that Greenmoor is not entitled to penalty payments under the CSPA. As discussed in more detail below, for damages that the Court concludes Greenmoor may recover, Greenmoor failed to establish that Burchick wrongfully withheld those payments.[17]

## IV.  **GREENMOOR'S DAMAGES**

### A.  **Payment Alleged To Be Owed To Greenmoor For Work Performed**

Greenmoor seeks to recover a number of payments for work that it performed under the Subcontract Agreement.  As discussed in detail below, the Court concludes that Greenmoor is entitled to recover some, but not all, of the payments it alleges it is owed for work performed.

#### 1.  *Escrow*

Because the Court concludes that Burchick breached its obligation to pay Greenmoor monies owed under the Escrow Agreement, the Court accordingly concludes that Greenmoor is entitled to the escrow account balance, as well as the accumulated interest owed on that balance.

---

[17]    As for the parties' claims for attorneys' fees under the CSPA, the Court defers ruling on this issue at this time.  Instead, the Court will seek additional briefing from the parties in light of the Court's rulings herein on liability and issues of non-payment presented by the parties.

The Court additionally concludes that under the CSPA, Greenmoor is entitled to be paid interest at the rate of 1% per month on the amounts due and owing, e.g., the escrow account balance of $275,510.27.

The Court, however, concludes that Greenmoor is not entitled to penalty payments under the CSPA.  By the time the escrow account balance came due in October, 2006, the parties were embroiled in a genuine dispute about Greenmoor's performance on the Moorhead Project.  As such, Burchick turned to the Subcontract Agreement to assess its rights and liabilities. Regardless of whether Burchick's reliance on the Subcontract Agreement was legally proper, the Court finds that such reliance was not in bad faith or for unreasonable or wrongful purposes, but rather a good faith belief that it could avail itself of the remedies under the Subcontract Agreement.

In sum, Burchick is liable to Greenmoor for the sum of $284,366.12, which represents the escrow account balance of $275,510.27 plus $8,855.85 in accumulated interest on that balance. Burchick additionally is liable to Greenmoor for CSPA interest on the escrow account balance of $275,510.27.

### 2.     *Unpaid Payment Applications*

Greenmoor seeks amounts due on a number of its payment applications, along with interest and penalties under the CSPA for Burchick's failure to make timely payments.  Burchick acknowledges and admits that it owes Greenmoor the amounts due on Greenmoor's payment applications dated (i) 2/28/2005; (ii) 3/31/2005; (iii) 6/30/2006; (iv) 7/31/2006; and (v) 8/31/2006.  Accordingly, the Court concludes that Greenmoor is entitled to recover, and Burchick must pay the amounts due on, each of these payment applications with the exception of a sum of $8,353.00 that Greenmoor seeks in its August 31, 2006 payment application.

The amount of $8,353.00 that Greenmoor seeks relates to the bond on the 18th floor. Greenmoor argues that it is entitled to be paid for this sum because it paid for the bond, but the bond was not rescinded.  Such an issue, in the Court's view, is one that exists between Greenmoor and its surety, not between Greenmoor and Burchick.  Equally irrelevant is whether Burchick returned a portion of the bond to the GSA.  The Court concludes that Greenmoor is not entitled to the $8,353.00 it seeks under its August 31, 2006 payment application because Greenmoor agreed to a credit for the 18th floor bond in a change order.  Moreover, the Court further finds that Greenmoor cannot recover this amount because Burchick did not improperly terminate Greenmoor and because this amount is part of that portion of the contract where PDG performed instead of Greenmoor.  In this regard, Greenmoor's argument that it paid for the bond, but that the bond was not rescinded is irrelevant.  For all of these reasons, Greenmoor is not entitled to recover the $8,353.00 line item under the August 31, 2006 payment application.

As for Greenmoor's claim for interest and penalty under CSPA on its payment applications, for the same reasons discussed above in connection with the Escrow Payments, the Court finds that Greenmoor is entitled to interest payments under the CSPA.  For each payment application, interest under the CSPA should be paid at the rate of 1% per month beginning seven (7) days after Burchick received payment from the GSA for each of those applications.  Because Burchick did not withhold these payments in bad faith, the Court concludes that Greenmoor is not entitled to penalty payments under the CSPA.

In sum, then, the Court finds that Burchick is liable to Greenmoor in the amount of $206,004.00, which represents the amounts that Burchick acknowledges it owed to Greenmoor on the unpaid payment applications, plus appropriate interest under the CSPA.

### 3. RFP-15

Greenmoor seeks $10,695.00 plus interest and penalties for work associated with RFP-15. Burchick disagrees that it owes Greenmoor this amount, but acknowledges that it owes Greenmoor $6,413.00 under RFP-15.  In light of Burchick's acknowledgment and in the absence of any other evidence establishing an agreement to be paid anything more, the Court finds that Burchick is liable to Greenmoor only in the amount of $6,413.00 for RFP-15.  Greenmoor has not established with persuasive evidence that it is owed the additional $10,695.00 it seeks under RFP-15.

Greenmoor is entitled to be paid interest payments on the unpaid amount of $6,413.00 under the CSPA. The Court, however, disagrees that interest is owed from June 30, 2005.  First, Greenmoor acknowledges that "Burchick did not obtain final approval of the value of this work for Greenmoor until" February, 2006.  The evidence also demonstrates that the parties continued to negotiate RFP-15 through, at least, February, 2006.  Additionally, Burchick ultimately provided the Change Order to Greenmoor in June, 2006, and a review of Burchick's payment applications to the GSA reveal that the earliest pay application which appears to even mention RFP-15 is the pay application dated June 30, 2006.  (Pl. Exs. 143.)  This pay application appears to have been paid by the GSA on or about July 26, 2006.  (Pl. Ex. 143.)  Finally, there is absolutely no indication of when – or if – Greenmoor ever invoiced the work it performed under RFP-15.  For all of these reasons, Greenmoor's argument that interest should accrue from February, 2005 simply because it is when Burchick should have billed for RFP-15 is nonsensical and unsupported by the record evidence.  Indeed, Greenmoor's argument is belied by its own expert, Mark Shaffer, who acknowledged that CSPA remedies cannot begin to accrue before a bill or invoice is submitted for payment.  (2/11/09 Tr. at 54-55, 60 (M. Shaffer).)  Based on the evidence, and in light of Burchick's admission of liability of a portion of this amount, the Court

finds that Burchick could not have become obligated to pay amounts under RFP-15 until the GSA paid Burchick for these amounts. As such, interest under the CSPA should be paid at the rate of 1% per month beginning seven (7) days after Burchick received payment for the work under RFP-15.

### 4.    RFP-68

Greenmoor seeks $14,336.56 plus interest and penalties for miscellaneous abatement work associated with RFP-68. Burchick acknowledges that it owes Greenmoor $13,392.08[18] under RFP-68, but withheld payment of this amount because of its purported right of a set off. Given Burchick's admission, the Court finds that Burchick is liable to Greenmoor in the amount of $13,392.08 for RFP-68.

Greenmoor is entitled to be paid interest payments on this amount under the CSPA. The Court, however, disagrees that interest is owed from June, 2005. Final approval of the value of the work did not occur until at least February, 2006. Further, it appears that the earliest Burchick invoiced this amount to the GSA was in its February 2006 payment application. Thus, the earliest Burchick would have received payment for work associated with RFP-68 was March 30, 2006. (Pl. Ex. 143.) As with its argument for RFP-15, Greenmoor's argument that interest should accrue from a date earlier than when the amounts due were finally approved or when Burchick received payment from the GSA is not well-taken. Based on the evidence, and in light of Burchick's admission of liability for $13,292.08, the Court finds that interest under the CSPA

---

[18]    Greenmoor also seeks a payment of $944.47 under RFP-68, which Greenmoor classifies as work performed for Burchick, as opposed to work performed for the GSA. It is clear that these payments were not approved as part of the RFP. (Def. Ex. 274, Pl. Ex. 36.) Therefore, Burchick is not liable to Greenmoor for these amounts, at least as part of RFP-68. Although Greenmoor argues that Burchick should not have included these amounts in the RFP submitted to GSA and URS, Greenmoor has not established why Burchick is liable to Greenmoor for these amounts. Greenmoor has not presented any evidence that it separately invoiced these amounts to Burchick or otherwise negotiated the payment of these amounts from Burchick.

should be paid at the rate of 1% per month beginning seven (7) days after Burchick received payment from the GSA for work under RFP-68.

### 5.    *RFP-51*

Greenmoor seeks $1,605.00 plus interest and penalties for work it completed under RFP-51.  Burchick acknowledges that it owes Greenmoor this sum of money, but withheld payment of this amount because of its purported right of a set off.  Given Burchick's admission, the Court finds that Burchick is liable to Greenmoor in the amount of $1,605.00 for RFP-51. The Court further finds that Burchick is liable to Greenmoor for interest payments under the CSPA at the rate of 1% per month beginning seven (7) days after Burchick received payment from the GSA for work under RFP-51.

### 6.    *RFP-10*

Greenmoor seeks $209.00 plus interest and penalties for work it completed under RFP-10. Regardless of the amounts it may have proposed for its work under RFP-10, the evidence reveals that Greenmoor billed Burchick $1,231.00 for the work.  Greenmoor acknowledges that Burchick paid it the $1,231.00 it billed for the work under RFP-10.  Accordingly, Burchick is not liable for the additional $209.00 Greenmoor claims under RFP-10.

### 7.    *Change Order No. 1*

Greenmoor seeks $18,655.66 plus interest and penalties associated with Change Order No. 1 (from Phase I).  Mr. Mlecsko, on behalf of Greenmoor, executed Change Order No. 1 in February 2005, thereby agreeing to Change Order No. 1.  The Court, accordingly, concludes that Greenmoor is not entitled to be reimbursed for the sums sought under Change Order No. 1.

### 8.    *Change Order No. 3*

Greenmoor seeks $17,477.00 plus interest and penalties under Change Order No. 3.  The amounts that Greenmoor seeks represent credits taken against Greenmoor – one credit for

$11,477.00 for perimeter isolation work on the 20th floor and the other credit for $6,000.00 which was requested by Mr. Sekowski of URS.  The Court finds that Burchick is not liable to Greenmoor for either of these amounts.  Contrary to Greenmoor's arguments, the perimeter isolation work on the 20th floor was part of Phase I work, which was within Greenmoor's scope of work.  In addition, the Court finds that the testimony provided by Mr. Finney relative to the $6,000.00 credit to be credible and, accordingly, finds that Greenmoor agreed to the $6,000.00 credit requested by URS.  For these reasons, Greenmoor cannot recover the amounts it seeks under Change Order No. 3.

### 9.      Backcharge No. 1

In Backcharge No. 1, Greenmoor seeks a total of $114,521.00 plus interest and penalties for extra work that it alleged it performed on the Moorhead Project.  The Court finds that Burchick is liable to Greenmoor for some, but not all, of the extra work identified in Backcharge No. 1.

### a.      Amounts For Which Burchick Is Liable

Greenmoor seeks $1,720.00 for the costs it incurred in demolishing the walls in the holding cell on the 23rd floor.  The Court finds that Burchick is liable to Greenmoor for these costs.  Although the walls in the 23rd floor holding cell had asbestos behind them, there is no evidence that the parties had known this to be the case such that these particular walls were within Greenmoor's scope of work (as in the case, for example, of the perimeter walls).  Although Burchick seems to treat the holding cell wall like the corridor walls by arguing that there was no difference between removing the block, Greenmoor presented evidence that Burchick directed Greenmoor to remove the entire wall, not just the top courses of block.  The Court concludes that ther removal of the holding cell wall on the 23rd floor was extra work for which Greenmoor should have been paid.  As such, Burchick is liable to Greenmoor in the

amount of $1,720.00 under Backcharge No. 1.  The Court also finds that Burchick is liable to Greenmoor for interest on this amount under the CSPA to be calculated at the rate of 1% per month beginning seven (7) days from the date Burchick received payment for this work from the GSA.

Greenmoor seeks $5,138.00 for costs it incurred in removing the ceiling tile in the historically abated area on the 21st floor.  Because Burchick concedes that Greenmoor is entitled to be paid for its work for this item, the Court finds that Burchick is liable to Greenmoor in the amount of $5,138.00.  The Court further finds that Burchick is liable for interest payments under the CSPA on this amount, which amount is to be calculated at the rate of 1% per month beginning seven (7) days from the date Burchick received payment for this work from the GSA.

### b.    Amounts For Which Burchick Is Not Liable

The Court finds that Burchick is not liable to Greenmoor for the following items under Backcharge No. 1.

Greenmoor seeks $14,065.00 plus interest and penalties for the costs it incurred in having to re-clean the 22nd floor.  The Court finds that Burchick is not liable to Greenmoor for these costs.  Greenmoor incurred these costs because it failed to pass the first inspection of the floor. As Greenmoor is responsible for preparing a floor for inspection, the Court finds that Burchick cannot be held liable for these additional expenses.  Moreover, URS, not Burchick, directed Greenmoor to perform the additional work.  For this additional reason, the Court finds that Burchick is not liable to Greenmoor for the alleged re-cleaning costs in the amount of $14,065.00.

Greenmoor seeks $60,866.00 plus interest and penalties for the work it performed in connection with Options 1A, 1B and 1C.  The Court finds that this work was within Greenmoor's scope of work and, as such, Greenmoor is not entitled to be paid extra money for it.

- 115 -

Greenmoor admits that it was aware that asbestos existed behind the walls associated with the Options.  In fact, Mr. Dellovade testified that this is the reason Greenmoor quoted the options work in the first instance.  Under these facts, the demolition work associated with the options was part of the asbestos abatement work related to the Options and, therefore, within Greenmoor's scope of work.

Even if the demolition of the walls was not within the scope of Greenmoor's work, Greenmoor is not entitled to the money expended on this work because Greenmoor failed to demonstrate the amount of money it is owed for this work.  The only documentation that Greenmoor provided to Burchick in support of its extra work order consisted of bids that it submitted to **other** contractors for this work during the bidding process in 2004.  This documentation, however, not only provides an estimate for the cost of the work (which, notably, was part of an **unaccepted bid**), but it is an estimate made **before** Greenmoor did any work on the Moorhead Project.  There is no evidence that Greenmoor revised this estimate prior to providing it to Burchick to correspond in any way to the actual work performed or the cost of the work performed.  Quite simply, Greenmoor has provided no credible evidence to substantiate its claim for the work related to the Options.  For all of these reasons, Burchick is not liable to Greenmoor for the $60,866.00 it allegedly incurred in connection with Options 1A, 1B and 1C.

Greenmoor seeks $3,376.00 plus interest and penalties for work it performed related to the damper isolation.  The Court finds that Burchick is not liable to Greenmoor for this amount because Greenmoor has failed to demonstrate that it was extra work.  Although Greenmoor maintains that the work was within the scope of the mechanical contractor's work, Greenmoor has not cited to any evidence establishing this to be the case.  As such, Burchick is not liable for the $3,376.00 for damper isolation work.

Greenmoor seeks $679.00 plus interest and penalties for assisting Burchick in cleaning up a water spill.  The Court finds that Burchick is not liable to Greenmoor for this amount because Greenmoor agreed to omit this charge from its backcharge.  (Pl. Ex. 50.)

Greenmoor seeks $28,677.00 plus interest and penalties for shaft isolation work.  The Court finds that Burchick is not liable to Greenmoor for this amount because the shaft isolation work was part of Greenmoor's base contract.  Although Greenmoor asserts that the mechanical subcontractor was responsible for the cutting and capping of ductwork, this assertion is undercut by Mr. Mlecsko's correspondence of January 10, 2005 in which he noted that "all contractors" are responsible for "cutting and capping of all openings contiguous with their work."  (Pl. Ex. 50.)  Insofar as the cutting and capping of ductwork occurred **after** Greenmoor's completed its mini-containments, it would seem just as likely that, under the base contract, Greenmoor also is responsible for cutting and capping the opening, which is "contiguous" with its construction of the mini-containments.  In short, the cutting and capping of ductwork is part and parcel of the shaft isolation work, which is part of the base contract and not extra work for which Greenmoor would be entitled to extra payment.  Moreover, Greenmoor failed to demonstrate its entitlement to this sum of money with persuasive evidence.  For this additional reason, Greenmoor is not entitled to payment for the shaft isolation work.

In sum, the Court finds that, as to Backcharge No. 1, Burchick is liable to Greenmoor in the amount of $6,858.00, plus interest under the CSPA to the extent discussed above.  Burchick is not liable to Greenmoor for any of the remaining costs sought in Backcharge No. 1.

### 10.    *Beers Meeting*

Greenmoor seeks $1,632.00 plus interest and penalties for a meeting that Burchick sought with Greenmoor's surety, United States Surety Company.  Greenmoor maintains that it is entitled to be reimbursed for this item because it believed that Burchick lacked any basis to call

the meeting.  The Court finds that Burchick is not liable for these costs because Greenmoor has

failed to satisfy its burden of establishing that it is entitled to be reimbursed for these costs.  The

Subcontract Agreement speaks only to Greenmoor's ability to submit claims for adjustments in

the price for changes to Greenmoor's work, or extra work.  Nothing in the Agreement speaks to

Greenmoor's ability to submit claims of the kind at issue with the Beers Meeting.  That

Greenmoor objected to having the meeting in the first instance is irrelevant to whether

Greenmoor may claim these costs under the Subcontract Agreement and whether Burchick is

liable for these costs.  No credible or persuasive evidence exists for the Court to conclude that

Greenmoor is entitled to be paid $1,632.00 for the Beers Meeting.

### 11.    Extra Work Order No. 9

Greenmoor seeks $23,710.00 plus interest and penalties for the removal of MEP on the

12th Floor of the Moorhead Project.  (Pl. Ex. 411; Pl's Prop. Findings of Fact & Concl. of Law,

Ex. A.)  The Court finds that Burchick is not liable to Greenmoor for this amount.  As the party

seeking to be paid for this work, Greenmoor has failed to establish that it is entitled to be paid for

this work.  Greenmoor only provided the testimony of Mr. Dellovade, who merely testified that

the "MEP" work involved "ductwork."  Greenmoor has provided no further explanation of what

"ductwork" entailed or why it believes that such "ductwork" is not a part of the base contract

work.[19]  Moreover, although the record contains some evidence that Greenmoor sought to paid

for this work in September, 2006, there is no evidence that Burchick was provided with the

necessary back-up documentation supporting Greenmoor's calculations.  The calculations that

Greenmoor cites to in support of this item of work only provides the summary numbers

---

[19]     Notably, the Court already has determined that the shaft isolation work in Greenmoor's Backcharge No. 1
was part of the base contract and that this work involved ductwork.  Greenmoor has provided even less
evidence of what the ductwork involved in Extra Work Order No. 9 entailed than what it provided in
connection with Backcharge No. 1.

Greenmoor calculated, with no back-up documents relevant to those numbers. Without such evidence, the Court cannot assess the whether the summary numbers correspond exclusively to the removal of the MEP. (Pl. Ex. 66.) For example, Greenmoor calculates 504 hours of labor time purportedly expended on this work, but provides no corresponding time sheets to evaluate the validity of this calculation, or any other evidence pertaining to the individuals who performed the work, the substance of the work those individuals performed, or the time period in which they purportedly performed the MEP work. (Pl. Ex. 66.) Quite simply, even assuming Burchick was presented with Greenmoor's calculations, the Court finds that the evidence is not sufficiently credible to substantiate Greenmoor's claim. Accordingly, the Court concludes that Greenmoor is not entitled to recover $23,710.00 for MEP removal on the 12th Floor.

### 12.    Extra Work Order No. 12

Greenmoor seeks $1,413.00 plus interest and penalties for overtime costs incurred as a result of the water being shutdown in the Moorhead Building. Because the water was shutdown, Greenmoor's workers were unable to shower and, therefore, could not leave the containment. Greenmoor asserts that it should be reimbursed for these amounts because the shutdown was caused by "other subcontractors" and, as a result, Greenmoor was forced to pay its workers overtime. The Court concludes that Greenmoor is not entitled to be reimbursed for these overtime costs. Greenmoor has failed to present any evidence that Burchick was responsible for the water being shut off, or that Burchick should be liable for the overtime costs Greenmoor incurred as a result of the water being shut off. Greenmoor has not cited to any contractual provisions that contemplates Greenmoor's ability to recover such costs. In any event, there is no credible evidence to substantiate the reason for the water being shut off. Although in correspondence to Burchick, Greenmoor asserted that the water was shut off "by SSM and/or Burchick Construction," Mr. Dellovade testified that "[f]or some reason, the water was shut off."

It is unreasonable to force Burchick to pay Greenmoor for these overtime costs when there is no evidence that Burchick was responsible for the water being shut off in the first instance, or that Burchick is otherwise responsible under the specific circumstances for the overtime costs incurred by Greenmoor.  For these reasons, Greenmoor cannot recover the $1,413.00 in overtime costs sought in Extra Work Order No. 12.

### 13.     Extra Work Order No. 7

Greenmoor seeks $89,052.00 for material and equipment purportedly used by PDG. Mr. Dellovade testified that through this extra work order, Greenmoor sought to recover rental income from Burchick for PDG's use of the equipment and materials.  The Court concludes that Greenmoor is not entitled to recover the amounts it seeks under Extra Work Order No. 7.  The Court credits the testimony of Mr. Finney, who testified that it had returned all of the equipment and materials to Greenmoor, with the exception of what he called "consumables."  As Mr. Finney explained, however, consumables consist of materials that Greenmoor used in setting up the floors for abatement.  But Burchick already paid Greenmoor – in both Phases I and II – for mobilization and set-up.  Moreover, PDG did not use consumable items such as the polybags or EPDM.  Because Burchick returned the equipment that remained on site and because it already has paid Greenmoor for mobilization and set up in Phase II, the Court concludes that Greenmoor cannot recover the amounts under Extra Work Order No. 7.[20]

---

[20]     Moreover, under Article IV.a., Greenmoor assumed the liability for any equipment and materials it provided, including any and all costs related to any loss, damage or destruction of such equipment and material.  Article IV.a. specifically provides:  "[Greenmoor] hereby assumes the entire responsibility and liability for all Work provided hereunder, whether or not erected in place, and for all plant, scaffolding, tools, equipment, supplies and other things provided by [Greenmoor] until final acceptance of the Work by Owner.  In the event of **any** loss, damage or destruction thereof from **any cause**, [Greenmoor] shall be liable therefore, and shall repair, rebuild and correct said loss, damage or destruction **at [Greenmoor's] costs**."  (Def. Ex. 33, Art. IV.a.) (emphasis added).  For this additional reason, the Court concludes that Greenmoor is not entitled to recover for the damages set forth in Extra Work Order No. 7.

In addition, to the extent Greenmoor seeks "rental income" from PDG's purported use of the equipment, the Court concludes that Greenmoor did not demonstrate with reasonable certainty the amounts Greenmoor seeks to recover under this extra work order.  Greenmoor failed to present credible evidence to substantiate the rental rates it purportedly seeks to charge for the equipment.  Although Mr. Dellovade testified that someone from the company "went to rental people that rent such equipment" to establish the "rental rates" that it purportedly seeks, there was no evidence corroborating this testimony.  Indeed, a review of the documentation attached to the extra work order reveals that Greenmoor's figures attached to the extra work order consist of what it paid for the various material and equipment, not necessarily the standard rental rate for the material or equipment.  Moreover, the credible evidence supports that neither Burchick nor PDG utilized Greenmoor's equipment and materials, with the sole exception of PDG's use of a select few pieces of equipment (and even that was only until PDG was able to get its own equipment on site).  For the limited time period that PDG used those few pieces of equipment, Greenmoor presented no credible evidence pertaining to the rental rates (let alone those rates with a degree of reasonable certainty) that Greenmoor purportedly seeks to charge Burchick, nor did it present any credible evidence of any other damages that Greenmoor seeks for the use of these items.  For all of these reasons, Burchick is not liable to Greenmoor for the damages sought under Extra Work Order No. 7.

### 14.    *Corridor Walls*

Greenmoor seeks $111,886.00 plus interest and penalties for additional labor and material costs it allegedly incurred in having to do its asbestos abatement work with the corridor walls in place during the abatement process.  Greenmoor contends that Burchick should have demolished the corridor walls before Greenmoor began its gross abatement work.  Burchick contends that the parties had agreed that it would demolish the corridor walls after Greenmoor

had completed its abatement work. The Court finds credible Mr. Huber's testimony that the parties agreed that Burchick would remove the masonry walls in the corridors after Greenmoor had conducted its abatement work, particularly when that testimony is considered in conjunction with the documentary evidence. As such, Greenmoor agreed to conduct abatement with the corridor walls in place. Because the parties so agreed, the Court agrees with Burchick and concludes that Greenmoor is not entitled to recover its alleged additional labor and material costs for having to conduct its abatement work with the corridor walls in place.

### 15.    *Disposal of Ceiling Tile*

Greenmoor seeks a sum of $47,562.00 plus interest and penalties for disposal of ceiling tile in Phases I and III of the Moorhead Project. Greenmoor contends that it is owed this sum of money because neither the removal nor the disposal of ceiling tile was within its scope of work. The Court disagrees and concludes that Greenmoor is not entitled to recover the damages it purportedly incurred for the disposal of ceiling tile.[21]

The dispute between the parties on this issue revolves around who was responsible for physically transporting the ceiling tile out of containment. Attachment D provides that Greenmoor "shall remove the acoustical ceiling tile and vacuum clean ACM and palletize ceiling tile for removal by [Burchick] as construction debris." (Def. Ex. 33, Att. D.) Greenmoor relies on the latter part of this language, e.g., "removal by [Burchick] as construction debris," to argue that Burchick was responsible for removing the ceiling tile from containment. The Court disagrees.

---

[21]    The Court previously granted Burchick's Rule 52(c) Motion concerning whether the removal of ceiling tile was within Greenmoor's scope of work. The Court concluded that the removal of ceiling tile was within the scope of Greenmoor's work and entered judgment on that issue in favor of Burchick, thereby finding that Greenmoor was owed no additional money for the cost to remove the ceiling tile.

Attachment D is clear that Greenmoor is responsible for removing the ceiling tile, cleaning it and placing it on pallets.  The language is less clear – and, indeed, is ambiguous – as to whether Greenmoor was responsible for removing or transporting the ceiling tile out of containment, e.g., transporting the tile from the floor to the loading dock at the Moorhead Building.  Based on the evidence presented at trial, the Court concludes that the language upon which Greenmoor relies, e.g., "removal by [Burchick] as construction debris," speaks not to who was responsible for the physical removal of the ceiling tile from the containments on each floor, but rather to the manner in which Burchick sought to treat the ceiling tile after Greenmoor removed it and, thus, the manner in which the material would be disposed.[22]

As for the responsibility for physically removing the bagged ceiling tile from the containment to the loading dock or garage, the Court concludes that, regardless of the method to be used, that responsibility always rested with Greenmoor under the Subcontract Agreement.  The Specifications provide that Greenmoor is responsible for the disposal of ceiling tile and Greenmoor, in its April 1 letter of intent, expressed that it would be responsible for the disposal of all asbestos-containing materials.  Consistent with this evidence, Mr. Huber testified that he discussed the ceiling tile processes with Mr. Mlecsko and that they specifically discussed that Greenmoor was to take the ceiling tile down to the loading dock or the garage of the Moorhead Building.  The Court finds Mr. Huber's testimony credible.  Greenmoor's argument that its responsibility (if any) as to the ceiling tile ended when it finished either placing the tile on pallets

---

[22]    The evidence demonstrates that the material was to be treated either as construction debris that would be recycled or as ACM that would not be recycled.  Burchick initially had wanted to treat the ceiling tile as debris and recycle it for LEED credit.  To that end, under Attachment D, Burchick required Greenmoor to clean the tile and place it on pallets so that Burchick could then provide it to Armstrong Ceiling who, in turn, would haul it away from the Moorhead Building to their plant.  URS, however, rejected Burchick's plans and instead wanted the material to be treated as ACM.  As such, Greenmoor simply could bag the ceiling tiles.  As it turns out, URS's rejection of Burchick's plans coincided with Greenmoor's concerns that the palletizing method outlined in Attachment D was too time-consuming.  Thus, the methodology Greenmoor was to use for the ceiling tile was to treat the tiles as ACM and bag them.

or placing it in poly bags is not only unsupported by the record evidence, but it also is not

logical.  Given that Burchick is not a licensed abatement contractor, it does not make sense for

Burchick to have to enter containment simply to retrieve the ceiling tile from containment after

Greenmoor has removed it from the ceiling.

Moreover, Greenmoor has not, in any event, established with sufficiently credible

evidence its costs in transporting the ceiling tile from containment to the loading dock or garage

at the Moorhead Building.  Greenmoor admits that it did not track its costs in connection with

this, even though it had done so in connection with the removal of historically abated ceiling tile.

For all of these reasons, the Court concludes that Burchick is not liable for, and

Greenmoor is not entitled to recover, costs incurred in the disposal of ceiling tile.

### B.     Lost Profits

Greenmoor seeks lost profits on those portions of the Moorhead Project that Greenmoor

did not perform as a result of its alleged unlawful and premature termination.  In support of this

claim, Greenmoor relies on the expert analysis completed by its expert, Mr. Mark Shaffer.

Mr. Shaffer opined that Greenmoor suffered lost profits in the amount of $1,565,667.93.  (Pl.

Ex. 410-290.)  Because the Court has concluded that Burchick's termination of Greenmoor was

proper and lawful, Greenmoor is not entitled to recover any lost profits on those portions of the

Moorhead Project that it did not perform.[23]

### C.     Labor Inefficiencies

Greenmoor also seeks to recover for labor inefficiencies it alleges it experienced on

Phase III of the Moorhead Project after it had been reinstated.  Greenmoor relies on the expert

analysis completed by Mark Shaffer.  Mr. Shaffer claims to have utilized the "measured mile"

---

[23]     The Court additionally concludes that Greenmoor cannot recover lost profits because it did not establish
that it incurred any lost profits, or the amount of any such lost profits, with persuasive evidence.

methodology to calculate the damages Greenmoor allegedly incurred and opined that

Greenmoor's estimated labor inefficiencies amounted to approximately $574,652.94.  (Pl.

Ex. 410-290.)

As this Court previously explained in connection with its ruling on the admissibility of

Mr. Mark Gleason's expert testimony relative to Burchick's administrative cost claim, the

"measured mile" approach is a method for calculating decreased productivity, or a loss of labor

productivity, on a given project by comparing "identical activities on impacted and nonimpacted

sections of the project in order to ascertain the loss of productivity resulting from the impact."

W. Schwartzkopf & J. McNamara, Calculating Construction Damages 64 (2001).  Fundamental

to the application of this methodology is the calculation of "labor productivity ratios," which is

derived by dividing the actual amount of hours on the activity being compared and the actual

quantities of work performed on that activity.  Id.

Notably, Mr. Shaffer did not calculate the traditional labor productivity ratios called for

under the measure mile analysis, nor otherwise compare the amount of time Greenmoor spent on

any given activity in Phases I and III.  This is despite the fact that Mr. Shaffer acknowledges that

the work was nearly identical on the two phases, suggesting that a labor productivity ratio could

have been calculated.  Instead, under the guise of the measured mile methodology, Mr. Shaffer

compared the gross margin allegedly enjoyed by Greenmoor on the two phases.  In light of the

Court's rulings on Greenmoor's damage claims, it is unclear from Mr. Shaffer's analysis how, if

at all, Greenmoor's claim for labor inefficiencies on Phase III is altered.  Quite simply, the

analysis offered by Mr. Shaffer is not persuasive.

Moreover, Mr. Shaffer's analysis suffers from serious deficiencies, which further renders

his expert opinion unpersuasive.  Mr. Shaffer, for example, failed to analyze the effects, if any,

that the smaller office had on Greenmoor's efficiency.  Mr. Shaffer also failed to perform any analysis as to how, if at all, the GSA's corrective action plans had on Greenmoor's efficiency. Mr. Shaffer even failed to account for any inefficiencies Greenmoor itself created.

For all of these reasons, the Court does not find Mr. Shaffer's analysis and testimony persuasive.  Additionally, Greenmoor offered no other evidence that Burchick caused any of its labor inefficiencies.  Because Greenmoor has failed to establish its labor inefficiency claim with any persuasive evidence, the Court concludes that Greenmoor is not entitled to recover any damages for alleged labor inefficiencies.

In conclusion, of the approximately $3,710,891.68 in total damages Greenmoor seeks, the Court concludes that Greenmoor is entitled to recover $518,638.20, plus interest under the Escrow Agreement on the amounts due thereunder and interest under the CSPA on the amounts due to Greenmoor as set forth above.

## V.    BURCHICK'S DAMAGES

In connection with its counterclaim, Burchick seeks to recover for (i) unpaid or unresolved backcharges and change orders and (ii) the cost of work that Greenmoor should have completed before being terminated. [24]  As set forth below, the Court concludes that Burchick is entitled to recover the latter costs, and some (but not all) of the unpaid backcharges and change orders.

As a preliminary matter, the Court observes that Burchick seeks a 12% mark-up in connection with several of its backcharges.  Greenmoor argues that the 12% mark-up is

---

[24]    As part of its counterclaim, Burchick also sought $205,000.00 for alleged increased administrative costs. In support of this damage claim, Burchick proffered the testimony and expert report of its expert, Mr. Mark Gleason.  The Court previously granted Greenmoor's Motion to Strike the Testimony and Expert Report of Mark Gleason and struck Mr. Gleason's expert report dated January 31, 2008, and related testimony as unreliable and inadmissible under Daubert.  (May 1, 2009 Order, Doc. 123.)  Even if the Court had allowed Mr. Gleason's report and testimony on the subject of the administrative cost claim, the Court finds that this evidence was not persuasive to establish such a claim.  For this additional reason, the Court concludes that Burchick is not entitled to recover from Greenmoor any of its alleged administrative costs.

improper, albeit only in connection with two of Burchick's backcharges.  Notwithstanding the

fact that Greenmoor only raises this issue in limited fashion, the Court concludes that Burchick's

12% mark-up is improper in those instances where the backcharge reflects work that a third party

completed for Burchick.  As the party seeking the mark-up, Burchick has the burden of

establishing that it is entitled to it.  Burchick has failed to satisfy its burden.  Burchick did not

offer evidence of any agreement under which it was permitted to mark-up backcharges, nor did it

offer evidence that it is customary in the industry to do so.  The only evidence presented at trial

on this subject is Mr. Dellovade's testimony that his understanding was that backcharges from

third parties would not be marked up.  Indeed, Mr. Finney appears to have corroborated

Mr. Dellovade's testimony by acknowledging that, "most of the time," a general agreement

existed between Burchick and its subcontractors that the 12% mark-up would not be assessed.

For this reason, and as set forth more specifically below, Burchick is not entitled to the 12%

mark-up in connection with Change Order Nos. 7, 11 and 12.

> **A.  Backcharges**
>
> > ***1.  Change Order No. 3***

In Change Order No. 3, Burchick seeks from Greenmoor $8,471.00, which purportedly

represents the cost to construct a temporary platform in the shafts.  The GSA contemplated that

two platforms would be built in the shafts:  a temporary platform, which Greenmoor would build

and a permanent platform, which Burchick would build.  Although Greenmoor was responsible

for constructing a temporary platform, the evidence shows that no such platform was built.

Instead, because Greenmoor was unable to present a way of building a temporary platform,

Burchick built an "alternate, permanent platform."  The Court finds that Burchick is not entitled

to recover the $8,471.00 it seeks under Change Order No. 3 for the purported cost to construct a

temporary platform.  Quite simply, Burchick did not build a temporary platform.  Instead,

Burchick built a permanent platform, albeit in an "alternate" manner. Burchick, however, was always responsible for building a permanent platform. Moreover, Burchick did not establish with sufficiently credible evidence any additional costs it purportedly incurred by having to construct the alternate platform in light of Greenmoor's failure to construct the temporary platform. Burchick did not present any evidence of what it would have cost to construct a permanent platform had Greenmoor done its job in constructing a temporary platform, including any evidence of its bid to the GSA for the construction of the permanent platform. In short, Burchick did not present any evidence to the Court of the additional cost, if any, it incurred in constructing the permanent platform. Without such evidence, the Court can neither determine whether Burchick, in fact, incurred any damages for Greenmoor's failure to fulfill its contractual obligation to construct the temporary platform, nor can it quantify such damage. For these reasons, the Court concludes that Greenmoor is not liable to Burchick for $8,471.00 under Change Order No. 3.

### 2. *Change Order No. 6*

In this Change Order, Burchick seeks to recover its costs for two items: (i) overtime supervision and (ii) repairs to wind ties on the 15th and 18th floors.

The Court concludes that Burchick is not entitled to any damages for providing overtime supervision of Greenmoor's work. To begin, nothing in the Subcontract Agreement requires Greenmoor to pay for Burchick's supervision. The Court also notes that Greenmoor, as a general matter, is permitted to work around the clock. Although Burchick asserts that this added supervision occurred as part of Greenmoor's "Phase 3 abatement recovery plan," Burchick not only failed to offer evidence of the substance of this "abatement recovery plan" as it pertains to Burchick providing additional overtime supervision, but also failed to offer any evidence that Greenmoor agreed to compensate Burchick for overtime supervision as part of this recovery

plan.  Quite simply, Burchick failed to demonstrate with persuasive evidence that it incurred

overtime supervision costs as a result of Greenmoor's breach of the Subcontract Agreement.

   The Court additionally concludes that Greenmoor is not liable to Burchick for the costs

incurred in connection with the wind ties that were cut on the 15th and 18th floors.  Burchick

failed to establish with credible evidence the damages that it purports to have suffered as a result

of Greenmoor's conduct.  At best, the evidence upon which Burchick relies, e.g., Bryan

Mechanical's change order request, establishes that Greenmoor cut the wind ties on the 15th

floor, as Greenmoor did not perform any work on the 18th floor.  In its invoice, Bryan

Mechanical did not distinguish between the costs for repairing the wind ties on the two floors.

The Court finds that finds that the evidence is insufficient to establish the damages Burchick

suffered and, accordingly, is not entitled to recover $772.00 for the repairs to the cut wind ties

sought under Change Order No. 6.

### 3.   Change Order No. 7

   In Change Order No. 7, Burchick seeks, inter alia, two deductions from Greenmoor:  (i) a

deduction for the "construction of mini containment[s] and abatement to support out of phase

plumbing not performed in Phase 3" and (ii) a deduction for Bryan Mechanical's work in

providing and installing three fire dampers.  The Court concludes that Burchick is entitled to the

deduction for the fire dampers, but is not entitled to the deduction for the construction of the

mini-containments.

   The Court concludes that Greenmoor inappropriately removed the fire dampers, requiring

Burchick to incur additional costs in replacing them by having to obtain the services of Bryan

Mechanical.  The Court finds that Burchick established its damages with respect to work related

to the fire dampers.[25]  The Court, however, finds that Burchick has not established its entitlement

to the 12% mark-up of $105.00.  See supra.  As such, Burchick is entitled to recover a sum of

$872.00 from Greenmoor.

    As for the out of sequence plumbing, the Court concludes that Burchick cannot recover

this deduction because Burchick failed to establish its entitlement to the deduction.  Burchick

asserts that the deduction is for mini-containments Greenmoor did not have to construct in Phase

III, but does not explain how it arrived at the $12,300.00 amount it seeks.  Although Burchick

explained that it obtained this value from Greenmoor's schedule of values, it has not presented

the schedule of values upon which it relies.  More importantly, Burchick presented no evidence

of the out-of-sequence Greenmoor did not perform, or evidence that the value of such work

totaled $12,300.00.  Indeed, the only evidence presented to the Court concerning out-of-sequence

work that Greenmoor did not perform is the evidence pertaining to RFP-15, all of which suggests

that Greenmoor already has provided a credit (and thus, Burchick already has obtained a

deduction) for out-of-sequence work that it did not perform.  Specifically, in RFP-15, Greenmoor

proposed a credit for mini-containments that it did not have to construct.[26]  Quite simply,

Burchick has not established the reason for Change Order No. 7 or the amount sought therein.[27]

---

[25]     Greenmoor argued that the evidence upon which Burchick relies to establish this and other, similar claims
is unsubstantiated hearsay and, therefore, unreliable evidence.  The Court notes that Greenmoor did not
object to the admissibility of this evidence at trial and, therefore, has waived its ability to object to this
evidence on hearsay grounds at this stage.  In any event, the Court has considered the probative value of the
evidence proffered by Burchick in reaching its conclusions on Burchick's ability to recover the damages it
seeks.

[26]     Ultimately, an even greater credit of $12,982.00 was established for the mini-containments that Greenmoor
did not have to construct.  (Pl. Exs. 32, 426.)

[27]     The Court notes that the $12,300.00 deduction Burchick seeks through Change Order No. 7 is equivalent to
the $12,300.00 line item for out-of-sequence plumbing work that appears on Greenmoor's August, 2006
payment application.  On the payment application, Greenmoor represents that it completed 100% of the
out-of-sequence plumbing work and that this work is valued at $12,300.00.  As previously discussed,
Burchick did not pay the amounts due under this payment application because, among other things,
Greenmoor did not make any of Burchick's requested changes.  Notably, Burchick did not make any
changes to the $12,300.00 line item and Burchick admits that it owes Greenmoor money under the August,
2006 payment application.  Thus, it would seem that Burchick agrees that Greenmoor performed this work

For these reasons, the Court concludes that Burchick is not entitled to the $12,300.00 deduction it seeks under Change Order No. 7.

### 4.      *Change Order No. 8:  Masonry Repairs*

In Change Order No. 8, Burchick seeks $799.00 for masonry repairs that it had to make as a result of damage allegedly caused by Greenmoor.  Because Greenmoor authorized Burchick to complete this work on its behalf, the Court concludes that Burchick is entitled to recover the amounts it seeks under Change Order No. 8.  In addition, in light of Greenmoor's authorization, Greenmoor's argument that Burchick cannot establish that Greenmoor caused the damage that necessitated the repairs at issue in this Change Order is irrelevant.  Burchick is entitled to recover from Greenmoor a sum of $799.00 under Change Order No. 8.

### 5.      *Change Order No. 9*

In Change Order No. 9, Burchick, <u>inter alia</u>, seeks four separate deductions to Greenmoor's contract totaling $3,945.00.  The deductions Burchick seeks include:  (i) a backcharge for $841.00 for masonry repairs in the elevator lobby on the 14th floor; (ii) a deduction of $750.00 for demolition and abatement work that Greenmoor did not need to complete; (iii) a backcharge for $1,944.00 for repairs to elevator cables; and (iv) a deduction of $410.00 for adjustments to Greenmoor's billing.  Greenmoor agrees that Burchick is entitled to the deductions for $750.00 and $410.00, but disputes Burchick's backcharges for the masonry repairs and the repairs to the elevator cables.

The Court finds that Greenmoor authorized Burchick to complete the masonry repairs in the elevator lobby on the 14th Floor and, therefore, Burchick is entitled to recover this backcharge.  The Court, however, finds that Burchick is not entitled to recover for the repairs to

---

and is owed $12,300.00 for it.  To the extent that this is the case, Burchick is not entitled to the deduction it seeks in Change Order No. 7.

the elevator cables because Burchick failed to establish with persuasive evidence that Greenmoor caused this damage or should otherwise be held responsible for it.  Although Miller Electric indicated that the elevator cables were cut during abatement, there is no evidence that Greenmoor cut these cables.  To be sure, although the fact that the cables were cut "during abatement" raises a distinct possibility that Greenmoor – as the lone abatement subcontractor – was responsible for this damage, the evidence Burchick offers does not establish that Greenmoor was the only entity present on the premises "during abatement" at the time that the cables were cut such that the Court could infer that Greenmoor cut the cables.  Burchick failed to proffer sufficiently credible evidence that Greenmoor caused the damage at issue.  Greenmoor, therefore, is not liable for the $1,945.00 backcharge for the repairs to the elevator cables.

In sum, the Court concludes that Burchick is entitled to recover $2001.00 under Change Order No. 9.

### 6.    *Change Order No. 11*

In Change Order No. 11, Burchick seeks the following backcharges:  (i) $28,964.00 "to take over Floor 12 abatement work;" (ii) $2,643.00 "to demo[lish] damaged masonry and install a critical barrier at the Floor 16 elevator lobby;"(iii) $2,914.00 "to remove debris from the Floor 13 perimeter windows;" and (iv) $900.00 "to repair marble panels on Floor 16 at Elevator Lobby."  The Court concludes that Burchick is entitled to recover for all but the $2,643.00 backcharge for the work on the 16th floor elevator lobby.  As to this backcharge, the Court concludes that Burchick failed to establish with persuasive evidence that Greenmoor was responsible for the costs Burchick incurred in completing this work.

As for the backcharge or deduction for $28,694.00 to complete the 12th floor abatement work, the Court concludes that Burchick is entitled to this backcharge because it involved work that Greenmoor was supposed to complete under its Subcontract Agreement, but failed to

complete by the time Burchick exercised its right to terminate Greenmoor.  The Court, however, concludes that Burchick is not entitled to the 12% mark-up of $3,103.00.  See supra.

Burchick also seeks a backcharge or deduction from Greenmoor's contract in the amount of $2,914 (which includes a 12% mark-up) for asbestos removal from above the windows on the perimeter walls.  Because the Court finds that this work was within the scope of Greenmoor's perimeter wall work in the historically abated areas, the Court concludes that Burchick is entitled to this backcharge.  The Court, however, concludes that Burchick is not entitled to the 12% mark-up of $312.00.  See supra.

Finally, Burchick seeks $900.00 (which includes a 12% mark-up) for repairs to the marble panels as a result of damage caused by Greenmoor.  Greenmoor admits that it damaged the marble panels and that it owes Burchick money for the repairs, but disputes the 12% mark-up assessed by Burchick.  The Court concludes that, although Burchick is entitled to recover the cost of the marble repairs under Change Order No. 11 ($804.00), it is not entitled to the 12% mark-up ($96.00).

In sum, then, Burchick is entitled to recover $29,267.00 under Change Order No. 11.

### 7.    *Change Order No. 12*

In Change Order No. 12, Burchick seeks $4,306.00 owed for repairs that the GSA had to make for damage that Greenmoor caused to the loading dock.  The repairs cost a total of $3,845.00.  Burchick billed these costs to Greenmoor and added a 12% mark-up, resulting in a $4,306.00 change order.  Greenmoor admits that it damaged the loading dock and further admits that it owes Burchick money under the Change Order, but disputes the 12% mark-up assessed by Burchick.  Because Burchick has not established that it is entitled to be paid the mark-up, the Court concludes that Burchick is entitled to recover the repair costs under Change Order No. 12 ($3,845.00), but not the 12% mark-up ($461.00).

### 8.      *Change Order No. 13*

In Change Order No. 13, Burchick seeks $672.00 for the cost of recycling three lead

doors, which Greenmoor was contractually obligated to complete under RFP-145.  Burchick

backcharged Greenmoor after it had to obtain the services of PDG to complete this work.  The

evidence, however, reveals that Greenmoor voluntarily reduced its claim under RFP-145 – which

is represented on its July, 2006 payment application – by $699.00 to account for the fact that it

did not finish recycling the lead doors as required under RFP-145.  As such, Burchick has not

established that it suffered any compensable damages with respect to the lead doors.  Indeed, to

compel Greenmoor to pay Burchick what it seeks under this Change Order would result in

somewhat of a windfall to Burchick.  For these reasons, the Court concludes that Burchick is not

entitled to recover $672.00 under Change Order No. 13.

### 9.      *Change Order No. 14*

In Change Order No. 14, Burchick seeks $1,723.00 for work it had to complete for

Greenmoor, namely masonry repairs on the 16th Floor and plaster removal on the 13th Floor.

Greenmoor argues that Burchick did not establish that it caused the damage on the 16th floor or

that the plaster removal on the 13th floor was within its scope of work.  In support of its

argument, Greenmoor notes that it had completed abatement of the relevant floors well before

Burchick made the repairs.  The Court finds that the date Greenmoor completed its abatement

work is irrelevant to the issue of whether Greenmoor is responsible for the amounts at issue in

the Change Order.  In fact, the only evidence presented to the Court is work orders (or work

authorizations) that Burchick completed wherein Burchick notes that the work was "for

Greenmoor."  Unlike other work authorizations, however, these specific work authorizations are

not signed by Greenmoor.  Without more, however, there is nothing to permit an inference that

any of the work Burchick completed under this Change Order was as a result of Greenmoor's

breaches of the Subcontract Agreement.  As such, Greenmoor is not liable for the backcharge of $1,723.00 under Change Order No. 14.

### B.        Shaft and Duct Work

Burchick seeks to recover $102,876.70 for costs that it incurred "for the removal of duct work from the shafts for the phases that Greenmoor did not do the work."  Burchick essentially seeks to recover the extra costs it incurred in having to complete work Greenmoor would have done had it not been terminated, but that PDG did not do despite taking over Greenmoor's contract.  Burchick met its obligations to mitigate its damages after it terminated Greenmoor by obtaining the services of PDG as the replacement subcontractor.  PDG agreed to do the balance of Greenmoor's work on the Moorhead Project for the balance of the value of Greenmoor's contract.  Despite agreeing to do the remaining work for the same price as Greenmoor, it expressly did not agree to perform the shaft duct work within that price even though the shaft duct work was part of the work remaining in Greenmoor's contract.  In fact, PDG offered to do the shaft duct work for an additional cost.  Burchick, then, was forced to expend its own money and resources – above and beyond what it would have spent had Greenmoor not breached – to complete the shaft duct work.  The Court finds that although PDG took over Greenmoor's contract, the demolition of duct work in the shafts was not within PDG's scope of work.  For these reasons, the Court concludes that Greenmoor is liable to Burchick for the costs Burchick incurred in having to complete those portions of the Moorhead Project that it originally subcontracted to Greenmoor.

In conclusion, of the approximately $387,803.47[28] in damages Burchick seeks under its counterclaim, the Court concludes that Burchick is entitled to recover $139,660.77.

---

[28]        This sum does not include the nearly $800,000.00 Burchick claims in attorneys' fees.

VI.    **CONCLUSION**

For all the reasons stated above, the Court concludes that Burchick did not breach the Subcontract Agreement by terminating Greenmoor from the Moorhead Project.  The Court also concludes that Burchick breached the Escrow Agreement by failing to release the escrowed funds to Greenmoor.  The Court additionally concludes that Greenmoor may recover the escrowed funds, the sums Burchick acknowledges are owed under the unpaid payment applications, and the costs Greenmoor incurred in completing certain of extra work on the Moorhead Project as discussed herein.  Finally, the Court concludes that Burchick may recover the costs for work that Greenmoor either did not complete or that Burchick or another entity completed on Greenmoor's behalf as set forth herein.

The Court defers ruling on either party's claim for attorneys' fees pending the parties' briefing on their respective ability to recover attorneys' fees and the extent of any such recovery. Renewed motions and briefing on the issue of attorneys' fees are due on or before January 8, 2010.[29]

Accordingly, the Court finds in favor of Burchick on Greenmoor's breach of contract claims arising under the Subcontract Agreement.  The Court finds in favor of Greenmoor on its breach of contract claim arising under the Escrow Agreement.  A monetary judgment will be entered in favor of Greenmoor in the amount of $518,638.20 plus interest as set forth above.  A monetary judgment will be entered in favor of Burchick in the amount of $139,660.70.

---

[29]    Pursuant to Federal Rule 58, the parties' time to appeal the final Judgment Order will be extended until thirty days after the Court's adjudication of the parties' motions, if any, for attorneys' fees.  See Bennett v. City of Holyoke, 362 F.3d 1, 4 (1st Cir. 2004) (approving this approach).

THESE FINDINGS AND CONCLUSIONS ARE SO ENTERED.


s/ Cathy Bissoon
Cathy Bissoon
U.S. Magistrate Judge

December 4, 2009

cc (via email):

Thomas C. Gricks, III, Esq.
John K. Gisleson, Esq.
D. Matthew Jameson, III, Esq.
Kurt F. Fernsler, Esq.